Ashley E. Littlefield (SBN 281027)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Tel: (415) 439-1400 / Fax: (415) 439-1400
ashley.littlefield@kirkland.com

Craig S. Primis, P.C. (admitted *pro hac vice*)
K. Winn Allen, P.C. (admitted *pro hac vice*)
Ronald K. Anguas, Jr. (admitted *pro hac vice*)
Katherine H. Epstein (admitted *pro hac vice*)
James Y. Xi  (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel:  (202) 389-5000 / Fax: (202) 389-5200
craig.primis@kirkland.com
winn.allen@kirkland.com
ronald.anguas@kirkland.com
kate.epstein@kirkland.com
james.xi@kirkland.com

*Attorneys for Defendants Meta Platforms, Inc.*
*and Mark Zuckerberg*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| DONALD J. TRUMP, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., et al.,<br><br>Defendants. | Case No. 4:21-cv-09044-JSW<br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF DONALD J. TRUMP'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hon. Jeffrey S. White |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 1

LEGAL STANDARD ........................................................................................................... 4

ARGUMENT ....................................................................................................................... 5

I.      MR. TRUMP IS UNLIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS. ........... 5

     A.    Mr. Trump Is Unlikely To Succeed On His First Amendment Claim. ........................ 5

          1.    Mr. Trump Has Not Demonstrated Government Compulsion. ....................... 5

          2.    Section 230 Does Not Turn Meta Into A State Actor. ................................... 9

          3.    Mr. Trump Has Not Demonstrated Joint Action. ........................................ 10

          4.    The First Amendment Precludes Mr. Trump's Requested Relief. ................. 12

     B.    Mr. Trump Is Unlikely To Succeed On His Claim That Section 230 Is
Unconstitutional. ................................................................................................... 14

     C.    Mr. Trump Is Unlikely To Succeed On His State Law Claims. ................................ 15

II.     MR. TRUMP CANNOT SATISFY THE REMAINING PRELIMINARY
INJUNCTION FACTORS. .................................................................................................. 17

CONCLUSION .................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abu-Jamal v. Nat'l Pub. Radio*,
   1997 WL 527349 (D.D.C. Aug. 21, 1997) ..................................................................6

*Agency for International Development*
   *v. Alliance for Open Society International, Inc.*,
   570 U.S. 205 (2013) ...................................................................................................12

*Am. Freedom Def. Initiative v. Lynch*,
   217 F. Supp. 3d 100 (D.D.C. 2016) ...........................................................................14

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999) ...................................................................................................5, 7

*Associated Press v. Otter*,
   682 F.3d 821 (9th Cir. 2012) .....................................................................................19

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015) .......................................................................................8

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) .......................................................................................................8

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ...................................................................................16

*Bendiburg v. Dempsey*,
   909 F.2d 463 (11th Cir. 1990) ...................................................................................11

*Blum v. Yaretsky*,
   457 U.S. 991 (1982) .....................................................................................................9

*Brentwood Academy v. Tennessee Secondary School Athletic Association*,
   531 U.S. 288 (2001) ...................................................................................................11

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ...................................................................................................19

*Caribbean Marine Servs. Co., Inc. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) .....................................................................................18

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*,
   827 F.2d 1291 (9th Cir. 1987) .................................................................................7, 8

*Children's Health Def. v. Facebook Inc.*,
    2021 WL 2662064 (N.D. Cal. June 29, 2021) ................................................6, 9, 11

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985)..................................................................................17

*Daniels v. Alphabet Inc.*,
    2021 WL 1222166 (N.D. Cal. Mar. 31, 2021)......................................................6, 7

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
    518 U.S. 727 (1996) ..............................................................................................13

*Diversified Silicone Prod. Corp. v. Elastapro Silicone Sheeting LLC*,
    2020 WL 4390380 (C.D. Cal. May 19, 2020) ......................................................17

*Divino Grp. LLC v. Google LLC*,
    2021 WL 51715 (N.D. Cal. Jan. 6, 2021) ..........................................................9, 14

*Doe v. Google LLC*,
    2021 WL 4864418 (N.D. Cal. Oct. 19, 2021)......................................................7, 11

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014) ................................................................................19

*Donald J. Trump for President, Inc. v. Way*,
    492 F. Supp. 3d 354 (D.N.J. 2020) .......................................................................18

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975)...............................................................................................14

*Edge v. City of Everett*,
    929 F.3d 657 (9th Cir. 2019) ................................................................................17

*Fed. Agency of News LLC v. Facebook, Inc.*,
    432 F. Supp. 3d 1107 (N.D. Cal. 2020) ................................................................11

*Focus on the Family v. Pinellas Suncoast Transit Auth.*,
    344 F.3d 1263 (11th Cir. 2003) ............................................................................12

*Fyk v. Facebook, Inc.*,
    2019 WL 11288576 (N.D. Cal. June 18, 2019)......................................................16

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) (en banc) ..............................................................5, 17

*George v. Edholm*,
    752 F.3d 1206 (9th Cir. 2014) ................................................................................8

*Hamama v. Adduci*,
    946 F.3d 875 (6th Cir. 2020) ................................................................................14

*Hammerhead Enters., Inc. v. Brezenoff*,
   707 F.2d 33 (2d Cir. 1983) .................................................................................8

*Hanginout, Inc. v. Google, Inc.*,
   54 F. Supp. 3d 1109 (S.D. Cal. 2014) ................................................................18

*Heineke v. Santa Clara Univ.*,
   965 F.3d 1009 (9th Cir. 2020) ............................................................................5

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995) ..................................................................................13, 14

*Int'l Ass'n of Plumbing & Mech. Offs. v. Int'l Conf. of Bldg. Offs.*,
   79 F.3d 1153, (9th Cir. 1996) ...........................................................................17

*Jackson v. Metropolitan Edison Co.*,
   419 U.S. 345 (1974) ...........................................................................................9

*La'Tiejira v. Facebook, Inc.*,
   272 F. Supp. 3d 981 (S.D. Tex. 2017) ...............................................................13

*Langdon v. Google, Inc.*,
   474 F. Supp. 2d 622 (D. Del. 2007) ..................................................................13

*Lewis v. Google LLC*,
   851 F. App'x 723 (9th Cir. 2021) ......................................................................14

*Manhattan Cmty. Access Corp. v. Halleck*,
   139 S. Ct. 1921 (2019) ...........................................................................5, 12, 19

*Miami Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974) ....................................................................................12, 13

*NetChoice, LLC v. Moody*,
   2021 WL 2690876 (N.D. Fla. June 30, 2021)
   (11th Cir.) ......................................................................................13, 16, 17

*NetChoice, LLC v. Paxton*,
   2021 WL 5755120 (W.D. Tex. Dec. 1, 2021) ...................................................13

