JOHN P. COALE *(pro hac vice)*
2901 Fessenden Street, NW
Washington, D.C. 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY *(pro hac vice)*
MICHAEL J. JONES *(pro hac vice)*
RYAN TOUGIAS *(pro hac vice)*
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

FRANK C. DUDENHEFER, JR. *(pro hac vice)*
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

ANDREI POPOVICI (234820)
MARIE FIALA (79676)
LAW OFFICE OF ANDREI D. POPOVICI,
P.C.
2121 North California Blvd. #290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
Facsimile: (650) 530-9990
Email: andrei@apatent.com
Email: marie@apatent.com

RICHARD POLK LAWSON *(pro hac vice)*
GARDNER BREWER HUDSON, P.A.
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gbmmlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| DONALD J. TRUMP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., et al., <br><br> Defendants. | Case No: 4:21-cv-09044-JSW <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Hon. Jeffrey S. White |

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................... 1

II.     STATEMENT OF FACTS ...................................................................................... 2

   A.   Procedural Background ................................................................................. 2

   B.   Factual Allegations ....................................................................................... 2

III.    ARGUMENT .......................................................................................................... 5

   A.   Plaintiffs' Alleged Facts Must Be Taken as a Whole and Accepted as True ................. 5

   B.   The State Action Issue Is Inherently Unsuited for Disposition on This Motion. ............ 5

   C.   Plaintiffs Have Pleaded State Action by Means of Coercion ........................................ 6

      1.   Origins of the Compulsion Theory .................................................................. 6

      2.   The Specificity Issue: Plaintiffs Belong to a Class of Citizens Targeted by the Government. ........................................................ 7

      3.   Plaintiffs Have Amply Alleged Coercive Statements by State Actors. ......................... 11

        (a)   Defendants Improperly Urge the Court to Decide a Fact Issue. ........................... 11

        (b)   Plaintiffs Have More Than Plausibly Alleged Coercion. ............................... 12

      4.   Threats by Individual Officials Suffice to Create State Action. ................................... 13

   D.   Government Encouragement of Defendants' Conduct Is Amply Pleaded. .................... 15

   E.   Joint Action Also Is Sufficiently Pleaded .................................................................... 17

   F.   Plaintiffs Have Standing to Challenge the Constitutionality of Section 230. ............... 18

   G.   Plaintiffs' Claims Under FDUTPA Are Viable. .......................................................... 18

   H.   Plaintiffs' Allegations Under the SSMCA Are Sufficient. .......................................... 19

   I.   Section 230(c)(1) Does Not Bar Plaintiffs' State Law Claims. ..................................... 20

IV.    CONCLUSION ..................................................................................................... 20

1

## <u>TABLE OF AUTHORITIES</u>

2

Cases

*Abu-Jamal v. Nat'l Public Radio*, 1997 WL 527349 (D.D.C. Aug. 21, 1997), *aff'd*, 159 F.3d 635
(D.C. Cir. 1998) ................................................................................................................. 14

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 .................................................................................. 8, 17

*Ahern v. Mayo Clinic*, 180 So.3d 165 (Fla. 1st DCA 2015) ............................................. 19

*American Family Ass'n v. City of San Francisco*, 277 F.3d 1114 (9th Cir. 2002) ..................... 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................ 5

*Atkinson v. Meta Platforms*, 2021 WL 5447022 (9th Cir. Nov. 22, 2021) ................................. 17

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ........................................................... 2, 12, 13

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ...................................................................... passim

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) .......................... 5

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1962) ..................................................... 2

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164 (Fla.
4th DCA 2015) .................................................................................................................. 19

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987) 7, 12, 13

*Children's Health Defense v. Facebook Inc.*, 2021 WL 2662064 (N.D. Cal. June 29, 2021) 7, 8, 9,
11

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ...................................... 5

*Daniels v. Alphabet, Inc.*, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ............................. passim

*Denver Area Educ. Telecoms. Consortium v. FCC*, 518 U.S. 727 (1996) .................................... 20

*Divino LLC v. Google LLC*, 2021 WL 51715 (N.D. Cal. Jan. 6, 2021) ................................. 15

*Doe v. Google LLC*, 2021 WL 4864418 (N.D. Cal. Oct. 19, 2021) ................................. 7, 8, 9, 11

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................................................ 9

*Fyk v. Facebook, Inc.*, 2019 WL 11288576 (N.D. Cal. June 18, 2019) ....................................... 20

*Gonzales v. Carhart*, 550 U.S. 124 (2007). ................................................................... 18

*Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983) .................................... 11, 12

*Heineke v. Santa Clara University*, 965 F.3d 1009 (2020) ........................................... 8, 9, 10, 11

*Howey v. U.S.*, 481 F.2d 1187 (9th Cir. 1973) .................................................................... 20

*In re Facebook Biometric Information Privacy Litig.*, 185 F. Supp.3d 1155 (N.D. Cal. 2016) .... 18

*In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738 (N.D. Cal. May 9,
2011) ................................................................................................................................ 5

*Iowa-Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239 (1931) ............................................. 14, 15

*Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018) .................................................................... 5

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ............................................................... 3

*Lewis v. Google LLC*, 461 F.Supp.3d 938 (N.D. Cal. 2020) ........................................................ 18

*Lombard v. Louisiana*, 373 U.S. 267 (1963) ................................................................... passim

*Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982)................................................................ 5

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S.Ct. 1921 (2019)................................................ 6

*Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498 (9th Cir. 1996) ....................................................... 9

*Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429 (9th Cir. 1989) ................................... 8, 9, 12, 13

*Mendocino Env. Ctr. v. Mendocino Cty.*, 192 F.3d 1283 (9th Cir. 1999)................................... 17

*NetChoice v. Moody*, 2021 WL 2690876 (N.D. Fla. June 30, 2021)........................................... 20

*Newman v. Google LLC*, 2021 WL 2633423 (N.D. Cal. June 25, 2021) ..................................... 15

*Ohno v. Yasuma*, 723 F.3d 984 (9th Cir. 2013) ........................................................................ 17

*Peterson v. City of Greenville*, 370 U.S. 935 (1963) ................................................................ 6, 7

*Prager Univ. v. Google LLC*, 951 F.3d 991 (9th Cir. 2020) ........................................................ 6

*Railway Employees' Dept. v. Hanson*, 351 U.S. 225 (1956) ...................................................... 16

*Reitman v. Mulkey*, 387 U.S. 369 (1967) ............................................................................ 6, 15

*Roberts v. AT&T Mobility LLC*, 877 F.3d 833 (9th Cir. 2017)................................................... 17

*Robinson v. Florida*, 378 U.S. 153 (1964).............................................................................. 6, 8

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989)............................................. 16

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ........................................................................... 18

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999) .............. 10, 11, 18

*Terry v. Adams*, 345 U.S. 461 (1952) .............................................................................. 14, 15

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) ...................................................... 17

*United States v. Classic*, 313 U.S. 299 (1941).................................................................... 14, 15

*United States v. Davis*, 482 F.2d 893 (9th Cir. 1973) ................................................................ 9

*United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) ............................................................... 3

