1

JOHN P. COALE (*pro hac vice*)
2901 Fessenden Street NW
Washington, D.C. 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

2

3

4

JOHN Q. KELLY (*pro hac vice*)
MICHAEL J. JONES (*pro hac vice*)
RYAN TOUGIAS (*pro hac vice*)
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

5

6

7

8

9

10

FRANK C. DUDENHEFER , JR. (*pro hac vice*)
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

11

12

13

14

ANDREI POPOVICI (234820)
MARIE FIALA (79676)
LAW OFFICE OF ANDREI D. POPOVICI, P.C.
2121 North California Blvd. #290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
Facsimile: (650) 530-9990
Email: andrei@apatent.com
Email: marie@apatent.com

RICHARD POLK LAWSON (*pro hac vice*)
GARDNER BREWER HUDSON, P.A.
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gbmmlaw.com

15

*Attorneys for Plaintiffs*

16

17

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

18

**OAKLAND DIVISION**

19

20

21

22

23

24

DONALD J. TRUMP, et al.,

Plaintiffs,

v.

META PLATFORMS, INC., et al.,

Defendants.

Case No: 4:21-cv-09044-JSW

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Hon. Jeffrey S. White

25

26

27

28

PLAINTIFFS' REPLY ISO MOT.
FOR PRELIMINARY INJUNCTION

Case No: 4:21-cv-09044-JSW

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................. 1

II.     STATEMENT OF FACTS ............................................................................................... 1

III.    LIKELIHOOD OF SUCCESS ON THE MERITS......................................................... 4

    A.     Plaintiffs Have Pleaded State Action by Means of Coercion............................................ 5

    B.     Plaintiffs Have Pleaded State Action by Means of Encouragement. .............................. 7

    C.     Joint Action Also Is Sufficiently Pleaded. ..................................................................... 7

    D.     The First Amendment Does Not Preclude the Relief Requested. .................................... 8

    E.     Plaintiffs Have Standing to Challenge the Constitutionality of Section 230. ................ 11

    F.     Plaintiffs' Claims Under Florida Law Support a Preliminary Injunction. ..................... 11

IV.     OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFF. ...... 11

    A.     Irreparable Harm to Plaintiff........................................................................................... 11

    B.     The Balance of Equities Favors Injunctive Relief. ........................................................ 13

    C.     The Public Interest Favors Injunctive Relief.................................................................. 14

V.      CONCLUSION............................................................................................................... 15

1

## **TABLE OF AUTHORITIES**

2

Cases

3

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ................................... 13

4

*Arc of Calif. v. Douglas*, 757 F.3d 975 (9th Cir. 2014) ................................................................ 13

5

*Backpage v. Dart*, 807 F.3d 229 (7th Cir. 2015) ........................................................................ 12

6

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 59 (1963)...................................................................... 1

7

*Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021)..................... 12

*Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ............................................................................... 7

8

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987) ... 5, 6, 8

9

*Children's Health Defense v. Facebook Inc.*, 2021 WL 2662064 (N.D. Cal. June 29, 2021) ......... 5

10

*Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010)............................................... 15

11

*Conservation Force v. Delta Air Lines, Inc.* 190 F. Supp. 3d 606 (N.D. Tex. 2016) ...................... 9

*Daniels v. Alphabet, Inc.*, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ...................................... 5

12

*Dinsmore v. The Louisville, Cincinnati & Lexington Railway Company*, 2 F. 465 (Cir. Ct., D. KY, 1880) ......................................................................................................................................... 10

13

*Doe v. Google LLC*, 2021 WL 4864418 (N.D. Cal. Oct. 19, 2021) ............................................... 5

14

*Domen v. Vimeo, Inc.* 991 F.3d 66 (2nd Cir. 2021) ..................................................................... 11

15

*Domen v. Vimeo, Inc.*, 2021 WL 4352312 (2nd Cir. Sept. 24, 2021) ........................................... 11

*Domen v. Vimeo, Inc.*, 6 F.4th 245 (2nd Cir. July 21, 2021) ....................................................... 11

16

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................................... 12

17

*Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214 (1989) .......................... 15

18

*FTC v. AT&T Mobility, LLC*, 883 F.3d 848 (9th Cir. 2017)......................................................... 10

19

*Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721 (7th Cir.2009) ................................................................................................................................. 13

20

*Hurley v. Irish American*, 515 U.S. 557 (1995).......................................................................... 8, 9

21

*Lombard v. Louisiana*, 373 U.S. 267 (1963) ................................................................................. 5

22

*Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429 (9th Cir. 1989) .................................................... 5

23

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976)................................................................... 12

24

*NetChoice LLC v. Moody*, 2021 WL 2690876 (N.D. Fla. June 30, 2021).................................... 9

25

*NetChoice LLC v. Paxton*, 2021 WL 5755120 (W.D. Tex. Dec. 1, 2021) ................................... 9

26

*O'Handley v. Padilla*, 2022 WL 93625 (N.D. Cal. Jan. 10, 2022)............................................... 9

27

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1 (1986)....................................... 8, 9, 11

*Pasadena Republican Club v. W. Justice Ctr.*, 985 F.3d 1161 (9th Cir. 2021) ............................. 8

28

*Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) ............................................................. 9

*Railway Employees' Dept. v. Hanson*, 351 U.S. 225 (1956) ............................................................ 7

*Reno v. ACLU*, 521 U.S. 844 (1997) ................................................................................................ 14

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002) ...................................... 15

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989) ................................................ 7

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999) ........................ 6, 7

*Trump v. International Refugee Assistance Project*, ___ U.S. ___, 137 S.Ct. 2080 (2017) .......... 13

*U.S. Telecom Ass'n v. FCC,* 825 F.3d 674 (DC Cir. 2016) ............................................................ 10