*Newman v. Google LLC*,
   2021 WL 2633423 (N.D. Cal. June 25, 2021) ...............................................9, 14

*Norwood v. Harrison*,
   413 U.S. 455 (1973) ...........................................................................................8

*O'Handley v. Padilla*,
   2022 WL 93625 (N.D. Cal. Jan. 10, 2022) ...................................................13, 14

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
762 F.2d 1374 (9th Cir. 1985) ..................................................................17

*Okwedy v. Molinari*,
333 F.3d 339 (2d Cir. 2003)......................................................................8

*Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n*,
475 U.S. 1 (1986)............................................................................12, 13

*Pasadena Republican Club v. W. Just. Ctr.*,
985 F.3d 1161 (9th Cir. 2021) ...................................................................10

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
55 F. Supp. 2d 1070 (C.D. Cal. 1999) ..........................................................18

*Putz v. Schwarzenegger*,
2010 WL 1838717 (N.D. Cal. May 5, 2010) ....................................................17

*Railway Employees' Department v. Hanson*,
351 U.S. 225 (1956)..........................................................................9, 10

*Rawson v. Recovery Innovations, Inc.*,
975 F.3d 742 (9th Cir. 2020) ....................................................................12

*Rendell-Baker v. Kohn*,
457 U.S. 830 (1982)..............................................................................9

*Rent-A-Center, Inc. v. Canyon Television. & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991) ....................................................................18

*Rowe v. City of Ft. Lauderdale*,
279 F.3d 1271 (11th Cir. 2002) ..................................................................12

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
547 U.S. 47 (2006)..............................................................................13

*Skinner v. Railway Labor Executives' Association*,
489 U.S. 602 (1989)..............................................................................9

*Sun v. Girardot*,
237 F. App'x 415 (11th Cir. 2007) ................................................................12

*Sutton v. Providence St. Joseph Med. Ctr.*,
192 F.3d 826 (9th Cir. 1999) ..................................................................6, 8

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943).............................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)................................................................................4

*Wooley v. Maynard*,
   430 U.S. 705 (1977)............................................................................................12

*Writers Guild of Am., W., Inc. v. FCC*,
   423 F. Supp. 1064 (C.D. Cal. 1976), (9th Cir. 1979) ......................................8

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ............................................................................9

*Zhang v. Baidu.com*,
   10 F. Supp. 3d 433 (S.D.N.Y. 2014)...............................................................13

*Zhou v. OutFront Media*,
   2020 WL 9037147 (N.D. Cal. May 26, 2020) ..................................................7

*Zlotnick v. Premier Sales Grp., Inc.*,
   480 F.3d 1281 (11th Cir. 2007) ......................................................................15

**Statutes**

47 U.S.C. §230(c) ................................................................................... *passim*

47 U.S.C. §230(c)(1).........................................................................................16

47 U.S.C. §230(c)(2).................................................................................16, 17

47 U.S.C. §230(c)(2)(A) ..................................................................................17

Fla. Stat. § 501.2041(2)(b)...........................................................................4, 15

1

## INTRODUCTION

2      Meta suspended former President Donald J. Trump's Facebook account more than a year ago

3  for violating its policy prohibiting praise of people engaged in violence.  Nine months after that

4  decision (and three months after initially filing suit), Mr. Trump filed a preliminary injunction motion

5  asking this Court to order Meta to reinstate his account.  The Court should deny Mr. Trump's request

6  for injunctive relief, as Mr. Trump is unlikely to succeed on the merits of any of his claims.  Mr. Trump

7  asserts that Meta violated the First Amendment by removing his posts from Facebook, but that claim

8  fails because the First Amendment prohibits only the *government* from restricting speech.  It does not

9  apply to editorial judgments made by private entities such as Meta.  Rather, as courts have held

10 repeatedly, the First Amendment *protects* a private entity's editorial decisions about what content to

11 leave up and take down.  Mr. Trump is also unlikely to succeed on his claim under the Florida

12 Deceptive and Unfair Trade Practices Act ("FDUTPA").  That claim is barred by the choice-of-law

13 provision in Meta's Terms of Service, and even if it were not, Mr. Trump has identified no violation

14 of the statute on its own terms.  Finally, Mr. Trump is unlikely to succeed on his claim under Florida

15 Senate Bill 7072.  That law does not apply to conduct before July 1, 2021, and Meta suspended Mr.

16 Trump several months earlier in January 2021.  And in all events, the law violates the First Amendment

17 and is preempted, as a district court in Florida recently held.

18      An injunction is all the more inappropriate because of the lopsided equities here.  Meta will

19 suffer an imminent loss of First Amendment rights if it is required to disseminate Mr. Trump's speech

20 against its will.  On the other hand, Mr. Trump will not suffer any imminent, irreparable injury in the

21 absence of an injunction.  Indeed, Mr. Trump's failure to seek a preliminary injunction until *nine*

22 *months* after Meta initially suspended him from its platform confirms there is no threat of imminent,

23 irreparable harm.  That alone is sufficient to deny him the extraordinary remedy of a preliminary

24 injunction.  For these reasons and those that follow, the Court should deny Mr. Trump's motion.

25

## BACKGROUND

26      Meta operates several online services and applications, including Facebook.  July 27, 2021

27 Am. Class Action Complaint, ECF No. 16 ("Am. Compl.") ¶ 32.  Facebook users can share content

28 on Facebook and interact with it.  That content is diverse and substantial: it is generated by billions of

users located throughout the world, uploaded in a variety of media formats, and spans substantively the entire range of human thought. *See id.* ¶¶ 2, 31.

Meta has invested years and significant resources into developing standards and policies to moderate the user-created content on its service. While Meta "wants people to be able to talk openly about the issues that matter to them," it also recognizes that "the internet creates new and increased opportunities for abuse." *Community Standards*, Decl. of Michael Duffey ("Duffey Decl."), Ex. A. It therefore restricts several categories of content. Meta prohibits, for example, content that "incites or facilitates serious violence," *Violence and Incitement*, Duffey Decl., Ex. B, or "praises, substantively supports, or represents … violent events," *Dangerous Individuals and Organizations*, Duffey Decl., Ex. D. And it "may suspend or permanently disable" accounts that "have clearly, seriously or repeatedly" breached Meta's policies. *Terms of Service*, Duffey Decl., Ex. G. Meta's policies are explained in Facebook's Community Standards, which users agree to abide by under Facebook's Terms of Service.