*United States v. Ross*, 32 F.3d 1411 (9th Cir. 1994)................................................................... 9

*Visonic Sys. v. AT&T Digital Life*, 971 F. Supp. 2d 1178, 1195 (S.D. Fla. 2013)......................... 19

*Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007) ..................................................................... 12

Statutes

47 U.S.C. § 230(c) ...................................................................................................................... 1

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ................................................................................. 19

Cal. Bus. & Prof. Code §§ 17204 *et seq.* ................................................................................. 19

Fla. Stat. § 501.2041(2)(a) & (b) ............................................................................................ 19

Fla. Stat. § 501.2041(2)(b) ........................................................................................................... 20

## I.      INTRODUCTION

This case raises one of the most important First Amendment issues of the current era: Can the government coerce or co-opt a private, multi-billion dollar social media company to achieve a goal—the censorship of disfavored political speech—that the Constitution prohibits it from achieving directly?  With a market capitalization of just under $900 billion, Meta is one of the world's largest companies.[1]  Its Facebook platform boasts close to three billion registered users and reported some $86 billion in total revenue in 2020.[2]  Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c) ("CDA"), immunizes Defendants from liability for, *inter alia*, content they choose to ban from their platform.  Section 230 was originally a federal subsidy to facilitate the growth of the Internet in its infancy, but its beneficiaries have since overtaken large segments of the economy.  Meta's value is directly attributable to this congressional grace. Beholden as Defendants are to this multi-billion-dollar federal subsidy, they must adhere to the preferences of their government overlords, who hold the power to dismantle their business model. Responding to government pressure, Defendants banned President Trump for engaging in constitutionally protected speech with millions of active participants—and have maintained the prior restraint to this day.  Defendants' overtly partisan censorship has restrained millions of Americans' from participating in the public discourse, contrary to First Amendment principles deeply rooted in American history and law.

This Court need only answer a limited question—does Plaintiffs' exhaustively detailed First Amended Complaint ("FAC") allege sufficient facts to make out the claims pleaded? Plaintiffs have alleged in great detail that the federal government's entanglement with Defendants' "content moderation" program (a euphemism worthy of Orwell) constitutes state action, subjecting Defendants' actions to First Amendment limitations.  Specifically, state action exists by virtue of (1) government *coercion*, including directing Defendants and other social media platforms to target President Trump and his supporters; (2) substantial *encouragement* of

---

[1] Plaintiffs will use "Meta" to refer to the Defendant company and "Facebook" for its social media platform and also when necessary for proper historic context.

[2] *See* First Amended Complaint ¶¶ 2, 86; Declaration of Andrei Popovici and Plaintiffs' Request for Judicial Notice ("RJN"), filed herewith, ¶ 13 (Facebook 2020 Form 10-K).

1   Defendants' censorship by official exhortations coupled with the threatened withdrawal of

2   Section 230 immunity; and (3) *joint action* with the government to suppress disfavored speech.

3   This is a fact-intensive inquiry.  "Only by sifting facts and weighing circumstances can the

4   nonobvious involvement of the State in private conduct be attributed its true significance."

5   *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1962).  Plaintiffs have amply alleged

6   that officials "deliberately set about to achieve the suppression of [speech] deemed

7   'objectionable.'"  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963).

## II.    STATEMENT OF FACTS

### A.    Procedural Background

9       Plaintiffs filed this case in the Southern District of Florida on behalf of a putative class,

10  alleging the First Amendment claim described above, that Section 230(c) of the CDA is

11  unconstitutional, and that Defendants violated the Florida Deceptive and Unfair Trade Practices

12  Act ("FDUTPA").  *See* FAC (Dkt. 16).  Plaintiff Trump moved for a preliminary injunction (Dkt.

13  78) but, before briefing thereon was completed, the case was transferred to this Court.

### B.    Factual Allegations

15      The FAC details a litany of events where members of Congress and the Executive Branch

16  coerced Defendants and other social media platforms to censor Plaintiffs' disfavored speech on

17  pain of catastrophic consequences.  *See* FAC ¶¶ 67-74 (detailing officials' statements).[3]

18  Legislators held hearings to which Defendant Zuckerberg was summoned, during which they

19  threatened to impose regulations and strip Meta of its Section 230 immunity.  The coercive,

20  viewpoint-discriminatory statements by legislators at these official proceedings shock the

21  conscience of any American concerned with the erosion of First Amendment rights:

22          **[I]t is time for Congress and this Committee to legislate and realign these companies'**
            **incentives** to effectively deal with disinformation.…  So when a company is actually
23          promoting this harmful content, **I question whether existing liability protections should**
            **apply.** …  **That is why you are here today, Mr. Zuckerberg. …  It is time we legislate**
24

25

---

26  [3] *See, e.g.*, FAC ¶ 71 ("[F]or the privilege of 230, there has to be a bigger sense of responsibility
    on it.  And it is not out of the question that that could be removed."  House Speaker Nancy Pelosi,
27  Apr. 12, 2019); ("Section 230 should be revoked, immediately should be revoked, number one.
    For Dorsey and other platforms."  Candidate Joe Biden, *New York Times,* Jan. 19, 2020).  The
28  White House confirmed President Biden's stance on Section 230 in July 2021.  FAC ¶ 121.

**to hold you accountable**.  FAC ¶¶ 71, 74; <u>"Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation": Hearing before H. Comm. on Energy and Com.</u>, 117th Cong. (March 25, 2021) ("March 2021 Hearing") (Opening Stmt. of Comm. Chairman Frank Pallone, Jr. (Dem.)) (emphasis added), RJN ¶ 7.[4]

What our witnesses need to take away from this hearing is … that this democratically elected body **is prepared to move forward with legislation and regulation**.  *Id.* (Opening Stmt. of Rep. Janice D. Schakowsky (Dem.)); (emphasis added), RJN ¶ 9.

**Congress will have to compel you, compel you perhaps with penalties, to make meaningful changes**.  *Id.*  (Quote from Rep. G.K. Butterfield (Dem.)) (Tr. at 861:1987-90; 881:2019-2021) (emphasis added), RJN ¶ 4.

I think **Congress must revisit Section 230**."  *Id.*  (Quote from Rep Doris Matsui (Dem.)) (Tr. at 941:2177-78, 2180-81) (emphasis added), RJN ¶ 4.

**[P]ursuant to 230, you all** [Facebook, YouTube, and Twitter] **can't be sued.** You have immunity. But it ain't 1996 anymore, is it? Meanwhile, lies are spreading like wildfire through platforms. … **What specific changes to Section 230 do you support to ensure more accountability**?  *Id.*  (Quote from Rep. Darren Soto (Dem.)) (Tr. at 1681:3998-4001; 1691:4016-17) (emphasis added), RJN ¶ 4.

Legislators specifically called for President Trump to be banned from Facebook:

Twitter recently had a policy where a user could not view **President Trump's misinformation**….  **Why did Facebook not adopt a similar approach?**  Under what conditions would Facebook adopt the same protections **against President Trump's misinformation**?  FAC ¶¶ 71, 74; <u>Breaking the News: Censorship, Suppression, and the 2020 Election: Hearing before S. Comm. on the Judiciary</u>, 116th Cong. (Nov. 17, 2020) ("Nov. 2020 Hearing") (Sen. Blumenthal to Mr. Zuckerberg) (emphasis added), RJN ¶ 3.