*United States v. Classic*, 313 U.S. 299 (1941) ................................................................................ 5

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) .................................................. 1

*Zeran v. Am Online, Inc.*, 129 F.3d 327 (9th Cir. 1997) ................................................................ 7

Statutes

47 U.S.C. § 230 ............................................................................................................................... 10

47 U.S.C. § 230(a)(3) ...................................................................................................................... 15

47 U.S.C. § 230(c) ............................................................................................................................ 2

47 U.S.C. § 414 ............................................................................................................................... 10

Cal. Civ. Code §§ 2168, 2169, 2209 ................................................................................................ 9

*"It is characteristic of the freedoms of expression in general that they are vulnerable to gravely damaging yet barely visible encroachments … [T]he freedoms of expression must be ringed about with adequate bulwarks."*

– Justice Brennan in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 59 (1963).

## I.   INTRODUCTION

By banning former President Trump and other speakers who share his political views from the Facebook platform, Defendants have prevented the free and open exchange of ideas that underpin our democracy and damaged the integrity of the election process.[1]  *See* Declaration of Alan M. Dershowitz ("Dershowitz Decl.") (Dkt. 87-1) ¶ 6 (Mr. Trump's right to speak and the rights of his audience to hear his views have been "seriously compromised"); ¶ 8 (Facebook ban will have "adverse and unknowable effect on the 2022 elections"); ¶ 10 ("Democracy demands a level playing field.").  The proposed preliminary injunction does not ask the Court to impose new duties on Defendants.  Rather, it seeks to restore *ex ante* Plaintiff Trump's access to the account that he had maintained for many years prior to his deplatforming by Defendants, in response to coercive pressure from legislators and members of the Executive Branch, including the Biden White House.  The test to be applied on this motion is whether (i) Mr. Trump is likely to succeed on the merits; (ii) he is likely to suffer irreparable harm in the absence of preliminary relief; (iii) the balance of equities tips in his favor; and (iv) an injunction is in the public interest.  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008).  Mr. Trump satisfies each of these tests, thus entitling him to the injunctive relief requested.

## II.   STATEMENT OF FACTS

The First Amended Complaint ("FAC") details a litany of events where members of Congress and the Executive Branch coerced Defendants and other social media platforms to censor Plaintiffs' disfavored speech on pain of catastrophic consequences.  *See* FAC ¶¶ 67-74 (detailing officials' statements).[2]  Legislators held hearings to which Defendant Zuckerberg was

---

[1] Plaintiffs will use "Meta" to refer to the Defendant company and "Facebook" for its social media platform and also when necessary for proper historic context.

[2] *See, e.g.*, FAC ¶ 71 ("[F]or the privilege of 230, there has to be a bigger sense of responsibility

1   summoned, during which they threatened to impose regulations and strip Meta of its immunity

2   under Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c) ("CDA").  The

3   coercive, viewpoint-discriminatory statements by legislators at these official proceedings shock

4   the conscience of any American concerned with the erosion of First Amendment rights:

5   **[I]t is time for Congress and this Committee to legislate and realign these companies'**
    **incentives** to effectively deal with disinformation.…  So when a company is actually
6   promoting this harmful content, **I question whether existing liability protections should**
    **apply**. …  **That is why you are here today, Mr. Zuckerberg. …  It is time we legislate**
7   **to hold you accountable**.  FAC ¶¶ 71, 74; "Disinformation Nation: Social Media's Role
    in Promoting Extremism and Misinformation": Hearing before H. Comm. on Energy and
8   Com., 117th Cong. (March 25, 2021) ("March 2021 Hearing") (Opening Stmt. of Comm.
9   Chairman Frank Pallone, Jr. (Dem.)) (emphasis added), RJN ¶ 7.

10  What our witnesses need to take away from this hearing is … that this democratically
    elected body **is prepared to move forward with legislation and regulation**. *Id*.
11  (Opening Stmt. of Rep. Janice D. Schakowsky (Dem.)); (emphasis added), RJN ¶ 9.

12  **Congress will have to compel you, compel you perhaps with penalties, to make**
    **meaningful changes**.  *Id*.  (Quote from Rep. G.K. Butterfield (Dem.)) (Tr. at 861:1987-
13  90; 881:2019-2021) (emphasis added), RJN ¶ 4.

14  I think **Congress must revisit Section 230**."  *Id*.  (Quote from Rep Doris Matsui (Dem.))
    (Tr. at 941:2177-78, 2180-81) (emphasis added), RJN ¶ 4.

15  **[P]ursuant to 230, you all** [Facebook, YouTube, and Twitter] **can't be sued.** You have
    immunity. But it ain't 1996 anymore, is it? Meanwhile, lies are spreading like wildfire
16  through platforms. … **What specific changes to Section 230 do you support to ensure**
    **more accountability**? *Id*.  (Quote from Rep. Darren Soto (Dem.)) (Tr. at 1681:3998-
17  4001; 1691:4016-17) (emphasis added), RJN ¶ 4.

18  Legislators specifically called for President Trump to be banned from Facebook:

19  Twitter recently had a policy where a user could not view President Trump's
    misinformation.…  **Why did Facebook not adopt a similar approach?**  Under what
20  conditions would Facebook adopt the same protections **against President Trump's**
21  **misinformation**?  FAC ¶¶ 71, 74; Breaking the News: Censorship, Suppression, and the
    2020 Election: Hearing before S. Comm. on the Judiciary, 116th Cong. (Nov. 17, 2020)
22  ("Nov. 2020 Hearing") (Sen. Blumenthal to Mr. Zuckerberg) (emphasis added), RJN ¶ 3.