After the media called the 2020 presidential election for Joe Biden, then-President Trump challenged its legitimacy. Thousands of people gathered in Washington, D.C., on January 6, 2021, to protest the results. During those protests, President Trump's supporters forcibly entered the Capitol Building in an attempt to disrupt a joint session of Congress. As that crisis unfolded, President Trump posted a video on Facebook, where he stated: "I know your pain. I know you're hurt. We had an election that was stolen from us. It was a landslide election, and everyone knows it, especially the other side, but you have to go home now. We have to have peace … We love you. You're very special. You've seen what happens. You see the way others are treated that are so bad and so evil. I know how you feel. But go home and go home in peace." Facebook Oversight Board, Decision 2021-001-FB-FBR (May 5, 2021), Declaration of Ronald K. Anguas, Jr. ("Anguas Decl."), Ex. C at 2.

Meta removed that post for violating its policy against praising violent events. Less than an hour later, President Trump posted a written statement on Facebook: "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace. Remember this day forever!" *Id.* Meta removed that post, too, and blocked President Trump from

posting on Facebook for 24 hours.  *Id.*  In explaining its decision, Meta stated: "Let us speak for the leadership team in saying what so many of us are feeling.  We are appalled by the violence at the Capitol today.  We are treating these events as an emergency."  *Our Response to the Violence in Washington* (Jan. 6, 2021), Anguas Decl., Ex. A.  Accordingly, Meta "removed from Facebook and Instagram the recent video of President Trump speaking about the protests and his subsequent post about the election results."  *Id.*  In Meta's view, Mr. Trump's posts "contribute to, rather than diminish, the risk of ongoing violence."  *Id.*

On January 7, after further reviewing President Trump's posts, his communications off Facebook, and additional information about the severity of the violence at the Capitol, Meta extended the block "indefinitely and for at least the next two weeks."  *Our Response to the Violence in Washington* (Jan. 6, 2021), Anguas Decl., Ex. A.  Meta's CEO, Mark Zuckerberg, explained: "Over the last several years, we have allowed President Trump to use our platform consistent with our own rules, at times removing content or labeling his posts when they violate our policies.  We did this because we believe that the public has a right to the broadest possible access to political speech, even controversial speech."  *Id.*.  The "current context," however, "is now fundamentally different, involving use of our platform to incite violent insurrection against a democratically elected government."  *Id.*  In Meta's view, Mr. Trump's "decision to use his platform to condone rather than condemn the actions of his supporters at the Capitol building has rightly disturbed people in the US and around the world.  We removed these statements yesterday because we judged that their effect— and their likely intent—would be to provoke further violence."  *Id.*

Meta then referred Mr. Trump's case to the Oversight Board, an independent body voluntarily created by Meta to review its editorial judgments.  *Referring Former President Trump's Suspension From Facebook to the Oversight Board* (Jan. 21, 2021), Anguas Decl., Ex. B.  The Board agreed that the two posts by President Trump on January 6 violated Meta's Community Standards.  The Board found that "We love you.  You're very special" in the first post and "great patriots" and "remember this day forever" in the second post violated Meta's policy prohibiting praise of people engaged in violence.  Facebook Oversight Board, Case Decision 2021-001-FB-FBR (May 5, 2021), Anguas Decl., Ex. C at 3.  The Board also found that, given the President's position and his far-reaching influence,

his posts legitimized the ongoing violence at the Capitol and risked exacerbating it. *See id.* Given the gravity of the violations, the Board concluded that Meta was justified in suspending Mr. Trump's accounts on January 6 and extending that suspension on January 7. *See id.* Meta later revisited the duration of Mr. Trump's suspension and set it for a period of two years, subject to certain enumerated conditions required for reinstatement. *In Response to Oversight Board, Trump Suspended for Two Years; Will Only Be Reinstated if Conditions Permit* (June 4, 2021), Anguas Decl., Ex. D.

On July 7, 2021—six months after Meta initially suspended his account—President Trump and four other individuals commenced this putative class action against Meta and its CEO, Mark Zuckerberg. They filed an Amended Complaint a few weeks later that added plaintiffs and two state law claims. The Amended Complaint alleges that (1) Meta violated Plaintiffs' First Amendment rights by suspending their accounts and removing their posts; (2) Section 230 of the Communications Decency Act is unconstitutional; (3) Meta violated the Florida's Deceptive and Unfair Trade Practices Act by representing that Meta applies "objective, uniform standards by which content may be censored"; and (4) Meta violated Florida Senate Bill 7072, 2021 Leg. (Fla. 2021), a law enacted in May 2021 (and enjoined a month later) that requires certain social media services to "apply censorship, deplatforming, and shadow banning standards in a consistent manner," Fla. Stat. § 501.2041(2)(b). Am. Compl. ¶¶ 187-245. Mr. Trump did not file a motion for preliminary injunction with either of the complaints. Instead, Mr. Trump waited until October 7, 2021—nine months after Meta suspended him from its platform and three months after filing his initial complaint—to file a motion for a preliminary injunction asking the Court to order Meta to reinstate his access to Facebook. He also asks for an order "[e]njoining and declaring that Section 230(c) of the Communications Decency Act of 1996 is unconstitutional as applied to the facts of this case." Oct. 7, 2021 Mot. for Prelim. Inj. with Mem. of Law In Supp. of Pl.'s Mot., ECF No. 78 ("PI Mot.") at 29.

## LEGAL STANDARD

To obtain the "extraordinary remedy" of a preliminary injunction, a plaintiff must establish that (1) he is likely to succeed on the merits of his claims, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The plaintiff's

burden is "doubly demanding" where, as here, he seeks to upend the status quo rather than preserve it. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). In that circumstance, the plaintiff "must establish that the law and facts *clearly favor* [his] position, not simply that [he] is likely to succeed." *Id.* Injunctions that modify the status quo "should not issue in 'doubtful cases.'" *Id.*

## ARGUMENT

## I.    MR. TRUMP IS UNLIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.

### A.    Mr. Trump Is Unlikely To Succeed On His First Amendment Claim.

Mr. Trump's First Amendment claim fails because Meta is a private entity. The First Amendment "prohibits only *governmental* abridgment of speech," not "*private* abridgment of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). As the Supreme Court has explained, when "a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment." *Id.* at 1930. Courts "begin with the presumption that private conduct does not constitute governmental action." *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1012 (9th Cir. 2020) (quotation marks omitted). That presumption may be overcome in just "a few limited circumstances," such as when a private actor performs a "traditional, exclusive public function," when the government "compels the private entity to take a particular action," and when the government "acts jointly with the private entity." *Halleck*, 139 S. Ct. at 1928.

Mr. Trump argues that Meta is a governmental actor for three reasons. *First*, Mr. Trump contends that Meta's decision to suspend his account is state action because certain elected officials pressured Meta to do so. *Second*, Mr. Trump claims that Congress encouraged Meta to suspend his account by passing Section 230 of the Communications Decency Act. And *third*, Mr. Trump claims that Meta acted jointly with the Centers for Disease Control and Prevention ("CDC") and the Biden Administration to suspend his account. Courts in this District (and others) have rejected each of those theories many times over, including with respect to Meta and companies like it. *See* Mot. to Dismiss at 4 n.2 (collecting cases). There is no reason for a different outcome here.