**President Trump is spreading dangerous misinformation** about our electoral process on your platforms right now. … [W]hat concrete steps has Facebook taken to enhance its enforcement policies regarding **election disinformation**…?  *Id.*  (Sen. Booker to Mr. Zuckerberg) (emphasis added), RJN ¶ 3.

There was a greater increase in hate speech the week **after the President's tweet**. … Mr. Zuckerberg … why do you still allow these hashtags on your platform[]?  March 2021 Hearing (Rep. Matsui to Mr. Zuckerberg) (emphasis added), RJN ¶ 4.

*See also* FAC ¶ 71 ("**Trump** is willing to do anything for himself … And until he stops,

Facebook must ban him.  Which is to say, forever."  (Rep. Adam Schiff, May 5, 2021)).[5]

---

[4] The court may consider judicially noticeable materials without converting a motion to dismiss into a motion for summary judgment.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The court also may "take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'"  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

[5] Defendants responded to this government pressure: "These platforms [Facebook, YouTube, and Twitter] often **ramp up their efforts** against [conservative] content in response to social **and political** pressure."  FAC ¶ 74; March 2021 Hearing (Memo. from Chairman Pallone prepared by Staff) (emphasis added), RJN ¶ 10.

Government and Meta have actively partnered to censor speech.  As one Senator said to Mr. Zuckerberg, "[W]e need to work very closely with you … [to] disrupt this ["radical" speech] … for folks that are using your platform."[6]  Mr. Zuckerberg testified, "I believe we need **a more active role for governments and regulators [in content moderation decisions].**…"[7]  A month later, Mr. Zuckerberg testified that Meta had "partnered with election officials" to censor more than 150 million pieces of content and that Meta "receive[s] reports from governments and courts…." in connection with its content moderation efforts.[8]  President Biden and leaders of federal agencies have coordinated with Defendants to censor speech that the government regards as undesirable, including Mr. Trump's views on election fraud and the origin of, and treatments for, COVID.  FAC ¶¶ 92-117.  The White House has confirmed that Executive Branch officials regularly "engage" with social media platforms at the highest levels to censor disfavored speech: "There are also proposed changes that we have made to social media platforms … we have recommended [] that they create a robust enforcement strategy." *Id*. ¶ 109.[9]  The White House made clear that bans should be extended across platforms: "You shouldn't be banned from one platform and not others … for providing misinformation out there." *Id*. ¶ 117.  Not surprisingly, Meta has developed a powerful tracking platform, CENTRA, to monitor its users' speech and activities on all social media platform.  *Id*. ¶ 39.  The White House has pointed out specific narratives to be censored: "So we are … regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans are seeing …." *Id*. ¶ 111.  Meta worked hand-in-glove with the White House, CDC, NIH, and the NIAID to monitor Plaintiffs' COVID-related postings and censor those that contradict government

---

[6] FAC ¶ 71; "Does Section 230's Sweeping Immunity Enable Big Tech Bad Behavior": Hearing before S. Comm. on Commerce, Science and Transportation, 117th Cong. (Oct. 28, 2020) ("Oct. 2020 Hearing") (Sen. Peters to Mr. Zuckerberg), RJN ¶ 12.

[7] Oct. 2020 Hearing (Testimony of Mr. Zuckerberg), RJN ¶ 11; Oct. 2020 Hearing (Mr. Zuckerberg to Sen. Blumenthal) (Meta accedes to government request for "a plan" to suppress any questions about integrity of 2020 elections), RJN 12.

[8] FAC ¶ 74; Nov. 2020 Hearing (Testimony of Mr. Zuckerberg) (emphasis added), RJN ¶ 2.

[9] *See also* FAC ¶ 110 (Surgeon General stated on July 15, 2021: "We're asking [social media companies] to monitor misinformation more closely. We're asking them to consistently take action against misinformation … on their platforms.").

pronouncements. *Id.* ¶¶ 92-105. Meta has admitted the critical role Section 230 immunity plays in allowing it to censor speech with impunity: "**[Section 230] allows platforms to moderate content.** Without Section 230, platforms could face liability for doing even basic moderation ….."[10] Defendants banned President Trump from their platform on January 12, 2021. Due to sustained government pressure, the ban continues to this day. *Id.* ¶¶ 6-7.

## III.    ARGUMENT[11]

### A.    Plaintiffs' Alleged Facts Must Be Taken as a Whole and Accepted as True.

The Rule 8 pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On this motion, all well-pleaded allegations of material fact are taken as true and construed most favorably to the non-moving party. *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018). Moreover, "plaintiffs should be given the full benefit of their proof **without tightly compartmentalizing the various factual components**…." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (emphasis added); *see In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *10-11 (N.D. Cal. May 9, 2011) (applying *Cont'l Ore* on motion to dismiss).

### B.    The State Action Issue Is Inherently Unsuited for Disposition on This Motion.

In determining whether state action exists, the Court must engage in a nuanced and "necessarily fact-bound" inquiry, *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982). "[T]o fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which '[t]his Court has never attempted.'" *Burton,* 365 U.S. at 722. *See also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (existence of state action "is a matter of normative judgment, and the criteria lack rigid simplicity"). The state's entanglement can consist solely of "winks and nods." *Id.* at 301. This inquiry is ill-suited to a Rule 12(b)(6) motion.

---

[10] FAC ¶ 74; Nov. 2020 Hearing (Testimony of Mr. Zuckerberg) (emphasis added), RJN ¶ 2.
[11] Half of Defendants' Opposition to the Preliminary Injunction Motion ("PI Opp.") elaborates on their Rule 12(b)(6) arguments. Accordingly, this brief cross-references to additional discussion in Plaintiffs' Reply in Support of Preliminary Injunction Motion ("PI Reply").

1

### C.     Plaintiffs Have Pleaded State Action by Means of Coercion.

Under the compulsion theory, a private decision has sufficiently received the imprimatur of government to make it state action where the state has exercised coercive power to shape private conduct.  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  The requisite nexus between the State and the challenged private actions has been found in a variety of circumstances, ranging from the State expressly mandating odious distinctions by private entities, *Peterson v. City of Greenville*, 370 U.S. 935 (1963) (requiring racial separation in restaurants), to removing legal barriers that would have kept private parties from trampling on constitutional rights, *Reitman v. Mulkey*, 387 U.S. 369 (1967) (state law repealed legal barrier prohibiting private actors from discriminating in housing sales/rentals).  Plaintiffs' allegations fit comfortably on the spectrum of fact patterns which the courts have found to constitute compulsion, and thus state action.[12]