23  **President Trump is spreading dangerous misinformation** about our electoral process
    on your platforms right now. …  [W]hat concrete steps has Facebook taken to enhance its
24  enforcement policies regarding election disinformation…?  *Id*.  (Sen. Booker to Mr.

25
    _____
26  (… cont'd)
    on it.  And it is not out of the question that that could be removed."  House Speaker Nancy Pelosi,
27  Apr. 12, 2019); ("Section 230 should be revoked, immediately should be revoked, number one.
    For Dorsey and other platforms."  Candidate Joe Biden, *New York Times,* Jan. 19, 2020).  The
28  White House confirmed President Biden's stance on Section 230 in July 2021.  FAC ¶ 121.

PLAINTIFFS' REPLY ISO MOT.
FOR PRELIMINARY INJUNCTION—2                              Case No: 4:21-cv-09044-JSW

Zuckerberg) (emphasis added), RJN ¶ 3.

> There was a greater increase in hate speech the week **after the President's tweet**. … Mr. Zuckerberg … why do you still allow these hashtags on your platform[]?  March 2021 Hearing (Rep. Matsui to Mr. Zuckerberg) (emphasis added), RJN ¶ 4.

*See also* FAC ¶ 71 ("**Trump** is willing to do anything for himself … And until he stops, **Facebook must ban him**.  Which is to say, forever."  (Rep. Adam Schiff, May 5, 2021)) (emphasis added).[3]

Government and Meta have actively partnered to censor speech.  As one Senator said to Mr. Zuckerberg, "[W]e need to work very closely with you … [to] disrupt this ["radical" speech] … for folks that are using your platform."[4]  Mr. Zuckerberg testified at the same hearing, "I believe we need **a more active role for governments and regulators [in content moderation decisions].**…"[5]  A month later, Mr. Zuckerberg testified that Meta had "partnered with election officials" to remove or post warnings on more than 150 million pieces of content and that Meta "receive[s] reports from governments and courts…." in connection with its content moderation efforts.[6]  President Biden and leaders of federal agencies have coordinated with Defendants to censor speech that the government regards as undesirable, including former President Trump's views on election fraud and the origin of, and treatments for, COVID.  FAC ¶¶ 92-117.  The White House has confirmed that Executive Branch officials regularly "engage" with social media platforms at the highest levels to censor disfavored speech: "There are also proposed changes that we have made to social media platforms … we have recommended [] that they create a robust enforcement strategy."  *Id*. ¶ 109.[7]  The White House made clear that bans should be extended

---

[3] Defendants responded to this government pressure: "These platforms [Facebook, YouTube, and Twitter] often **ramp up their efforts** against content in response to social **and political** pressure."  FAC ¶ 74; March 2021 Hearing (Memo. from Chairman Pallone prepared by Staff) (emphasis added), RJN ¶ 10.

[4] FAC ¶ 71; "Does Section 230's Sweeping Immunity Enable Big Tech Bad Behavior": Hearing before S. Comm. on Commerce, Science and Transportation, 117th Cong. (Oct. 28, 2020) ("Oct. 2020 Hearing") (Sen. Peters to Mr. Zuckerberg), RJN ¶ 12.

[5] Oct. 2020 Hearing (Testimony of Mr. Zuckerberg), RJN ¶ 11; Oct. 2020 Hearing (Mr. Zuckerberg to Sen. Blumenthal) (Meta accedes to government request for "a plan" to suppress any questions about *integrity of 2020 elections*), RJN 12.

[6] FAC ¶ 74; Nov. 2020 Hearing (Testimony of Mr. Zuckerberg) (emphasis added), RJN ¶ 2.

[7] *See also* FAC ¶ 110 (Surgeon General stated on July 15, 2021: "We're asking [social media companies] to monitor misinformation more closely.  We're asking them to consistently take

1     across platforms: "You shouldn't be banned from one platform and not others … for providing

2     misinformation out there." *Id*. ¶ 117.  Not surprisingly, Meta has developed a powerful tracking

3     platform, CENTRA, to monitor its users' speech and activities on all social media platforms. *Id*.

4     ¶ 39.  The White House has pointed out specific narratives to be censored: "So we are …

5     regularly making sure social media platforms are aware of the latest narratives dangerous to

6     public health that we and many other Americans are seeing …." *Id*. ¶ 111.  Meta worked hand-

7     in-glove with the White House, CDC, NIH, and the NIAID to monitor Plaintiffs' COVID-related

8     postings and censor those that contradicted government pronouncements. *Id*. ¶¶ 92-105.  Meta

9     has admitted the critical role Section 230 immunity plays in allowing it to censor speech with

10    impunity: "**[Section 230] allows platforms to moderate content.**  Without Section 230,

11    platforms could face liability for doing even basic moderation."

12            Defendants banned President Trump from their platform on January 12, 2021.  Due to

13    sustained government pressure, the ban remains in force.  FAC ¶¶ 6-7.[8]  For example, the

14    Surgeon General has issued a "Misinformation Advisory" directing social media platforms to

15    trample on First Amendment rights by "strengthening the monitoring" of so-called

16    "misinformation"; "moderating" discussions *in live streams*; identifying and imposing

17    "consequences" on "repeat offenders"; connecting users to "trusted leaders" who can provide

18    approved information; and "protecting" journalists and others from "harassment" from people

19    "believing in misinformation"—i.e., from citizens exercising their free speech rights.[9]  Such

20    government practices have no place in a free society.

21    **III.     LIKELIHOOD OF SUCCESS ON THE MERITS**

22            The most powerful public officials and entities in the Executive and Legislative Branches

23

24    _____

      (… cont'd)

25    action against misinformation … on their platforms.").