### 1.    Mr. Trump Has Not Demonstrated Government Compulsion.

The key question under the government compulsion test is "whether the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice

1    must in law be deemed to be that of the State.'"  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52

2    (1999) (citation omitted).  Mr. Trump argues that Meta's decision to suspend his account should be

3    attributed to the government because various Democratic members of Congress compelled Meta to do

4    so.  *See* PI Mot. at 6-8.  As explained in Meta's motion to dismiss, that argument fails for two

5    independent reasons.  *First*, Mr. Trump cannot rely on statements from individual legislators and non-

6    governmental actors to turn private decisions into state action.  *See Daniels v. Alphabet Inc.*, 2021 WL

7    1222166, at *7 (N.D. Cal. Mar. 31, 2021); *Abu-Jamal v. Nat'l Pub. Radio*, 1997 WL 527349, at *6

8    (D.D.C. Aug. 21, 1997), *aff'd*, 159 F.3d 635 (D.C. Cir. 1998); *see also* Mot. to Dismiss at 5-6.  And

9    *second*, Mr. Trump has not pointed to any statement that coerced or significantly encouraged Meta to

10   take action against his *specific* posts or his *specific* account.  *See* Mot. to Dismiss at 6-8.

11          Nothing in Mr. Trump's preliminary injunction motion changes those conclusions.  Mr. Trump

12   cites a handful of statements from various members of Congress and then-candidate Joe Biden that

13   were not included in the Amended Complaint.  *See* PI Mot. at 8; Decl. of  Samantha Ferrera, ECF No.

14   87-2  ("Ferrara Decl.") ¶¶ 30-35, 39-41.  But Mr. Trump cannot rely on statements from individual

15   members of Congress or private parties to turn private decisions into state action.  *See Daniels*, 2021

16   WL 1222166, at *6-7; *Abu-Jamal*, 1997 WL 527349, at *4-6.  And in all events, Mr. Trump still has

17   not identified any statement that purported to coerce or significantly encourage Meta to take action

18   against his specific account.  *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 843 (9th

19   Cir. 1999) (no state action where plaintiff failed to allege that "the government directed a specific

20   entity to take a specific (allegedly unconstitutional) action against a specific person").  The vast

21   majority of statements identified in the preliminary injunction motion simply call for reforms to

22   Section 230 or call on social media companies to do a better job of exercising their editorial judgment

23   as a general matter.  *See, e.g.*, PI Mot. at 8 ("Speaker of the House Nancy Pelosi warned that a 'new

24   era' of regulating social media was coming and that Section 230 could be 'in jeopardy.'"); *id.*

25   ("Chairman Frank Pallone … revealed that a principal topic of the hearing was the 'role' of 'Facebook,

26   Google, and Twitter' in 'spreading disinformation' and extremism.").  They do not direct Meta to take

27   specific action against Mr. Trump's posts or his account and therefore do not meet the standard for

28   government compulsion.  *See Children's Health Def. v. Facebook Inc.*, 2021 WL 2662064, at *15

(N.D. Cal. June 29, 2021), *appeal docketed*, No. 21-16210 (9th Cir.) ("CHD does not allege that Schiff (or anyone from the government) directed Facebook or Zuckerberg to take any specific action with regard to CHD or its Facebook page."); *Doe v. Google LLC*, 2021 WL 4864418, at *3 (N.D. Cal. Oct. 19, 2021) (similar), *appeal docketed* No. 21-16934 (9th Cir.); *Daniels*, 2021 WL 1222166, at *6 (similar).

Mr. Trump points to just two new statements that were not included in the Amended Complaint that even mention his account, one from Senator Richard Blumenthal and one from Representative Frank Pallone.[1]  Each statement—which was made by an individual member of Congress who alone possesses no legislative authority—falls well short of the "coercion" or "significant encouragement" necessary to turn Meta's decision into governmental action.  *Sullivan*, 526 U.S. at 52.  Neither statement threatens to impose sanctions on Meta for failing to suspend Mr. Trump's account.  As courts in this District have held, mere "call[s] for" private parties to take certain action are not enough. *Zhou v. OutFront Media*, 2020 WL 9037147, at *2 (N.D. Cal. May 26, 2020), *aff'd*, No. 21-15554 (9th Cir. Jan. 14, 2022).  And even if the statements could somehow be interpreted as threatening "catastrophic legislative and/or regulatory consequences," PI Mot. at 8, courts in this District have squarely rejected the notion that such "speculative" threats by individual members of Congress are enough to turn a private platform's editorial judgments into state action.  *See Doe*, 2021 WL 4864418, at *3 (threatened "repeal of CDA Section 230 protections, 'show trials' in front of the U.S. Senate, and a DOJ antitrust suit" not sufficient to turn private decision into state action); *see also* Mot. to Dismiss at 8.

Mr. Trump cites just a single case that holds a private party liable as a state actor based on pressure from government officials.  *See Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987).  That case was decided more than three decades ago and, in all events,

---

[1] On October 28, 2020, Senator Blumenthal stated: "I want to know whether you have a plan Facebook, Twitter, Google, a plan, if the President uses your platforms to say on the day of the election that there is rigging or fraud without any basis in evidence."  Ferrera Decl. ¶ 39, Ex. BB.  And on January 6, 2021, Representative Pallone tweeted: "Enough is enough!  Trump is inciting violence and spreading dangerous misinformation that is undermining our democracy and our way of life.  Social media continues to amplify his anti-democratic rhetoric.  It's time for @jack and Mark Zuckerberg to remove Trump from their platforms."  *Id.* ¶ 43, Ex. H.

Mr. Trump's reliance on it is misplaced. In *Carlin Communications*, a *prosecutor* threatened to bring *criminal charges* against a private party if it did not comply with the prosecutor's demands. *Id.* at 1295. The private party unsurprisingly complied. *Id.* Only in that context did the court find that the state "exercised coercive power" over the private party "and thereby converted its otherwise private conduct into state action." *Id.* There is nothing like that here. Neither Senator Blumenthal nor Representative Pallone threatened to impose sanctions (let alone criminal sanctions) on Meta for failing to remove Mr. Trump's posts or suspend Mr. Trump's account. Nor could they, as they are individual members of Congress who do not possess any legislative authority on their own.