### 1.     Origins of the Compulsion Theory

The compulsion doctrine had its genesis in civil rights cases where the interplay of government and private businesses maintained racial segregation.  In *Robinson v. Florida*, 378 U.S. 153 (1964), a restaurant denied service to Black customers.  While segregated dining was not mandated by law, health regulations required separate restroom facilities in any establishment serving both races.  Defendants, Black restaurant patrons who refused to leave, were arrested and convicted of trespass; they challenged their conviction as a violation of Equal Protection.  The Supreme Court reasoned that, while the restroom regulations did not forbid integrated service, "they certainly embody a state policy putting burdens upon any restaurant which serves both races."  *Id.* at 156-57.  This government entanglement, although indirect, rendered otherwise private conduct as state action.  More significantly, *Lombard v. Louisiana*, 373 U.S. 267 (1963), involved *no formal governmental action* at all.  Black patrons were denied service at an all-White restaurant.  The restaurant summoned the police after the group refused to leave; they were

---

[12] *Manhattan Cmty. Access Corp. v. Halleck*, 139 S.Ct. 1921 (2019), and *Prager Univ. v. Google LLC*, 951 F.3d 991 (9th Cir. 2020), MTD at 1, 3-4, are not relevant.  In *Halleck*, the Supreme Court rejected the theory that a heavily regulated private entity that operates its property "as a public forum" becomes a state actor.  139 S.Ct. at 1926.  Plaintiff in *Prager* argued that YouTube is a state actor "because it performs a public function."  951 F.3d at 998.  Plaintiffs do not invoke the public forum or public function theories here.

1   arrested and convicted of trespass.  While the Court located no government ordinance

2   encouraging segregation, it nevertheless found state action because the Mayor and Police Chief

3   had given speeches declaiming that "sit-in" demonstrations would not be tolerated.  These public

4   statements, the Court held, "must be treated exactly as if [the City] had an ordinance prohibiting

5   such conduct," *id*. at 273, rendering the resulting private discrimination state action.  Importantly,

6   in neither case had the government conduct specifically targeted any individual.[13]  *Carlin*

7   *Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987), cited

8   *Peterson* as support for finding state action where a county attorney had merely "advised" the

9   telephone company to disconnect a customer's service or face prosecution if it did not comply.

10  *Carlin* confirms that the state action inquiry focuses on the *substance* of government coercion

11  rather than the form by which it is communicated.  *See also* PI Reply at 5-6.

12      **2.    The Specificity Issue: Plaintiffs Belong to a Class of Citizens Targeted by the Government.**

13          Defendants rely on recent district court decisions holding that, for state action to exist, the

14  government must have targeted a particular individual.  *Doe v. Google LLC*, 2021 WL 4864418

15  (N.D. Cal. Oct. 19, 2021); *Children's Health Defense v. Facebook Inc.* ("*CHD*"), 2021 WL

16  2662064 (N.D. Cal. June 29, 2021) (currently on appeal, Ninth Circuit No. 21-16210); *Daniels v.*

17  *Alphabet, Inc.*, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021); *see* MTD at 7.  These cases are

18  inconsistent with the Supreme Court and Ninth Circuit precedents on which they relied.  No

19  doubt, a private party's mere compliance with a generally-applicable law does not amount to state

20  action.  But that is not what Plaintiffs have alleged.  The public officials' coercive conduct here

21  was directed at former President Trump individually, and also at an identifiable group—speakers

22  who publicly supported his views on election fraud or the COVID-19 pandemic.  Government

23  conduct compelling Defendants to censor a distinct group is state action, just as if officials had

24  exhorted Defendants to ban all Republicans or LGBTQ people from their platform.

25

26  _____

    [13] In *Peterson,* 370 U.S. 935, a private lunch counter had barred Black customers in compliance

27  with a city ordinance requiring segregation in restaurants.  The Supreme Court found that the private actor's conduct violated the Equal Protection Clause because the State had commanded

28  that particular result.  Notably, the Court did not require that the targets of state action be identified *specifically and individually*.

**Laws of General Applicability—No State Action:** To the extent state action includes a "specificity" requirement, it is no more than that "compliance with generally applicable laws [is not] sufficient to convert private conduct into state action." *Heineke v. Santa Clara University*, 965 F.3d 1009, 1014 (9th Cir. 2020), citing *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999). *Sutton* explains the reason behind this requirement:

> To accept [that] argument would be to convert every employer … into a governmental actor every time it complies with a presumptively valid, generally applicable law…. Private employers would then be forced to defend those laws and pay any consequent damages, even though they bear no real responsibility for the violation of rights arising from the enactment of the laws.

192 F.3d at 838-39.  That scenario bears no resemblance to the facts here.

**State Action Targeting Identified Groups—This Case:** The public officials' challenged actions here were directed either at President Trump individually, or else targeted a distinct group of citizens—those who echoed his views.  Because Mr. Trump was named individually, he was the target of state action even under the overly restrictive "particular case" test applied in *Doe, Daniels,* and *CHD*.  Other groups of targeted speakers were identified with the particularity required by the Supreme Court civil rights cases discussed above, as well as later decisions.  The Supreme Court had no difficulty finding state action in *Robinson* and *Lombard* even though the governmental conduct in those cases was directed at Black Americans as a group, not specific individuals.[14]  Ninth Circuit decisions have followed suit.  In *Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429 (9th Cir. 1989) ("*Mathis I*"), a worker at a nuclear power plant brought suit claiming he had been excluded from the plant without due process for alleged drug use.  The Ninth Circuit found state action in the form of warnings by the Nuclear Regulatory Commission that licensees needed to control their employees' drug use, or the NRC would do it for them; the NRC had not yet taken any formal action.  Mathis alleged that the NRC had "pressured" nuclear plant operators.  The NRC's informal actions were not directed at Mathis individually; the Commission didn't even know he existed.  The Ninth Circuit held that, despite this "bare record," "we cannot

---

[14] *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 195-96 (Brennan, J., concurring) (state law leaving decision whether to serve any individual to unfettered discretion of private restaurants imbues private decision with state action).

1   agree with the conclusion that Mathis' allegations of governmental coercion or encouragement

2   are frivolous or wholly without substance," and allowed his claim to proceed.[15]  *Id.* at 1434.  *See*

3   *also United States v. Davis*, 482 F.2d 893, 904 (9th Cir. 1973) (passenger search by private airline

4   was state action due to FAA's incipient efforts to create anti-hijacking program, although no

5   federal regulation existed at the time; no claim that FAA specifically directed the particular

6   search); *United States v. Ross*, 32 F.3d 1411, 1413-14 (9th Cir. 1994) (airline's search of

7   passenger's luggage to conform to non-binding FAA guidelines was governmental action; FAA

8   did not target any individual passenger).  As in these cases, Plaintiffs have alleged government

9   coercion of censorship aimed at a particular group, here defined by political viewpoint.[16]

10       **The "Particular Case" Fallacy—*Doe*, *Daniels*, and *CHD*:** *Doe* and *Daniels* purport to

11   take their "treatment of a specific plaintiff" formulation from *Blum* and *Heineke*.  *See Doe*, 2021

12   WL 4864418, at *3; *Daniels*, 2021 WL 1222166, at *6.  *CHD*, in turn, relies on *Daniels* for the

13   same proposition, 2021 WL 2662064, at *15, and thus traces its provenance to the same sources.