26    [8] Declaration of Richard Lawson ("Lawson Decl."), Exh. 11.  The *Wall Street Journal* has
      revealed that Meta applies a more lenient content moderation policy to favored prominent users
      and has concealed that information from its own Oversight Board.  *See* Declaration of Samantha

27    Ferrara ("Ferrara Decl."), Exhs. A-F.

28    [9] FAC ¶ 74; Nov. 2020 Hearing (Testimony of Mr. Zuckerberg) (emphasis added), RJN ¶ 2.

      PLAINTIFFS' REPLY ISO MOT.
      FOR PRELIMINARY INJUNCTION—4                              Case No: 4:21-cv-09044-JSW

1    acted in virtual lockstep to coerce, encourage, and/or coordinate with Defendants to ban Plaintiff

2    from Facebook.  They told Defendants in so many words to ban Mr. Trump, or else.  The

3    allegations in the FAC are sufficient to convert Facebook's prior restraint of Plaintiff and his

4    political views to state action.  Because Defendants' merits arguments largely duplicate those

5    made in their Motion to Dismiss, Plaintiffs incorporate herein their Opposition to Defendant's

6    Motion to Dismiss ("MTD Opp.").  The following discussion focuses on additional arguments.

7            **A.      Plaintiffs Have Pleaded State Action by Means of Coercion.**

8            Plaintiffs' Opposition to the Motion to Dismiss leaves no doubt that Defendants'

9    censorship of Mr. Trump's Facebook content constitutes state action by coercion.  MTD Opp. at

10   6-15.  Members of Congress and the White House—speaking in their official capacities[10]—

11   relentlessly pressured Defendants and other social media companies to ban *Mr. Trump*

12   *specifically* from their platforms, wielding the threat of repealing Section 230 immunity as a

13   cudgel to force Defendants' compliance.  *Id*.  Because Mr. Trump was identified individually, he

14   was the subject of state action even under the overly restrictive "particular case" test applied in

15   *Doe v. Google LLC*, 2021 WL 4864418 (N.D. Cal. Oct. 19, 2021); *Children's Health Defense v.*

16   *Facebook Inc.* ("*CHD*"), 2021 WL 2662064 (N.D. Cal. June 29, 2021) (currently on appeal,

17   Ninth Circuit No. 21-16210); and *Daniels v. Alphabet, Inc.*, 2021 WL 1222166 (N.D. Cal. Mar.

18   31, 2021).  Even were that not the case, state action would exist because the public officials'

19   threats and exhortations targeted a distinct and identifiable group of citizens—those who echoed

20   Mr. Trumps's views—for censorship.  *See, e.g.*, *Lombard v. Louisiana*, 373 U.S. 267 (1963);

21   *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987);

22   *Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429 (9th Cir. 1989) ("*Mathis I*"); MTD Opp. at 6-11.

23          There can be no doubt that the pointed threats levied at Defendants at congressional

24   hearings, specifically convened to pressure social media companies to censor disfavored speech,

25

26   [10] The bulk of the state actors' statements were made *ex cathedra*—on the floor of Congress or
     from the White House.  Even if that were not the case, however, informal—or even unlawful—
27   conduct by state actors can give rise to state action.  *See, e.g., Lombard v. Louisiana*, 373 U.S.
     267 (1963) (speeches by public officials); *United States v. Classic*, 313 U.S. 299, 326 (1941);
28   MTD Opp. at 13-15.

1   constitute naked coercion: "**Congress will have to compel you, compel you perhaps with**

2   **penalties, to make meaningful changes**." *Supra* at 2.  Defendants assert that "compulsion"

3   requires a threat to impose legal sanctions such as criminal prosecution, citing *Carlin*, 827 F.2d at

4   1295.  PI Opp. at 7-8.  Not so.  That supposed rule appears nowhere in the case.  *Carlin* held only

5   that "with this threat [to prosecute], Arizona 'exercised coercive power' over [the phone

6   company] and thereby converted its otherwise private conduct into state action."  827 F.2d at

7   1295.  Obviously a threat of prosecution is *sufficient* to establish coercion, but *Carlin* nowhere

8   said it is *necessary*.  The court made no ruling about the limits of the coercion doctrine.

9        Defendants implicitly argue that it is practically impossible for a plaintiff to bring a state

10  action claim against a private defendant, citing *Sutton v. Providence St. Joseph Medical Center*,

11  192 F.3d 826 (9th Cir. 1999) (PI Opp. at 8).  The state action doctrine is not so restrictive and, in

12  any event, Plaintiffs' allegations satisfy even the most stringent requirements.  *Sutton* held that

13  "governmental compulsion **in the form of a generally applicable law**, without more, is [not]

14  sufficient to deem a private entity a governmental actor."  Instead, "the plaintiff must establish

15  some other nexus" between the state and the private entity.  "Typically, the nexus has consisted of

16  participation by the state in an action ostensibly taken by the private entity, through conspiratorial

17  agreement, official cooperation with the private entity …, or enforcement and ratification of the

18  private entity's chosen action."  *Id*., 192 F.3d at 841 (citations omitted) (emphasis added).  As

19  discussed in the Opposition to the Motion to Dismiss, state action in this case does not rest on a

20  "generally applicable law."  MTD Opp. at 7-9.  The public officials' coercive conduct and

21  Defendants' expressed willingness to cooperate with government's goals constitute the

22  "participation," "cooperation," or "enforcement and ratification" that *Sutton* requires.

23  Defendants' misreading of *Sutton* leaves no room for operation of the state action doctrine:

24  Either the Government officials are rogue actors because their actions do not have the force of

25  law, or they are acting pursuant to a generally-applicable law, so there can never be state action.