The rest of Mr. Trump's cases are just as far afield. *See* PI Mot. at 5-7, 11. *Norwood*, *Bantam Books*, *George*, *Backpage.com*, *Okwedy*, *Hammerhead Enterprises*, and *Writers Guild of America* all involved lawsuits against *government officials or entities*, not private parties.[2] Those cases hold that *the government* can violate the U.S. Constitution when it threatens to sanction a private party for refusing to act on its behalf, such as by threatening prosecution. They say nothing about when pressure from a government official renders *private parties* liable under the First Amendment. In fact, the Ninth Circuit has squarely distinguished cases that seek to hold government officials liable under the First Amendment for threatening to sanction a private party for its speech and cases that seek to hold private parties liable under the First Amendment for actions taken because of such threats. It has explained that, in the ordinary case, "only the state actor, and not the private party should be held liable for the constitutional violation that resulted from the state compulsion." *See Sutton*, 192 F.3d at 838-43. After all, "[w]hen the state compels a private party" to do something, "it is the state action, not the private conduct, which is unconstitutional." *Id.* "A private party in such a case is 'left with no choice of his own' and consequently should not be deemed liable." *Id.* (alteration omitted). Mr. Trump's cases have no relevance here.

---

[2] *Norwood v. Harrison*, 413 U.S. 455 (1973), *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), *George v. Edholm*, 752 F.3d 1206 (9th Cir. 2014); *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003), *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983), and *Writers Guild of Am., W., Inc. v. FCC*, 423 F. Supp. 1064, 1150 (C.D. Cal. 1976), *vacating judgment*, 609 F.2d 355 (9th Cir. 1979).

1             **2.**        **Section 230 Does Not Turn Meta Into A State Actor.**

2         Mr. Trump argues that Meta's decision to suspend him is state action because Congress

3 encouraged Meta to do so by passing Section 230 of the Communications Decency Act in 1996, years

4 before Meta was launched. *See* PI Mot. at 9-11. That argument fails because Section 230 does not

5 encourage Meta to take content down any more than it encourages Meta to leave content up. Section

6 230's immunity provisions apply either way. *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th

7 Cir. 1997) (explaining that Section 230 bars suits "seeking to hold a service provider liable for its

8 exercise of a publisher's traditional editorial functions—such as deciding whether to *publish,*

9 *withdraw,* postpone or alter content" (emphasis added)); *see also* Mot. to Dismiss at 8-9. Because the

10 government has not "put its own weight on the side of the proposed practice," *Jackson v. Metropolitan*

11 *Edison Co.*, 419 U.S. 345, 357 (1974), Meta's decision to suspend Mr. Trump cannot be attributed to

12 the government. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 841-42 (1982); *Blum v. Yaretsky*, 457 U.S.

13 991, 1008-09 (1982).

14         Mr. Trump's citation to *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602

15 (1989), is not to the contrary. In that case, the Supreme Court held that breath and urine tests conducted

16 by private railroads constituted state action for Fourth Amendment purposes. The Court explained

17 that the federal government "did more than adopt a passive position toward the underlying private

18 conduct," as it issued regulations that "removed all legal barriers" to testing, expressed a "strong

19 preference" for the testing, and allowed the government to "share the fruits" of the intrusions. *Id.* at

20 615. There is nothing of that sort here. Section 230 protects Meta from lawsuits regardless whether

21 it removes Mr. Trump's posts and account or leaves them up. Far from expressing a "strong

22 preference" for removal, Section 230 is "passive"; it does not express a preference either way. *See*

23 *CHD*, 2021 WL 2662064, at *13-14 (distinguishing *Skinner*); *Newman v. Google LLC*, 2021 WL

24 2633423, at *9-10 (N.D. Cal. June 25, 2021) (same); *Divino Grp. LLC v. Google LLC*, 2021 WL

25 51715, at *6 (N.D. Cal. Jan. 6, 2021) (same).

26         *Railway Employees' Department v. Hanson*, 351 U.S. 225 (1956), is also inapposite. In that

27 case, the plaintiffs sued their employer and their union, alleging that the union shop agreement between

28 the two violated state law. *Id.* at 228. The defendants argued in response that the Railway Labor Act,

a federal statute, preempted state law. *Id.* The question at the Supreme Court was whether the Railway Labor Act violated the First Amendment and the Due Process Clause, not whether the private union shop agreement did. *Id.* at 238. There was no state action problem in *Hanson* because the enactment of a federal statute is unquestionably state action. Here, by contrast, Mr. Trump challenges Meta's decision to suspend him from Facebook. *Hanson* has nothing to say about whether that decision can be attributed to the state.

### 3.    Mr. Trump Has Not Demonstrated Joint Action.

Mr. Trump's third theory is that Meta's decision to suspend him is state action because Meta participated in "joint activity" with the CDC and the "Biden Administration" to combat the spread of misinformation about COVID-19 and vaccines. PI Mot. at 11. That argument lacks merit. To demonstrate state action under the joint activity test, Mr. Trump must show that Meta and the government were "inextricably intertwined" in deciding to suspend his *specific* account and to remove his *specific* posts. *Pasadena Republican Club v. W. Just. Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021); *see also* Mot. to Dismiss at 10. Mr. Trump comes nowhere close to meeting that standard. For one thing, Meta did not suspend Mr. Trump following any COVID-19 or vaccine-related posts. Rather, it suspended Mr. Trump for praising violence during the January 6 Capitol riot. *See Referring Former President Trump's Suspension From Facebook to the Oversight Board*, Anguas Decl., Ex. B ("Our decision to suspend then-President Trump's access was taken in extraordinary circumstances: a US president actively fomenting a violent insurrection designed to thwart the peaceful transition of power; five people killed; legislators fleeing the seat of democracy. This has never happened before—and we hope it will never happen again. It was an unprecedented set of events which called for unprecedented action."). Mr. Trump has not pointed to anything suggesting that the CDC or the "Biden Administration" (which took office only after Meta suspended Mr. Trump) had anything to do with that decision.

Elsewhere in his motion, Mr. Trump asserts that Meta "censored" his posts in June and August 2020 for spreading misinformation regarding COVID-19. PI Mot. at 11; Ferrera Decl. ¶¶ 24-25. Those assertions do not entitle Mr. Trump to an injunction reinstating his account. Meta did not suspend Mr. Trump from Facebook in June or August 2020. At most, Meta removed some of his posts

1  from that time period or attached warnings to them.  *See* Ferrara Decl. ¶¶ 24-25.  But more

2  fundamentally, Mr. Trump fails to demonstrate that the government and Meta were "inextricably

3  intertwined" in making those decisions.  The best Mr. Trump can muster is a statement from the CDC

4  that "it acts with 'social media' 'partners' to 'curb the spread of vaccine information.'"  PI Mot. at 12.