14   But *Blum* and *Heineke* stand for no such rule.  The claims in those cases were challenges to the

15   impact of generally-applicable laws on particular individuals.  *Blum* concerned a state-regulated

16   private nursing home.  Medicaid regulations required nursing-home physicians to assess the level

17   of care patients required.  If the physicians found patients no longer needed nursing home care,

18   the regulations required the nursing home to downgrade or discharge them.  Plaintiffs, whose care

19   had been downgraded, sued the state officials in charge of the Medicaid program, seeking to hold

20   them liable for the physicians' decisions.  *Blum* held that the relevant question was whether the

21   state's regulations encouraged the nursing home to downgrade the plaintiffs' care without due

22   process.  The Court emphasized that, because the decision about the necessary level of medical

23

24   ---

[15] In *Mathis I*, the Ninth Circuit reversed the district court's dismissal of the lawsuit, finding that
25   plaintiff had sufficiently pleaded state action.  The case was appealed again after a full trial and a
     verdict in plaintiff's favor.  In *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498 (9th Cir. 1996)
26   ("*Mathis II*") (cited in MTD at 7), the Ninth Circuit reversed the lower court's denial of
     defendant's JNOV motion because Mathis had "presented no evidence" to provide that PG&E
27   had excluded him at the NRC's behest.  *Id.* at 505-06.  *Mathis II* is irrelevant on this motion.
[16] Silencing citizens based on their political beliefs is viewpoint discrimination—the core evil the
28   First Amendment was designed to avert.  *Elrod v. Burns*, 427 U.S. 347, 356 (1976).

1   care was entirely in the physician's discretion, the state had not participated in any due process

2   deprivation.  *Id*. at 1007-12.  Similarly, plaintiff in *Heineke* was a professor at a private university

3   who was terminated for sexually harassing a student.  He claimed that the university had deprived

4   him of due process due to government coercion—by conditioning the university's receipt of

5   federal funds on its compliance with anti-discrimination laws.  The court held that the university

6   did not become a state actor merely by complying with these general laws.  965 F.3d at 1013-14.

7        Defendants also cite *Sutton* for the proposition that the government must have directed

8   private action against a specific person.  MTD at 7.  But as in *Blum* and *Heineke*, the only

9   question presented in *Sutton* was whether a private actor's compliance with a general law—

10  requiring employers to obtain employees' Social Security numbers—was alone sufficient to

11  constitute compulsion.  *See Sutton*, 192 F.3d at 839 ("[T]he question that we must answer … [is]

12  whether governmental compulsion **in the form of a general statute, without more,** is sufficient

13  to deem a private defendant a governmental actor.") (emphasis added).  Again, the Court

14  concluded that this was insufficient.  *Id*. at 841-43.[17]  Defendants' misreading of *Sutton* leaves no

15  room for operation of the state action doctrine: Either the government officials are rogue actors

16  because their actions do not have the force of law, or they are acting pursuant to a generally-

17  applicable law, so there can never be state action.  Not only is this reading at loggerheads with

18  half a century of Supreme Court precedent but it would contradict some of the cases on which

19  Defendants rely, such as *Carlin¸* because the prosecution there was threatened under a generally-

20  applicable statute.  That is not the law.

21        In all these cases, the private entity was subject to, and in turn enforced, laws or

22  regulations that applied to all similarly situated private entities—nursing homes in *Blum*,

23  universities in *Heineke*, employers in *Sutton*.  The courts in those cases could choose only

24

25

---

26  [17] *Sutton* held that, where alleged state compulsion consists solely of a generally-applicable law, a plaintiff suing a private actor must also demonstrate a "nexus" between the state and the private actor in the form of agreement, cooperation, or enforcement and ratification. 192 F.3d at 841.  As

27  discussed *supra*, Plaintiffs' claims do not arise out of enforcement of a general statute.  Plaintiffs have alleged myriad facts showing extensive entanglement, or a "nexus," between the state and

28  Defendants.  *See also* PI Reply at 6 (further discussion of *Sutton*).

between two fact patterns: either everyone affected by a general law, or the specific result for an individual plaintiff.  The former was not enough, the courts held.  None of those cases held that actions taken in response to government coercion aimed at an identifiable group were unredressable.  *Daniels*, *Doe*, and *CHD* plucked these unexceptionable holdings out of context and transmogrified them into a much broader, and insupportable, rule—that state action can only exist where the government has targeted an individual.  The infirmity of the "particular case" test adopted by *Doe*, *Daniels*, and *CHD* is evident when mapping it onto, e.g., the *Lombard* facts.  In *Lombard*, no law, regulation, or ordinance required or encouraged segregation.  The mayor and police chief had simply made speeches inveighing against sit-in protests.  Had the rule of *Doe*, *Daniels*, and *CHD* been applied to the *Lombard* facts, the courts would have been compelled to dismiss the case because the government officials had not identified the affected individuals in their public statements.  The only difference here is that a group was targeted for their political views rather than by race.  *Blum, Heineke*, and *Sutton* did not address this issue of group identification.  Because the plaintiffs in those cases sued as individuals and not as members of groups, the courts did not need to, and did not, consider the question of the requisite granularity of identification where the government incentivized a private entity to target an identifiable group.  For that reason, these cases do not compel the result Defendants advocate.

### 3.    Plaintiffs Have Amply Alleged Coercive Statements by State Actors.

#### (a)    Defendants Improperly Urge the Court to Decide a Fact Issue.

Defendants argue that government officials' extensive pronouncements demanding that social media platforms, including Facebook, censor Plaintiff Trump and those who supported his views do not rise to the level of coercion as a matter of law.  MTD at 8.  But this is an exquisitely fact-intensive issue.  Statements made by public officials "require courts to draw fine lines between permissible expressions of personal opinion and implied threats to employ coercive state power to stifle protected speech."  *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983).  A court's decision whether such a statement is "sufficiently coercive" to constitute state action depends on a factual judgment: can "the comments of governmental officials [] reasonably be interpreted as intimating that some form of punishment or adverse regulatory action

1   will follow failure to accede to the officials' request." *Id*. That judgment cannot be made based

2   on conclusory allegations in Defendants' brief. Instead, the Court must consider the entirety of

3   the Defendants' words and actions in determining whether they could reasonably be interpreted as

4   an implied threat.[18] The FAC contains numerous allegations relevant to this analysis, all of which

5   eventually must be weighed to determine whether Plaintiffs have proven a First Amendment

6   claim—but not on this motion.

7               **(b)    Plaintiffs Have More Than Plausibly Alleged Coercion.**

8               The line between government expression and compulsion is crossed when there is an

9   "actual or threatened imposition of government power or sanction." *American Family Ass'n v.*

10  *City of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002). The threat need not be explicit; an

11  indirect threat suffices. In *Bantam Books,* the Supreme Court held that state officials violated the

12  First Amendment by sending letters to booksellers warning that the sale of "objectionable" books

13  could bring legal repercussions. It made no difference that the officials who communicated the

14  threats lacked the "power to apply formal legal sanctions." 372 U.S. at 68. Nor did it matter that

15  the letters were framed as mere "exhort[ation]" or that booksellers were "free" to ignore them.