26  Not only is this reading at loggerheads with half a century of Supreme Court precedent but it

27  would contradict some of the cases on which they rely, such as *Carlin*, because the prosecution

28  there was threatened under a generally-applicable statute.  That is not the law.

PLAINTIFFS' REPLY ISO MOT.
FOR PRELIMINARY INJUNCTION—6                           Case No: 4:21-cv-09044-JSW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.      Plaintiffs Have Pleaded State Action by Means of Encouragement.

State action exists when the government provides significant encouragement, either overt or covert, to the private party's conduct. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  Plaintiffs do not rely on the existence of Section 230 alone as the basis for meeting the state action encouragement test.  Indeed, Mr. Zuckerberg admitted that "**[Section 230] allows platforms to moderate content.**[11]  Defendants may have used 230 to block content on their own, but government officials were incensed that Defendants were not aggressive enough in censoring.  So the officials demanded that Defendants use the Section 230 immunity from liability to engage in more censorship, and specifically to censor Mr. Trump.  In other words, the government both handed Defendants the tool with which they could effectively censor and threatened to take away the tool if Defendants did not censor.  These facts add up to encouragement.

Defendants' feeble effort to distinguish *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), and *Railway Employees' Dept. v. Hanson*, 351 U.S. 225 (1956), are unavailing. PI Opp. at 9-10.  The *only* sources of state action in *Skinner* were regulations that, *inter alia*, allowed private railroads to conduct toxicological testing of their employees with immunity from liability for doing so.  Here, in addition to Section 230 immunity, Plaintiffs have described numerous direct interactions with, and communications from, government actors expressing their "strong preference" for censorship.  489 U.S. at 603.  And in *Hanson*, plaintiffs' First Amendment challenge against private railroads only reached the Court because state action existed.  The Court found state action in the railroads' union shop agreements because, under a federal statute, such agreements could not be "made illegal" by any state law.  "If private rights are being invaded, it is by force of an agreement made **pursuant to federal law which expressly declares that state law is superseded**…. [T]he federal statute is the source of the power and authority by which any private rights are lost or sacrificed." 351 U.S. at 232 (emphasis added).[12]

### C.      Joint Action Also Is Sufficiently Pleaded.

The record is replete with facts from which a jury could infer a common understanding

---

[11] FAC ¶ 74; Nov. 2020 Hearing (Testimony of Mr. Zuckerberg) (emphasis added); RJN ¶ 2.
[12] *Zeran v. Am Online, Inc.*, 129 F.3d 327 (9th Cir. 1997) (PI Opp. at 9)is not a state action case.

PLAINTIFFS' REPLY ISO MOT.
FOR PRELIMINARY INJUNCTION—7                                Case No: 4:21-cv-09044-JSW

1    between the government and Defendants to censor Mr. Trump.  Mr. Zuckerberg testified before

2    Congress that Meta had "partnered with election officials" to remove or attach warnings to 150

3    million pieces of content, acceded to the government's request for "a plan" to censor election-

4    related content, and wanted government to take "a more active role" in making content

5    moderation decisions.  *See supra* at 3 & n.5.  The government, for its part, overtly incentivized

6    social media to coordinate the censorship of disfavored speech.  And the White House admitted

7    that social media platforms respond to political pressure by ramping up their "enforcement"

8    efforts.  These allegations are enough to show that Defendants and the government were

9    "inextricably intertwined" in censoring Mr. Trump's Facebook content.  *Pasadena Republican*

10   *Club v. W. Justice Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021).

11              **D.       The First Amendment Does Not Preclude the Relief Requested.**

12              Defendants assert that the First Amendment protects their continued censorship of

13   President Trump because their Facebook platform should be treated like a newspaper (*Miami*

14   *Herald v. Tornillo*, 418 U.S. 241 (1974)), a St. Patrick's Day parade (*Hurley v. Irish American*,

15   515 U.S. 557 (1995)), or a utility company mailer (*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*,

16   475 U.S. 1 (1986)).  In *Tornillo*, a Florida law required newspapers to provide space for a right of

17   reply from public officials who had been criticized in the papers' pages.  The Court held that the

18   law impinged on the *Miami Herald's* First Amendment rights because it would have to devote

19   space to and incur costs for publishing a reply; the law would have a chilling effect on what the

20   *Herald* published; and the law intruded on the paper's editorial control over the material that

21   appeared in its pages.  418 U.S. at 256-58.  These factors do not apply to Defendants' platform.

22   In an electronic medium, space and the cost of paper are not issues.  Chilling effect is impossible

23   because what appears on Facebook is not its own content, but that of its users.  Finally,

24   Defendants cannot plausibly claim that, among the posts generated by their billions of worldwide

25   users, Facebook is somehow curating an editorial message like that of a newspaper.  Courts take a

26   functional approach in determining the nature of novel communications technologies.  *See, e.g.,*

27   *Carlin*, 827 F.2d at 1294 (analogizing telephone company to "a small radio station" because the

28   particular service there in question did not enable callers to speak to each other).

PLAINTIFFS' REPLY ISO MOT.
FOR PRELIMINARY INJUNCTION—8                                      Case No: 4:21-cv-09044-JSW

1    Defendants' reliance on *Hurley* and *Pacific Gas* is similarly misplaced.  In *Hurley*, the

2    Court held that the organizers of Boston's St. Patrick's Day Parade had a message to convey, and

3    the regulation at issue might compel them to carry contrary content.  The Court recognized that

4    such events are "a form of expression, not just motion, …"  515 U.S. at 568.  Similarly, in *Pacific*

5    *Gas*, the Court held that a utility company could not be compelled to include messages with

6    which it disagreed in its mailings to customers.  475 U.S. at 10-11.  Facebook, with its millions of

7    daily posts by third parties, has nothing in common with the speakers in these cases.  Its content-

8    moderation policies govern the speech of millions of independent parties, not its own.