5  But courts in this District have held repeatedly that such statements are inadequate to demonstrate

6  joint action.  *See CHD*, 2021 WL 2662064, at *12 (explaining that "simply alleging that Facebook and

7  the CDC are 'working together' or 'partnering' to curb the spread of 'vaccine misinformation' does

8  not allege that the *specific acts* challenged in this lawsuit were made pursuant to a CDC policy"

9  (emphasis added)); *see also Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1126

10  (N.D. Cal. 2020) (finding "no joint action because Plaintiffs fail to allege specific facts establishing

11  the existence of an agreement or a meeting of the minds between Facebook and the government

12  relating to Facebook's deletion of FAN's Facebook page"); *Doe*, 2021 WL 4864418, at *5 (finding

13  no joint action against YouTube where "there is no allegation that government officials were in the

14  room or somehow directly involved in the decision to suspend Plaintiffs").  And Mr. Trump does not

15  explain how the Biden Administration could possibly be involved in Meta's decision to "censor" his

16  posts in June and August 2020 when Mr. Biden did not even take office until January 2021.

17       None of Mr. Trump's cases compel a different conclusion.  In *Brentwood Academy v.*

18  *Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), the Court found that a

19  nominally-private athletic association was engaged in state action because government officials not

20  only controlled the association, but "overwhelmingly perform[ed] all but the purely ministerial acts

21  by which the Association exists and functions in practical terms."  *Id.* at 300.  That case is inapposite

22  because Mr. Trump does not point to anything suggesting the CDC or the Biden Administration

23  controlled Meta or performed its functions.  And in *Bendiburg v. Dempsey*, 909 F.2d 463 (11th Cir.

24  1990), the Eleventh Circuit held that private doctors acted jointly with the state when they

25  "intentionally exaggerated the emergency nature" of a child's medical problems for the express

26  purpose of "supplying [] state officials with the necessary facts to obtain *ex parte* temporary custody"

27  of the child.  *Id.* at 469.  There is nothing of the sort here.  Mr. Trump's remaining cases are also

28  irrelevant because they either named a government entity as the defendant or found no state action.

*See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1268 (11th Cir. 2003) (naming government entity as defendant); *Sun v. Girardot*, 237 F. App'x 415, 418 (11th Cir. 2007) (finding no state action); *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1288-89 (11th Cir. 2002) (same).[3]

### 4.   The First Amendment Precludes Mr. Trump's Requested Relief.

Mr. Trump's First Amendment claim fails for all of the reasons set forth above and in Meta's motion to dismiss, but it also has the First Amendment interests in this case entirely backward because the First Amendment affirmatively *precludes* an injunction ordering Meta to reinstate his account.  As the Supreme Court has explained repeatedly, the First Amendment "prohibits the government from telling people what they must say," *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205, 213 (2013), as it protects "both the right to speak freely and the right to refrain from speaking at all," *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  Just as the government may not compel private parties to disseminate its own preferred message, *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), the government may not compel one private speaker to disseminate the message of another private speaker.  *Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1 (1986); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

Those core First Amendment principles prohibit the government from interfering with the right of private parties to exercise "editorial control over speech and speakers on their properties or platforms."  *Halleck*, 139 S. Ct. at 1932.  The Supreme Court's decision in *Tornillo* illustrates the point.  There, the Court invalidated a state law that required newspapers to give candidates for political office space to respond to negative coverage.  The Court explained that the "choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" protected by the First Amendment.  418 U.S. at 258.  The law's

---

[3] Seeking to compensate for the weakness of each of his state action theories, Mr. Trump emphasizes their combination.  *See* PI Mot. at 5, 13.  But a combination of inadequate theories is still inadequate.  Mr. Trump identifies no case that finds state action based on a combination of different theories that are insufficient to establish state action on their own.  Mr. Trump cites *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020), but that case found state action under multiple theories that each stood alone, not a combination of inadequate ones.  *Id.* at 754-56.

"intrusion into the function of editors," even apart from any added costs or space constraints imposed on the paper, failed to "clear the barriers of the First Amendment." *Id.* Requiring newspapers to print that which it would not otherwise print "infringed the newspaper editors' freedom of speech by altering the message the paper wished to express." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 64 (2006).

While *Tornillo* concerned a traditional newspaper, its key insight—that "the editorial function itself is an aspect of 'speech,'" *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737-38 (1996) (plurality op.)—is not "restricted to the press," but applies equally to "business corporations generally," as well as "ordinary people engaged in unsophisticated expression." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995). Thus, a private utility cannot be forced to include third-party speech in its billing envelopes, *Pacific Gas*, 475 U.S. at 20-21, and a private parade organizer cannot be forced to include a group whose message it disapproves, *Hurley*, 515 U.S. at 574-76. Numerous courts have applied those principles to hold that online services like Meta cannot be forced to disseminate speech against their will. *See, e.g.*, *O'Handley v. Padilla*, 2022 WL 93625, at *13-15 (N.D. Cal. Jan. 10, 2022); *NetChoice, LLC v. Paxton*, 2021 WL 5755120, at *7 (W.D. Tex. Dec. 1, 2021) , *appeal docketed* No. 21-51178 (5th Cir.); *NetChoice, LLC v. Moody*, 2021 WL 2690876, at *8-9 (N.D. Fla. June 30, 2021), *appeal docketed* No. 21-12355 (11th Cir.); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991-92 (S.D. Tex. 2017); *Zhang v. Baidu.com*, 10 F. Supp. 3d 433, 440-41 (S.D.N.Y. 2014); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007).

A preliminary injunction ordering Meta to reinstate Mr. Trump would turn those bedrock First Amendment principles on their head. Meta's editorial judgments are quintessentially expressive, as they convey a message about the type of content that Meta finds acceptable and the community that Meta hopes to foster. *See O'Handley*, 2022 WL 93625, at *14-15; *see also Moody*, 2021 WL 2690876, at *9; *Paxton*, 2021 WL 5755120, at *9-10. Meta's decision to suspend Mr. Trump is a case in point. Meta removed Mr. Trump's posts after determining that they violated its policy prohibiting praise of people engaged in violence. It suspended his account because, in its view, the "risks of allowing President Trump to continue to use our service during this period are simply too great." *Our Response*

*to the Violence in Washington*, Anguas Decl., Ex. A.  Under the First Amendment, this choice was for Meta—not the government—to make.  The First Amendment does not permit an injunction directing Meta to exercise its editorial judgment in a particular way, as that would violate "the fundamental rule … that a speaker has the autonomy to choose the content of [its] own message." *Hurley*, 515 U.S. at 573; *see also O'Handley*, 2022 WL 93625, at *15 ("Twitter has important First Amendment rights that would be jeopardized by a Court order telling Twitter what content-moderation policies to adopt and how to enforce those policies.").

**B.      Mr. Trump Is Unlikely To Succeed On His Claim That Section 230 Is Unconstitutional.**

In addition to seeking an injunction ordering Meta to reinstate his access to Facebook, Mr. Trump also seeks an order "[e]njoining and declaring that Section 230(c) of the Communications Decency Act of 1996 is unconstitutional as applied to the facts of this case." PI Mot. at 29.  But there is no basis for a preliminary injunction declaring Section 230 unconstitutional, since the remedy of a "preliminary declaratory judgment does not exist." *Hamama v. Adduci*, 946 F.3d 875, 878 (6th Cir. 2020) (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975)).