16  As the Court sensibly observed, "people do not lightly disregard public officers' veiled threats."

17  *Id*. at 66-68. The coercion alleged in *Mathis I*, which the Court found sufficient to invoke state

18  action, was even more diffuse. Mathis made only "bare" allegations that he had been injured by

19  NRC pressure on power-plant operators to screen out drug users. That was enough to tie the

20  NRC to his dismissal and preserve his claim for trial. *Mathis I*, 891 F.2d at 1434. Defendants

21  assert that "compulsion" requires a threat to impose legal sanctions such as criminal prosecution,

22  citing *Carlin*, 827 F.2d at 1295. MTD at 7; *see also* PI Opp. at 7-8 (arguing state exercises

23  coercive power "only in the context" of threatened criminal prosecution). Not so. That supposed

24

25  [18] *See Bantam Books,* 372 U.S. at 67 (court must "look through forms to the substance" to assess
    whether state "coercion, persuasion, and intimidation" amounted to impermissible "informal

26  censorship"). Factors bearing on this inquiry include: (1) governmental actors' regulatory or
    other authority over the private entities; (2) language of the allegedly threatening statements; (3)

27  allegedly retaliatory exercises of regulatory authority over the private entities; and (4) the
    perceived threat by the private entities and their response. *Zieper v. Metzinger*, 474 F.3d 60, 66

28  (2d Cir. 2007).

rule appears nowhere in the case. *Carlin* held only that, on the facts before it, "with this threat [to prosecute], Arizona 'exercised coercive power' over [the phone company] and thereby converted its otherwise private conduct into state action." 827 F.2d at 1295. Obviously a threat of prosecution is *sufficient* to establish coercion, but *Carlin* nowhere said it is *necessary*. The court made no ruling whatsoever about the limits of the coercion doctrine.

There can be no doubt that a plausible inference can be drawn from Plaintiffs' allegations that the public officials "deliberately set about to achieve the suppression of [speech] deemed 'objectionable.'" *Bantam Books*, 372 U.S. at 68. As detailed in the FAC, some of the most powerful Legislative and Executive Branch officials, with the power to make good on their threats, repeatedly called for social media to quash what officials deemed to be unacceptable speech or else risk repeal of their Section 230 immunity—including in statements made at congressional hearings and from the West Wing. Moreover, "[t]he mere fact that [a defendant] might have been willing to act without coercion makes no difference if the government did coerce." *Mathis I*, 891 F.2d at 1434. Indeed, the restaurants in *Robinson* and *Lombard* may have been perfectly happy to segregate; they may have appreciated the government's cover for doing so. It made no difference. Plaintiffs have alleged far more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Twombly*, 550 U.S. at 555. This issue can only be resolved conclusively after evidence is introduced, not now.[19]

### 4.  Threats by Individual Officials Suffice to Create State Action.

Defendants argue that Plaintiffs' First Amendment claim must be dismissed because government officials were not speaking on behalf of Congress or the Executive Branch when they called for Mr. Trump and those who supported his views to be censored. MTD at 5. On the contrary, most of the statements identified above were made *ex cathedra*—on the floor of Congress or from the White House. Even if that were not the case, however, what Plaintiffs have alleged is enough. Informal conduct by state actors can give rise to state action. *See, e.g.,*

---

[19] *See also Carlin*, 827 F.2d at 1295 ("[The phone company] insists that it remains an unresolved question of fact whether the county attorney's letter was the **real motivating force** behind the termination. Even if unresolved, **this factual question is immaterial.**") (emphasis added)

*Lombard* (speeches by public officials).  Not even the fact that the actions of the state agents are *illegal* precludes them from being attributable to the state.  "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."  *United States v. Classic*, 313 U.S. 299, 326 (1941).  *See also Iowa-Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239, 246 (1931) ("[A]cts done 'by virtue of public position under a State government . . . and . . . in the name and for the State' . . . are not to be treated as if they were the acts of private individuals, although in doing them the official acted contrary to an express command of the state law.") (Brandeis, J.).  Justice Frankfurter put this canard to rest:

> This phrase [state action] gives rise to a false direction in that it implies some impressive machinery or deliberative conduct ….  The vital requirement is … that somewhere, somehow, to some extent, there be **an infusion of conduct by officials, panoplied with State power**, into any scheme [to deny protected rights].

*Terry v. Adams*, 345 U.S. 461, 473 (1952) (concurring) (emphasis added).  If even misuse of state power by those clothed with state authority can be state action, then official action clothed in the formal trappings of a congressional hearing or a White House press briefing is surely sufficient.

Defendants wrongly rely on *Daniels* and *Abu-Jamal v. Nat'l Public Radio*, 1997 WL 527349 (D.D.C. Aug. 21, 1997), *aff'd*, 159 F.3d 635 (D.C. Cir. 1998), for the position that a statement by an individual government official can *never* amount to state action.  MTD at 5-6.  In *Abu-Jamal*, the Fraternal Order of Police publicly denounced NPR's decision to air "commentaries" written by the plaintiff, a convicted cop-killer.  Senator Robert Dole contacted NPR demanding that it not play Abu-Jamal's pieces, which NPR ultimately pulled.  And in *Daniels*, the asserted basis for state action consisted of two letters from Congressman Adam Schiff and one comment from House Speaker Nancy Pelosi, describing Section 230 immunity as a "gift" that "could be removed."  These statements bear scant resemblance to the barrage of threats levied at Defendants at congressional hearings, specifically convened to pressure social media companies to censor disfavored speech: "**Congress will have to compel you, compel you perhaps with penalties, to make meaningful changes**."  *See supra* at 3.  The district courts' holdings in *Abu-Jamal* and *Daniels* do not stand for a general proposition that "statements from

1    individual members of Congress [cannot] turn private decisions into state action," MTD at 5, and

2    if they did, they would be in direct conflict with binding Supreme Court precedent in *Lombard*,

3    *Classic*, *Iowa-Des Moines Nat'l Bank*, and *Terry*.

4            D.      **Government Encouragement of Defendants' Conduct Is Amply Pleaded.**

5            State action exists when the government provides significant encouragement, overt or

6    covert, to the private party's conduct.  *Blum*, 457 U.S. at 1004.  Plaintiffs do not rely on Section

7    230 alone as the basis for alleging encouragement.  The above-described official statements not

8    only amount to coercion, they also provided "significant encouragement" to Defendants'

9    censorship.  Indeed, Mr. Zuckerberg admitted that "**[Section 230] allows platforms to moderate**

10   **content.**[20]  Defendants may have used Section 230 to block content on their own, but government

11   officials were incensed that Defendants were not aggressive enough in censoring.  So the officials

12   demanded that Defendants use the Section 230 immunity to engage in more censorship, and

13   specifically to censor Mr. Trump.  In other words, the government both handed Defendants the

14   tool with which they could effectively censor and threatened to take away the tool if Defendants

15   did not censor.  The ultimate impact of the statute has been to "encourage and significantly

16   involve the State in private [viewpoint based] discrimination."  *Reitman*, 387 U.S. at 376.[21]