9    Defendants' other cited cases hold that a social media company engages in editorial

10   judgments when it, e.g., promotes a post, ranks search results, places advertisements, or the like.

11   *O'Handley v. Padilla*, 2022 WL 93625 (N.D. Cal. Jan. 10, 2022);  *NetChoice LLC v. Paxton*,

12   2021 WL 5755120 (W.D. Tex. Dec. 1, 2021); PI Opp. at 13.  Such activities are qualitatively

13   different than, and thus irrelevant to, the basis for the claims here—Defendants' hosting of third-

14   party content.  *NetChoice v. Moody* (PI Opp. at 13) recognized exactly this distinction:

> But newspapers, unlike social-media providers, create or select all their content, including op-eds and letters to the editor. …[A] newspaper is not a medium invisible to the provider. …Social media providers, in contrast, routinely use algorithms to screen all content for unacceptable material but usually not for viewpoint, and the overwhelming majority of the material never gets reviewed except by algorithms. Something well north of 99% of the content that makes it onto a social media site never gets reviewed further. The content on a site is, to that extent, invisible to the provider.

20   *NetChoice LLC v. Moody*, 2021 WL 2690876, at *8 (N.D. Fla. June 30, 2021).[13]

21   Social media is more akin to a common carrier like a railroad than a newspaper.[14]  Its

22   history parallels the development of railroads in the 1800s.  To spur construction, Congress gave

23

24
_____

25   [13] Defendants can address concerns that content they carry might represent their opinions by disclaimers.  The Supreme Court approved this method when it held that any burden shopping
26   mall owners suffered by hosting speakers with contrary views could be managed by affixing disclaimers.  *Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 88 (1980).

27   [14] While Plaintiffs do not allege unfair discrimination by a common carrier, such claims are available under California state law (Cal. Civ. Code §§ 2168, 2169, 2209) and federal common
28   law.  *See Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606 (N.D. Tex. 2016).

1   massive tracts of public lands to the railroads, which sold the land and used the revenues to build

2   transcontinental rail lines.  As the railroads grew in wealth and size, so did complaints about their

3   unfair discriminatory practices.  Courts held that, as beneficiaries of massive land grants, the

4   railroads were common carriers, bound by common law prohibitions against unfair

5   discrimination.[15]  These early decisions form the basis of today's common carrier jurisprudence.[16]

6          The parallels between railroads and the government's Section 230 subsidy for social

7   media are striking.  Congress midwifed the rapid rise of social media by enacting Section 230.

8   Without Section 230's immunity, social media as we know it would not exist today.  The growth

9   fostered by this immunity has been extraordinary.  Lawson Decl., Exhs. 1 & 2; FAC ¶ 76.  For

10  example, in 2011, advertising expenditures for print and online were $20 billion and $31 billion,

11  respectively; by 2019, those numbers were $15 billion and $124 billion.  Lawson Decl., Exhs. 3

12  & 4.  Facebook, Twitter, and Alphabet (YouTube's parent company), have market capitalizations

13  of $880 billion, $31 billion, and $1.7 trillion, respectively.  The SEC filings for each specifically

14  caution that Section 230 is vital to their business models and any changes would substantially

15  affect revenues.  *Id*., Exhs. 5-10.  To date, over three billion users have taken Meta up on this

16  "come one come all" offer, demonstrating that Defendants make no individualized decisions

17  about the terms on which to deal—the classic hallmark of a common carrier.  *U.S. Telecom Ass'n*

18  *v. FCC,* 825 F.3d 674, 740 (D.C. Cir. 2016).[17]  The First Amendment analysis in *Tornillo*,

19  *Hurley*, and *Pacific Gas* no more applies to Defendants when they host Mr. Trump's tweets than

20  it would apply to Delta Airlines when Mr. Trump rides their planes.

[15]  *See, e.g., Dinsmore v. Louisville, C. & L. Ry. Co.*, 2 F. 465 (C.C.D. Ky. 1880) ("Railroads are quasi-public institutions . . . their construction has been encouraged by liberal grants of power, and aided by private and public contributions").

[16]  As recently as 2017, the Ninth Circuit traced the contemporary understanding of common carriers from England in the 1670s to the railroads to today's telecommunications industry.  *FTC v. AT&T Mobility, LLC*, 883 F.3d 848, 860 (9th Cir. 2017).

[17]  Whether a party is conveying speech or physical goods is immaterial to common carrier analysis.  *U.S. Telecom*, 825 F.3d at 742.  The fact that Section 230 is housed within the Federal Communications Act is no bar to a finding that Facebook meets a common law definition of a common carrier; the Act itself states that it does not in, "any way abridge or alter the remedies now existing at common law or by statute."  47 U.S.C. § 414.

PLAINTIFFS' REPLY ISO MOT.
FOR PRELIMINARY INJUNCTION—10                        Case No: 4:21-cv-09044-JSW

**E.      Plaintiffs Have Standing to Challenge the Constitutionality of Section 230.**

In addition to their motion to dismiss arguments, Defendants assert that Plaintiff lacks standing to challenge the constitutionality of Section 230 because Plaintiff's injury is not "fairly traceable" to the Section 230 immunity and "it is speculative" whether Meta would continue to censor Plaintiff's content if he prevailed on this claim.  PI Opp. at 14.  Both of those are factual issues.  The only evidence that tends to prove or disprove them was submitted by Plaintiffs.  As noted above, Mr. Zuckerberg admitted in sworn testimony before Congress that "**[Section 230] allows platforms to moderate content.**  Without Section 230, platforms could face liability for doing even basic moderation …."[18]  Without any countervailing evidence from Defendants, these issues should be resolved in Plaintiffs' favor.  *See also* MTD Opp. at 18 (discussing standing).