In all events, Mr. Trump is unlikely to succeed on his claim that Section 230 is unconstitutional. As explained in Meta's motion to dismiss, Mr. Trump lacks Article III standing to seek such relief. Mr. Trump's alleged injury is not "fairly traceable" to Section 230, as Meta's decision to suspend him "arose from the actions of [Meta], a private entity, as it enforced its own standards," not from any application of Section 230.  *Lewis v. Google LLC*, 851 F. App'x 723, 723-24 (9th Cir. 2021), *cert. denied* 142 S. Ct. 434 (2021).  And it is "entirely speculative" that "Facebook … would voluntarily change course and permit Plaintiffs' censored content to stand were the [court] to declare § 230 unconstitutional." *Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100, 106 (D.D.C. 2016), *aff'd* 697 F. App'x 7 (D.C. Cir. 2017); *see also Lewis*, 851 F. App'x at 723-24; Mot. to Dismiss at 12. In addition, courts in this District have repeatedly held that plaintiffs cannot use "the Declaratory Judgment Act to anticipate an affirmative defense" like Section 230.  *See, e.g.*, *Newman*, 2021 WL 2633423, at *13-14; *Divino Grp.*, 2021 WL 51715, at *11.  And in any event, Section 230 is plainly constitutional.  Even assuming that incentivizing private parties to restrict speech raises First Amendment concerns, Section 230 did not incentivize Meta to suspend Mr. Trump's account, as

Section 230's protections apply regardless whether Meta takes content down or leaves it up.  *See* Mot. to Dismiss at 13-14.

### C.  Mr. Trump Is Unlikely To Succeed On His State Law Claims.

Mr. Trump asserts that Meta violated the FDUTPA.  As explained in Meta's motion to dismiss, that claim fails for multiple reasons.  *First*, Meta's Terms of Service provides that "the laws of the State of California … govern" Mr. Trump's claims.  Nov. 19, 2021 Order, ECF No. 108 at 2.  As the Southern District of Florida concluded earlier in this case, Mr. Trump agreed to those Terms, *id.* at 9, and he has no basis for evading them.  *See* Mot. to Dismiss at 14.  *Second*, Mr. Trump's requested relief is squarely foreclosed by the First Amendment.  *Id.* at 14-15; *supra* at 12-14.  And *third*, even if Mr. Trump could get around those problems, he does not come close to demonstrating "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment," as required to state a claim under the FDUTPA.  *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007).  Indeed, Mr. Trump does not point to any statement by Meta that is likely to mislead a reasonable consumer.  *See* Mot. to Dismiss at 15-16.

Nothing in Mr. Trump's preliminary injunction motion changes those conclusions.  Mr. Trump still does not point to any statement by Meta that is likely to mislead a reasonable consumer.  Instead, he asserts only that, "[b]y publishing its standards on its website, defendant is promising its Users that it will live up to them."  PI Mot. at 23.  But Meta's Community Standards simply provide details about what content Meta prohibits and why.  Indeed, Meta's Community Standards and Terms of Service make clear to users that Meta often makes difficult judgment calls about whether content violates its standards.  *See* Mot. to Dismiss at 15-16.  Some people will invariably disagree with some of those decisions or find them inconsistent, but that does not render Meta's policies deceptive.  *See id.*

Mr. Trump also argues that Meta's decision to suspend him violated Florida's Senate Bill 7072, which requires certain large platforms to "apply censorship, deplatforming, and shadow banning standards in a consistent manner."  Fla. Stat. § 501.2041(2)(b).  That law took effect on July 1, 2021—nearly six months after Meta's initial decision to suspend Mr. Trump's account.  There is no plausible argument that the law applies retroactively.  *See* Mot. to Dismiss at 16.  And in all events, Senate Bill

7072 plainly violates the First Amendment, as the Northern District of Florida has already recognized. *See Moody*, 2021 WL 2690876, at *12; Mot. to Dismiss at 16-17.  Although Mr. Trump acknowledges that decision, he makes no attempt to contest or distinguish the Northern District of Florida's conclusion that Senate Bill 7072 violates the First Amendment.  *See* PI Mot. at 25.

Finally, Section 230 preempts both of Mr. Trump's state law claims.  As this Court has explained, Section 230(c)(1) prohibits plaintiffs from imposing liability on internet platforms for exercising "a publisher's traditional editorial functions," such as "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content."  *Fyk v. Facebook, Inc.*, 2019 WL 11288576, at *1-2 (N.D. Cal. June 18, 2019) (White, J.).  Yet that is exactly what Mr. Trump seeks to do: impose liability on Meta under state law for its decision about whether or not to permit his content.  As courts have recognized repeatedly, such decisions are at the heartland of what Section 230 protects.  *See id*. at *3 (holding that § 230 protection applies where "Plaintiff's claims arise from the allegations that Facebook removed or moderated his pages"); *see also* Mot. to Dismiss at 18 (collecting cases).

Mr. Trump's efforts to avoid Section 230(c)(1) are also unavailing.  He argues that Section 230(c)(1) does not apply to decisions to *remove* his content and account because reading Section 230(c)(1) to cover removal decisions would "swallo[w] the more specific immunity in (c)(2)."  PI Mot. at 15.  The Ninth Circuit has squarely rejected that argument.  *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009).  As the Ninth Circuit explained, "the persons who can take advantage of [(c)(2)] are not merely those whom subsection (c)(1) already protects, but *any* provider of an interactive computer service."  *Id.*  "Thus, even those who cannot take advantage of subsection (c)(1), perhaps because they developed, even in part, the content at issue, can take advantage of subsection (c)(2) if they act to restrict access to the content because they consider it obscene or otherwise objectionable."  *Id.* (citation omitted).  Mr. Trump gives no good reason to second guess the Ninth Circuit's decision.  There is likewise no merit to Mr. Trump's argument that Meta "materially

contribute[d]" to the content at issue.  PI Mot. at 16, or that the content at issue is somehow Meta's own, PI Mot. at 17.[4]

## II.    MR. TRUMP CANNOT SATISFY THE REMAINING PRELIMINARY INJUNCTION FACTORS.

Mr. Trump's failure to show a substantial likelihood of success on the merits, let alone that "the law and facts *clearly favor* [his] position," *Garcia*, 786 F.3d at 740, suffices to deny his motion for a preliminary injunction.  *See Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019).  The remaining factors—imminent irreparable injury, balance of the equities, and the public interest—compel the same result.