17           Defendants claim that Section 230 is irrelevant to the state action analysis because it does

18   not compel parties to take any action.  MTD at 8-9.  But the state "acts" not only when it coerces,

19   but also when it enables discriminatory private conduct.  In *Reitman*, California voters passed an

20   amendment to the state Constitution prohibiting the state from enacting laws forbidding racial

21   discrimination in private housing.  The amendment left private actors free to discriminate without

22

23   ─────────────────────
     [20] FAC ¶ 74; Nov. 2020 Hearing (Testimony of Mr. Zuckerberg) (emphasis added); RJN ¶ 2.
24   [21] These facts distinguish this case from *Divino LLC v. Google LLC*, 2021 WL 51715 (N.D. Cal.
     Jan. 6, 2021), and *Newman v. Google LLC*, 2021 WL 2633423 (N.D. Cal. June 25, 2021).  In
25   *Newman*, plaintiff claimed that by simply passing Section 230, the government sanctioned of
     Defendants' discriminatory conduct.  2021 WL 2633423, at *9.  In *Divino*, plaintiffs claimed that
26   the "mere availability of Section 230 encourages discrimination."  2021 WL 51715, at *6.  Here,
     Plaintiffs allege much more than that the mere passage of Section 230 comprises state action.
27   The requisite "encouragement" arises from the combination of government officials' demands
     that Defendants censor disfavored speech coupled with the government's explicit wielding of
28   Section 230 immunity, and the threat of its withdrawal, to spur compliance by private actors.

     PLAINTIFFS' OPP. TO MOT. TO DISMISS—15              Case No: 4:21-cv-09044-JSW

1    fear of legal consequences.  387 U.S. at 381.  Plaintiffs were denied housing on account of their

2    race; they sued the property owners, who cited the amendment as a defense.  The Court held that,

3    by making private discriminatory practices immune from the legislative process, the amendment

4    encouraged private racial discrimination and thus violated the Equal Protection Clause.  *Id*.  In the

5    same way, Section 230's grant of immunity impermissibly encourages social media platforms to

6    block disfavored speech, free not merely from official restraint, but private lawsuits as well.

7         The Supreme Court has held that federal laws that immunized private conduct from

8    liability can convert such conduct into state action.  In *Railway Employees' Dept. v. Hanson*, 351

9    U.S. 225, 232 (1956), the Court found state action in private employers' union shop agreements

10   because, under a federal statute, such agreements could not be "made illegal" by any state law.

11   Like Section 230, the federal law was permissive; it did not compel employers to enter into union

12   shop agreements; it only prohibited states from banning them.  And in *Skinner v. Railway Labor*

13   *Executives' Ass'n*, 489 U.S. 602 (1989), the Court found state action in *voluntary* employee drug

14   testing conducted by private employers after the federal government enacted regulations

15   immunizing the employers from liability for performing such testing.[22]  The Supreme Court

16   concluded that this was encouragement enough to make the testing state action:

17        We are unwilling to conclude …that breath and urine tests **required by private railroads**
18        **in reliance on Subpart D** will not implicate the Fourth Amendment. … The fact that the
          Government has not compelled a private party to perform a search does not, by itself,
19        establish that the search is a private one.

20   *Id*. at 614-15 (emphasis added).  The regulations "removed all legal barriers" to such testing and

21   thus were "clear indices of the Government's encouragement, endorsement, and participation" in

22   the practice.  *Id*. at 615-16.  Similarly, Section 230(c) removed legal barriers to private censorship

23   and thus is one of several "indices of the Government's encouragement" of such censorship.

24        Ninth Circuit authority is not inconsistent.  *Atkinson v. Meta Platforms*, 2021 WL

25

26

---

[22] Subpart C of the federal regulations mandated toxicological testing following a "major train
27   accident."  But the Court's relevant holding, quoted above, pertained to *voluntary* testing
     conducted under *Subpart D*, which did not compel testing, but merely immunized it from private
28   lawsuits—just like Section 230.  *Skinner*, 489 U.S. at 611.

5447022, at *1 (9th Cir. Nov. 22, 2021) (MTD at 8), held that plaintiff had not plausibly pleaded state action based on *coercion* or *joint action*.  The court did not discuss the "encouragement" part of the state action test.  Plaintiffs in *Roberts v. AT&T Mobility LLC*, 877 F.3d 833 (9th Cir. 2017) (MTD at 9) sought to find state action in the mere existence of the Federal Arbitration Act.  "This stretches the encouragement test too far," said the court.  The agreement to arbitrate was reached by private contract and "there is no state action simply because the state enforces that private agreement."  *Id.* at 844.  Here, by contrast, Section 230 does far more; it insulates Defendants from liability for engaging in content censorship.[23]  *See* PI Reply at 7 (re *Skinner* and *Hanson*).

### E.     Joint Action Also Is Sufficiently Pleaded

The joint action test asks "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights."  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012).  The test is satisfied by an "understanding" between the private party and government officials to accomplish a common objective.  *See, e.g.*, *Adickes*, 398 U.S. at 158-59 (tacit "understanding" enough to create state action).  "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence…."  *Mendocino Env. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301 (9th Cir. 1999).  Whether such an agreement existed is "a factual issue and should be resolved by the jury, 'so long as there is a possibility that the jury can "infer from the circumstances" that [defendants and officials] …reached an understanding" to achieve [unlawful] objectives.'"  *Id*. at 1301-02.  The record is replete with facts from which a jury could infer a common understanding between the government and Defendants to censor President Trump and those who echoed his views.  Mr. Zuckerberg testified before Congress that Meta had "partnered with election officials" to remove or attach warnings to 150 million pieces of content, acceded to the government's request for "a plan" to censor election-related content, and wanted government to take "a more active role" in making content moderation decisions.  *See*

---

[23] *Ohno v. Yasuma*, 723 F.3d 984, 996 (9th Cir. 2013) (MTD at 6, 10), held only that a private party's federal suit to enforce a foreign money judgment did not involve state action.  "[M]erely resorting to the courts … does not make a party a co-conspirator … with the judge."  *Kimzey v. Yelp! Inc.*, 836 F.3d 1263 (9th Cir. 2016), *Zeran v. Am Online, Inc.*, 129 F.3d 327 (9th Cir. 1997), and *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003), MTD at 8-9, are not state action cases at all.

*supra* at 4.  The government, for its part, overtly incentivized social media to coordinate the censorship of disfavored speech.  The White House admitted that social media platforms respond to political pressure by ramping up their "enforcement" efforts.  These allegations show Defendants' "willful participation" in the joint censorship campaign.  *Sutton*, 192 F.3d at 843.