**F.      Plaintiffs' Claims Under Florida Law Support a Preliminary Injunction.**

Because Defendants' arguments regarding the state law claims closely track the arguments made in their Motion to Dismiss, Plaintiffs incorporate by reference the arguments made at pp. 18-20 of their Opposition to that motion.[19]

## IV.      OTHER PRELIMINARY INJUNCTION FACTORS FAVOR PLAINTIFF.

Defendants barely address the other three factors to be considered (irreparable harm, balance of equities, and the public interest) when courts weigh the propriety of issuing a preliminary injunction.  Defendants' dismissive treatment should not diminish the critical importance of these factors in this Court's analysis.

**A.      Irreparable Harm to Plaintiff**

The preliminary injunction seeks to remedy partisan censorship that will "cause the plaintiff and the electorate irreparable harm."  *Id*. ¶ 12.  In addition, because Meta has imposed an arbitrary prior restraint on speech in violation of the First Amendment, Plaintiff's motion seeks

---

[18] FAC ¶ 74; Nov. 2020 Hearing (Testimony of Mr. Zuckerberg) (emphasis added), RJN ¶ 2.

[19] Defendants additionally argue that Section 230 preempts the SSMCA, citing *Moody*.  PI Opp. at 17 n.4.  *Moody* relied for that analysis on a Second Circuit opinion that has been vacated and replaced since *Moody* came out.  *See Domen v. Vimeo, Inc.* 991 F.3d 66 (2nd Cir. 2021); replaced by *Domen v. Vimeo, Inc.*, 6 F.4th 245 (2nd Cir. July 21, 2021): replaced by *Domen v. Vimeo, Inc.*, 2021 WL 4352312 (2nd Cir. Sept. 24, 2021).  The current version of *Domen* contains no preemption analysis at all.

1   relief for issues that are *per se* irreparably harmful. *Elrod v. Burns*, 427 U.S. 347, 373 (1976)

2   (prior restraint "unquestionably constitutes irreparable injury"). Prior restraints on speech present

3   some of the "most serious and the least tolerable infringement" on free speech rights. *Nebraska*

4   *Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The loss or threatened infringement of free

5   speech rights "for even minimal periods of time [] unquestionably constitutes irreparable injury."

6   *Elrod*, 427 U.S. at 373 (1976); *see also Backpage v. Dart*, 807 F.3d 229, 239 (7th Cir. 2015)

7   (threat by public officials to ban speech "unquestionably constitutes irreparable injury").

8        Mr. Trump's injuries are compounded daily, with Defendants' prior restraint of his views

9   on politics, the economy, the border, national security, health, election integrity, and a host of

10  other matters of national interest remains in place. Plaintiff's injuries are further exacerbated due

11  to the silencing of his speech as the presumptive head of the Republican Party at a time when the

12  nation is drawing ever closer to the 2022 elections, including his ability to endorse and fundraise

13  for GOP candidates in primary races that are currently commencing throughout the nation. Mr.

14  Trump's campaigning and fundraising are also his means of accumulating personal political

15  capital while weighing another run for the presidency. FAC ¶ 78. Defendant's own submission

16  details Plaintiff's difficulties in his efforts to construct his own media platform, which has been

17  plagued with problems and delays. Dozens of engineers, cybersecurity specialists, and other

18  technical experts are needed to build a social media platform. The process will be slow until it

19  can merge with a publicly traded company, and a likely launch date is still months away. MTD,

20  Exh. E. The existence of potential alternative platforms for Plaintiff's speech is irrelevant,

21  particularly when the few available alternatives lack the Defendants' market penetration. As the

22  Supreme Court recently held,

23      It changes nothing that these platforms are not the sole means for distributing speech or
        information. A person always could choose to avoid the toll bridge or train and instead
24      swim the Charles River or hike the Oregon Trail. But in assessing whether a company
        exercises substantial market power, what matters is whether the alternatives are
25      comparable. For many of today's digital platforms [such as Facebook], nothing is."

26

27  *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1225 (2021). The

28  proposed preliminary injunction causes no harm to Defendants. Meta undertakes the cost of

PLAINTIFFS' REPLY ISO MOT.
FOR PRELIMINARY INJUNCTION—12                        Case No: 4:21-cv-09044-JSW

1    hosting, storing, and disseminating all content posted on the Facebook platform.  Any cost

2    Defendants incur to restore Plaintiff's access to his prior channels would be *de minimus* at most.

3           Defendants also argue that Mr. Trump was dilatory in pursuing preliminary injunctive

4    relief.  Defendants ignore the fact that a great part of the delay from initiation of this lawsuit to

5    the present time was caused by Defendants' procedural maneuverings, including the lengthy

6    motion practice that resulted in the case being transferred from Florida to this Court.

7    Furthermore, Defendants fundamentally misunderstand the nature of a prior restraint, which

8    creates an ongoing injury while the restraint is in place, and is equally as ripe now as earlier.  The

9    Ninth Circuit has held that the issue of a purported delay in seeking injunctive relief is only "a

10   single factor to consider" and that the courts should be "loath" to withhold preliminary injunctive

11   relief solely on this ground.  *Arc of Calif. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (delay in

12   seeking relief "not particularly probative in the context of ongoing, worsening injuries).  The

13   preliminary injunction motion was filed within a reasonable time from the initial restraint and the

14   resulting harm is just as severe now, if not even more so, given the impending immediacy of the

15   mid-term elections in November.