To begin, Mr. Trump has not established the requisite imminent, irreparable injury.  Mr. Trump's failure to seek a preliminary injunction until *nine months* after Meta initially suspended his Facebook account and three months after filing his initial complaint confirms that there is no imminent risk of irreparable harm.  *See Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("[P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.").  Courts in this Circuit routinely hold that a plaintiff's delay of a similar or even shorter length in seeking injunctive relief is strong evidence there is no risk of irreparable harm in the absence of an injunction.  *See, e.g.*, *Int'l Ass'n of Plumbing & Mech. Offs. v. Int'l Conf. of Bldg. Offs.*, 79 F.3d 1153 (table), 1996 WL 117447, at *2 (9th Cir. Mar. 15, 1996) (seven-month delay); *Putz v. Schwarzenegger*, 2010 WL 1838717, at *8 (N.D. Cal. May 5, 2010) (seven-month delay); *Diversified Silicone Prod. Corp. v. Elastapro*

---

[4]   Section 230(c)(2) also independently preempts Mr. Trump's claims.  *See Moody*, 2021 WL 2690876, at *6 (holding that Section 230(c)(2) preempts Senate Bill 7072's inconsistency provision).  The provision states that no provider or user of an interactive computer service shall be held liable for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."  47 U.S.C. §230(c)(2)(A).  Mr. Trump's claims seek to do what Section 230(c)(2) plainly prohibits: impose liability on Meta for good faith decisions to remove content.

*Silicone Sheeting LLC*, 2020 WL 4390380, at *3 (C.D. Cal. May 19, 2020) (seven-month delay); *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1132 (S.D. Cal. 2014) (seven-month delay); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1090 (C.D. Cal. 1999) (five-month delay).  Just so here.[5]

Even setting aside that timing problem, Mr. Trump has not shown the type of irreparable injury that justifies the extraordinary remedy of a preliminary injunction.  Mr. Trump points to three sources of injury that he claims justify injunctive relief, but none is sufficient.  *First*, Mr. Trump argues that Meta's decision to suspend him "led to the demise of the Trump Campaign merchandising and fundraising program."  PI Mot. at 26.  But any lost sales or lost fundraising that Mr. Trump may purportedly suffer during the pendency of the litigation can be addressed through monetary damages if he ultimately succeeds on the merits of his state law claims.  *See Rent-A-Center, Inc. v. Canyon Television. & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).  *Second*, Mr. Trump claims (without citing evidence) that Meta's decision "threaten[s] irreparable damage to the Republican Party's prospects in the 2022 and 2024 elections."  PI Mot. at 26.  But as the Ninth Circuit has emphasized, "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."  *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  Rather, a "plaintiff must demonstrate *immediate* threatened injury as a prerequisite to preliminary injunctive relief."  *Id.* (emphasis added).  Whether suspending Mr. Trump from Facebook will harm "the Republican Party's prospects in the 2022 and 2024 elections" is inherently speculative and, in all events, is not imminent or "immediate."  *See, e.g.*, *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 373-74 (D.N.J. 2020).  Mr. Trump must point also to imminent harm to his

---

[5] Mr. Trump's decision to build his own platform—which is still "months away from being fully operational"—rather than join other social media platforms (to which he supposedly declined invitations to join) also undermines his claim that he is suffering imminent irreparable harm from Meta's decision to suspend him from Facebook.  *See, e.g.*, Washington Post, A Year Into His Social Media Exile, Trump Is Working To Get Back Online (Jan. 10, 2022), Anguas Decl., Ex. E.  Likewise, Mr. Trump's many public appearances and statements from his representatives also contradict any claim that he has suffered any such harm.  *See id.* ("The demand for President Trump, his leadership, and his America First solutions continue to grow despite Big Tech's attack on his freedom of speech … His influence is not limited to any one verified account.  To cancel Trump, Twitter, Facebook and other platforms would have to cancel a majority of their most engaged users.  The fact is you can't cancel MAGA, because MAGA is America.")

1  *own* prospects, not harm to other entities like the Republican Party, generally.  *See Califano v.*
2  *Yamasaki*, 442 U.S. 682, 702 (1979).  And *finally*, Mr. Trump claims that a violation of First
3  Amendment rights is always irreparable, but Meta did not violate Mr. Trump's First Amendment rights
4  for all of the reasons set forth above.

5  The remaining factors—balance of the equities and the public interest—also favor Meta.  It is
6  *Meta* that will suffer an imminent loss of First Amendment rights if it is required to disseminate speech
7  that it does not wish to disseminate.  *See supra* at 12-14.  That harm outweighs any interest that Mr.
8  Trump may have in forcing Meta to disseminate his speech.  Nor does an injunction serve the public
9  interest, which favors the protection of First Amendment rights.  *Associated Press v. Otter*, 682 F.3d
10  821, 826 (9th Cir. 2012); *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("[T]he public
11  interest favors the exercise of First Amendment rights.").  And as the Supreme Court has made clear,
12  an injunction of the sort Mr. Trump seeks here would disfavor the public interest because "disabl[ing]
13  private property owners … from exercising editorial discretion over speech and speakers on their
14  property" would "significantly endanger individual liberty and private enterprise."  *Halleck*, 139 S.
15  Ct. at 1931-32.

16                                             **CONCLUSION**

17  For the foregoing reasons, Mr. Trump's motion for preliminary injunction should be denied.

18
19  Dated: January 14, 2022                  */s/ Ashley E. Littlefield*
                                            Ashley E. Littlefield (SBN 281027)
20                                          KIRKLAND & ELLIS LLP
                                            555 California Street
21                                          San Francisco, CA 94104
                                            Tel: (415) 439-1483 / Fax: (415) 439-1400
22                                          ashley.littlefield@kirkland.com

23                                          Craig S. Primis, P.C. (admitted *pro hac vice*)
24                                          K. Winn Allen, P.C. (admitted *pro hac vice*)
                                            Ronald K. Anguas (admitted *pro hac vice*)
25                                          Kate H. Epstein (admitted *pro hac vice*)
                                            James Y. Xi (admitted *pro hac vice*)
26                                          KIRKLAND & ELLIS, LLP
                                            1301 Pennsylvania Avenue, N.W.
27                                          Washington, D.C. 20004
                                            Tel: (202) 389-5000 / Fax: (202) 389-5200
28

craig.primis@kirkland.com
winn.allen@kirkland.com
ronald.anguas@kirkland.com
kate.epstein@kirkland.com
james.xi@kirkland.com

1

**CERTIFICATE OF SERVICE**

2      The undersigned hereby certifies that on the 14th day of January 2022, the foregoing was

3  electronically transmitted to the Clerk of Court using the CM/ECF system, which will transmit

4  notification of such filing to all registered participants.

5                                                  */s/ Ashley E. Littlefield*

6                                                  Ashley E. Littlefield

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---