### F.  Plaintiffs Have Standing to Challenge the Constitutionality of Section 230.

Defendants argue that (i) Plaintiffs lack standing to claim that Section 230 is unconstitutional, and (ii) the statute is not unconstitutional.  MTD at 12-13.  The second argument raises a purely merits issue that should not be adjudicated on an undeveloped record.  As to the first, Plaintiffs have standing to challenge Section 230 because Defendants have raised Section 230 as a ground for dismissing Plaintiffs' state law claims.  Standing exists because, in this "discrete and well-defined instance[] a particular condition has [occurred] or is likely to occur." *Gonzales v. Carhart*, 550 U.S. 124, 167 (2007).  The "particular condition" here is that Defendants have raised their Section 230 immunity as a shield from liability.  This application of Section 230 would deprive Plaintiffs their right to access the courts to hold Defendants responsible under state laws.  Plaintiffs will suffer "a concrete and particularized injury" that is "traceable to the conduct they challenge," and that "would likely be redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The decision in *Lewis v. Google LLC*, 461 F.Supp.3d 938 (N.D. Cal. 2020), does not compel a different result.  MTD at 12. Indeed, it supports Plaintiffs' position.  Although the court in *Lewis* ultimately ruled against plaintiff, it reached the merits of Lewis's claim challenging the constitutionality of Section 230 for precisely the same reason as exists here: "[T]he Court will address Plaintiff's argument raised in his third claim [Section 230 unconstitutionality] because Defendants assert this statute as a ground for dismissing Plaintiff's claims." *Id*. at 952.  *See also* PI Reply at 11.

### G.  Plaintiffs' Claims Under FDUTPA Are Viable.

**Choice of Law:**  Enforcement of the choice-of-law provision does not depend on Facebook's Terms of Service ("TOS"), but on whether Florida's fundamental policy is at odds with California's.  *In re Facebook Biometric Information Privacy Litig.*, 185 F.Supp.3d 1155, 1170 (N.D. Cal. 2016) (striking choice of law provision that would "completely negat[e]" Ill.

consumer law).  Florida policy allows a plaintiff to seek injunctive relief without showing financial injury.  Fla. Stat. § 501.211(a) (2021); *Ahern v. Mayo Clinic*, 180 So.3d 165, 172 (Fla. 1st DCA 2015).  Under California's Unfair Competition Law ("UCL"), a plaintiff must show that he has lost money as a result of the unfair competition.  Cal. Bus. & Prof. Code §§ 17204 *et seq*. Because applying the UCL's narrower standing requirement would undermine Florida's policy, the choice-of-law provision should not be enforced.

**Material Omission:**  Defendants have deceived users in violation of FDUTPA by failing to disclose that they make content removal decisions based on subjective and political criteria. FAC ¶¶ 9-11, 67-80, 92-131; *see Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 167 (Fla. 4th DCA 2015).  Meta has publicly stated its standards for removing content, yet extensive content that violates these standards remains on its platform. FAC ¶¶ 12, 41-46, 134-37.  Plaintiffs' claims are not based on tricky judgment calls, as Defendants argue, but on deceptive omissions about how those calls are made.  As for the Rule 9(b) argument, FDUTPA is broader than the fraud doctrine.  *Visonic Sys. v. AT&T Digital Life*, 971 F. Supp. 2d 1178, 1195 (S.D. Fla. 2013).  Regardless, the FAC contains sufficient allegations as to the omission (moderating content to curry political favor; FAC ¶¶ 9-11, 229), where it occurred (the TOS; FAC ¶¶ 41-46), its effect (Plaintiffs relied on TOS with material omissions; FAC ¶¶ 224-231), and its benefit (Defendants kept the Section 230 immunity; FAC ¶¶ 81-91).

**H.      Plaintiffs' Allegations Under the SSMCA Are Sufficient.**

**Retroactivity:**  Florida's Stop Social Media Censorship Act ("SSMCA") requires subject companies to publish their content moderation standards and apply them *in a consistent manner*. Fla. Stat. § 501.2041(2)(a) & (b) (2021).  Defendants' arguments that the law is not retroactive misses the mark; a plaintiff need not be the party affected by the inconsistent treatment.  *Id*. Plaintiffs have brought claims based on Defendants' failure to consistently apply their standards **after** the statute's effective date.   FAC ¶¶ 109-117; 120-21.

**First Amendment:**  Defendants claim that Meta is a "speaker" and that the First Amendment forecloses Plaintiffs' claims under the SSMCA because it interferes with Meta's editorial judgment and singles out social media for "disfavored treatment."  MTD at 16-17.

1   Defendants cite *NetChoice v. Moody*, 2021 WL 2690876 (N.D. Fla. June 30, 2021) for the

2   proposition that the SSMCA's consistency provision is unconstitutional.  However, the

3   *NetChoice* court entered a preliminary injunction; it made no merits ruling on the plaintiff's First

4   Amendment claims.  Moreover, the court's First Amendment analysis never mentioned the

5   SSMCA's "consistency" provision, Fla. Stat. § 501.2041(2)(b), which is at issue here.  Finally,

6   any constitutional infirmity related to other provisions is immaterial as the SSMCA's enacting

7   statute contains a severability clause.  Florida Senate Bill 7072, Section 6; *see also Denver Area*

8   *Educ. Telecoms. Consortium v. FCC*, 518 U.S. 727, 767-768 (1996).  *See* PI Reply at 8-10.

9           **I.**      **Section 230(c)(1) Does Not Bar Plaintiffs' State Law Claims.**

10         Defendants move to dismiss the Florida state law claims under Section 230(c)(1).  In order

11   for that immunity to apply, Plaintiffs must seek to hold Defendants liable for "information

12   provided by another information content provider," and as the "publisher[s] or [speakers]" of that

13   information.  *Fyk v. Facebook, Inc.*, 2019 WL 11288576, at *2 (N.D. Cal. June 18, 2019).

14   Plaintiffs' claims are based on Defendants' failure to disclose the standards they apply in deciding

15   whether to remove content from their platform (FDUTPA) and to apply their standards

16   consistently (SSMCA).  Nothing in these claims attempts to base liability on information

17   provided by a third-party user, nor do they involve "the reviewing, editing, and deciding whether

18   to publish" third-party content.  *Id*.  Defendants' challenged actions cannot "be boiled down to

19   deciding whether to exclude material that third parties seek to post online," which is the *sine qua*

20   *non* of Section 230 immunity.  *Id*.

21  **IV.**    **CONCLUSION**

22         Plaintiffs respectfully submit that the motion to dismiss should be denied.[24]

23  Dated: February 7, 2022        ANDREI POPOVICI (234820)
                                 MARIE FIALA (79676)

24                               LAW OFFICE OF ANDREI D. POPOVICI, P.C.

25                     By:     */s/ Marie L. Fiala*

26                            Marie L. Fiala

27

28

---

[24] In the event of dismissal, justice requires that leave to amend be granted.  *See Howey v. U.S.*, 481 F.2d 1187, 1190 (9th Cir. 1973) (factors for denying leave to amend do not exist here).

JOHN P. COALE *(pro hac vice)*
2901 Fessenden Street, NW
Washington, D.C. 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY *(pro hac vice)*
MICHAEL J. JONES *(pro hac vice)*
RYAN TOUGIAS *(pro hac vice)*
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

FRANK C. DUDENHEFER, JR. *(pro hac vice)*
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

RICHARD POLK LAWSON (*pro hac vice*)
GARDNER BREWER HUDSON, P.A.
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gbmmlaw.com
*Attorneys for Plaintiffs*