16          **B.      The Balance of Equities Favors Injunctive Relief.**

17          The purpose of interim injunctive relief is not to "conclusively determine the rights of the

18   parties, but to balance the equities as the litigation moves forward."  *Trump v. International*

19   *Refugee Assistance Project*, 137 S.Ct. 2080, 2087 (2017).  The "balance of equities" test means

20   simply that "the injunction must do more good than harm."  *Alliance for the Wild Rockies v.*

21   *Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011), quoting *Hoosier Energy Rural Elec. Co-op., Inc. v.*

22   *John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir.2009).

23          Here, the balance of hardships tips decidedly in Plaintiff's favor.  Mr. Trump has been

24   denied access to the Meta platform that previously provided him the means for rapid

25   dissemination of speech on issues of national importance and central to the core of political

26   debate.  FAC ¶ 59.  The harm to Mr. Trump and the public, as well as to the integrity of the

27   electoral process itself, is incalculable.  As leader of the Republican Party, and one of the most

28   influential figures in American politics, Plaintiff's inability to access the Facebook platform has

PLAINTIFFS' REPLY ISO MOT.
FOR PRELIMINARY INJUNCTION—13                              Case No: 4:21-cv-09044-JSW

1    significantly impacted political discourse in the United States.  Defendants' prior restraint on the

2    marketplace of ideas is a "finger on the scale" for voters making decisions on 2022 Congressional

3    Candidates, and contemplating the 2024 Presidential election.  Declaration of Corey

4    Lewandowski (Dkt. 87-3).  By contrast, Defendants have shown no hardship if the Court

5    temporarily enjoins their continued ban of Mr. Trump and requires a return to the status *quo ante*.

6    The only impact of injunctive relief would be to require Defendants to host Mr. Trump's content,

7    as it had done for more than a decade before the heavy hand of the state compelled and

8    encouraged censorship.  FAC ¶ 59.  Defendants have not and cannot make a colorable argument

9    that reinstating Mr. Trump would cost them time and effort.  Defendants could simply reactivate

10   Mr. Trump's account, much like the "flipping" of a light switch, and Mr. Trump would have

11   access to his prior accounts.  Defendants have not even attempted to argue that reinstating Mr.

12   Trump would be detrimental to their bottom line.

13          Defendants further claim the reinstatement of Plaintiff's account violates their free speech

14   rights.  Defendants' claimed constitutional right is being used to ban Plaintiff, a private citizen, at

15   the behest of government actors, for voicing constitutionally protected speech.  Any impingement

16   on Defendants' "speech"—and it is highly questionable whether censoring users' postings

17   constitutes Defendants' speech in any meaningful way—pales in comparison to the impact of

18   Defendants' restraint on the First Amendment rights of the former President.  The enormous

19   personal toll taken on Plaintiff, both while President and subsequently as a private citizen, as a

20   result of Meta's actions is immeasurable and weighs heavily in Plaintiff's favor.

21          **C.      The Public Interest Favors Injunctive Relief**

22          Access to the "vast democratic forums of the Internet" is a First Amendment right.  *Reno*

23   *v. ACLU*, 521 U.S. 844 (1997).  That right reaches its zenith where speech affects the election

24   process.  "The right of citizens to inquire, to hear, to speak, and to use information to reach

25   consensus is a precondition to enlightened self-government and a necessary means to protect it.

26   **The First Amendment 'has its fullest and most urgent application' to speech uttered during**

27

28

1   **a campaign for political office.**"  *Citizens United v. Federal Election Comm'n*, 558 U.S. 310,

2   339 (2010) (emphasis added).[20]

3       The public interest inquiry primarily addresses the impact of the challenged practice on

4   non-parties.  *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)

5   (emphasis added).  "Courts considering requests for preliminary injunctions have consistently

6   recognized the **significant public interest** in upholding First Amendment principles."  *Id*.  When

7   Defendants imposed the prior restraint on Mr. Trump, it imposed a prior restraint on

8   approximately 34 million of his Facebook followers, as well as those who access his posts on the

9   Internet.  The scope and impact of Defendants actions are unparalleled in the long and storied

10  history of the First Amendment.  Mr. Trump's right to participate meaningfully in the public

11  discourse will remain restrained so long as Defendants continue to ban him from Facebook to

12  avoid the threatened repeal of Section 230.  Removing Defendants' prior restraint is inherently in

13  the public interest, since the public benefits from a robust marketplace of ideas.  The public also

14  benefits from safeguarding the integrity of the election process by allowing all perspectives to be

15  heard.  Eliminating two-party debate at the hands of the government, as was done here, should be

16  unimaginable within First Amendment jurisprudence.  Defendants' arbitrary discrimination

17  against speech is contrary to American history, tradition and principles of ordered liberty.

18  **V.       CONCLUSION**

19      For all of the foregoing reasons, Plaintiff respectfully submits that the motion for a

20  preliminary injunction should be granted.

21  Dated: February 7, 2022                    Respectfully submitted,

22                                                            ANDREI POPOVICI (234820)
23                                                            MARIE FIALA (79676)
                                                              LAW OFFICE OF ANDREI D. POPOVICI, P.C.
24
25                                              By:      */s/ Marie L. Fiala*
                                                              Marie L. Fiala
26

27  ───────────────────
    [20] Congress itself has found that "[t]he Internet and other interactive computer services offer a
28  forum for a true diversity of political discourse …."  47 U.S.C. § 230(a)(3).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

JOHN P. COALE *(pro hac vice)*
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY *(pro hac vice)*
MICHAEL J. JONES *(pro hac vice)*
RYAN TOUGIAS *(pro hac vice)*
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

FRANK C. DUDENHEFER, JR. *(pro hac vice)*
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
 Email: fcdlaw@aol.com

RICHARD POLK LAWSON (*pro hac vice*)
GARDNER BREWER HUDSON, P.A.
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gbmmlaw.com
*Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

28