Ashley E. Littlefield (SBN 281027)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Tel: (415) 439-1400 / Fax: (415) 439-1500
ashley.littlefield@kirkland.com

Craig S. Primis, P.C. (admitted *pro hac vice*)
K. Winn Allen, P.C. (admitted *pro hac vice*)
Ronald K. Anguas, Jr. (admitted *pro hac vice*)
Katherine H. Epstein (admitted *pro hac vice*)
James Y. Xi  (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel:  (202) 389-5000 / Fax: (202) 389-5200
craig.primis@kirkland.com
winn.allen@kirkland.com
ronald.anguas@kirkland.com
kate.epstein@kirkland.com
james.xi@kirkland.com

*Attorneys for Defendants Meta Platforms, Inc.
and Mark Zuckerberg*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| DONALD J. TRUMP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., et al., <br><br> Defendants. | Case No. 4:21-cv-09044-JSW <br><br> **DEFENDANTS' STATEMENT OF RECENT DECISIONS** <br><br> Hon. Jeffrey S. White |

Defendants Meta Platforms and Mark Zuckerberg respectfully submit this Statement of Recent Decisions to bring to this Court's attention two recent orders granting motions to dismiss First Amendment claims, one by The Honorable James Donato in *Trump v. Twitter, Inc.*, No. 3:21-cv-08378 (Dkt. 165) (N.D. Cal. May 6, 2022), the other by The Honorable Charles R. Breyer in *Hart v. Facebook Inc.*, No. 3:22-cv-00737 (Dkt. 87) (N.D. Cal. May 5, 2022). Both decisions are relevant judicial opinions from this District, filed after briefing was completed on Defendants' motion to dismiss the operative complaint in this case. They are therefore appropriate for consideration by the Court, and true and correct copies are attached as Exhibits A and B. See Civil L.R. 7-3(d)(2).

Dated: May 10, 2022

/s/ Ronald K. Anguas

Ashley E. Littlefield (SBN 281027)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Tel: (415) 439-1483 / Fax: (415) 439-1500
ashley.littlefield@kirkland.com

Craig S. Primis, P.C. (admitted *pro hac vice*)
K. Winn Allen, P.C. (admitted *pro hac vice*)
Ronald K. Anguas (admitted *pro hac vice*)
Kate H. Epstein (admitted *pro hac vice*)
James Y. Xi (admitted *pro hac vice*)
KIRKLAND & ELLIS, LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 389-5000 / Fax: (202) 389-5200
craig.primis@kirkland.com
winn.allen@kirkland.com
ronald.anguas@kirkland.com
kate.epstein@kirkland.com
james.xi@kirkland.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 10th day of May 2022, the foregoing was electronically transmitted to the Clerk of Court using the CM/ECF system, which will transmit notification of such filing to all registered participants.

*/s/ Ronald K. Anguas*
Ronald K. Anguas

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD J. TRUMP, et al., | Case No. 21-cv-08378-JD |
| Plaintiffs, | |
| v. | **ORDER RE MOTION TO DISMISS** |
| | Re: Dkt. No. 138 |
| TWITTER INC., et al., | |
| Defendants. | |

Former President Donald J. Trump, the American Conservative Union, and five individuals have sued Twitter, Inc., and Jack Dorsey (together, Twitter), on behalf of themselves and a putative class of Twitter users who have been "de-platformed" and "censored by Defendants." Dkt. No. 21 (AC) ¶¶ 8, 18. Plaintiffs alleged claims under the First Amendment and Florida state consumer and "social media" statutes, and seek a declaration that Section 230 of the Communications Decency Act, which states that online service providers like Twitter cannot be held responsible for content posted by others, is unconstitutional. *Id.* ¶¶ 168-233. Twitter has moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 138. The amended complaint is dismissed.

## BACKGROUND

As alleged in the amended complaint, which the Court accepts as true for Rule 12(b)(6) purposes, *see In re Capacitors Antitrust Litigation*, 106 F. Supp. 3d 1051, 1060 (N.D. Cal. 2015), Twitter is the well-known "social networking service that allows its Users to post and interact with

each other through short messages known as 'tweets.'" AC ¶ 28.  Dorsey co-founded Twitter in 2006, and the company today hosts more than 500 million tweets posted daily by approximately 340 million users worldwide.  *Id*. ¶¶ 28-29, 36.

Plaintiff Trump opened a Twitter account in May 2009 and was an active user until January 7, 2021.  *Id*. ¶¶ 43-49, 113.  On January 8, 2021, Twitter stated that it had "permanently suspended" the account "due to the risk of further incitement of violence."  *Id*. ¶ 114.

The amended complaint alleges that the other named plaintiffs also had their Twitter accounts treated unfavorably.  Linda Cuadros's account was "permanently banned" in 2020 "due to a post about vaccines."  *Id*. ¶ 124.  Rafael Barboza's account was "indefinitely suspended" on January 8, 2021, "after retweeting President Trump and other conservatives on January 6, 2021." *Id*. ¶ 137.  Dominick Latella's account "was permanently removed from the Defendants' platform during the 2018 election cycle" after he "post[ed] positive messages about Republican candidates and President Trump," although Latella has a "second account [which] is still active" albeit "shadow banned."  *Id*. ¶¶ 142-46.  Wayne Allyn Root was "banned permanently by Twitter" after "multiple occasions where the Defendants censored his account for messages he posted related to COVID-19 and the 2020 election results."  *Id*. ¶¶ 152, 155.  Dr. Naomi Wolf's account was "suspended" for "vaccine misinformation."  *Id*. ¶¶ 159, 162.  The American Conservative Union "started noticing a reduction in engagement in its content" in 2017, and alleges its "followers were purged," dropping from 99,000 followers in June 2020 to 88,000 by January 19, 2021.  *Id*. ¶¶ 128-29.

In plaintiffs' view, these account actions were the result of coercion by members of Congress affiliated with the Democratic Party.  *Id*. ¶¶ 51-64.  Plaintiffs quote Senator Mark Warner (D-VA) as saying on October 28, 2020, that "[w]e can and should have a conversation about Section 230 -- and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to . . . enable domestic terrorist groups to organize violence in plain sight."  *Id*. ¶ 55.  Section 230 of the Communications Decency Act is said to have "significantly encouraged defendants' censorship of the plaintiff and the putative class members," *id*. ¶¶ 65-77, and the

United States District Court
Northern District of California

1   amended complaint alleges that defendants "willful[ly] participat[ed] in joint activity with federal

2   actors to censor plaintiff and the putative class members." *Id.* ¶¶ 78-112.

3          Plaintiffs allege:  (1) a violation of the First Amendment to the United States Constitution;

4   (2) that Section 230 of the Communications Decency Act is unconstitutional; (3) deceptive and

5   misleading practices in violation of the Florida Deceptive and Unfair Trade Practices Act

6   (FDUTPA), Florida Statutes § 501.201 et seq.; and (4) a violation of the Stop Social Media

7   Censorship Act (SSMCA), Florida Statutes § 501.2041.  *Id.* ¶¶ 168-233.  In the prayer for relief,

8   plaintiffs seek, among other things, compensatory and punitive damages, and injunctive and

9   declaratory relief, including an order for Twitter to "immediately reinstate the Twitter accounts of"

10  plaintiffs.  *Id.* at 56.

11         This case was originally filed by plaintiffs in the United States District Court for the

12  Southern District of Florida, Dkt. No. 1, and transferred to this District on Twitter's motion, which

13  was made on the basis of a forum selection clause in Twitter's Terms of Service.  Dkt. No. 87.

14  The amended complaint, Dkt. No. 21, is the operative complaint.  Defendants ask to dismiss all

15  four of the claims in the AC for failure to plausibly state a claim.  Dkt. No. 138.

                              **DISCUSSION**

16

17  **I.      TWITTER AND THE FIRST AMENDMENT**

18         Plaintiffs' main claim is that defendants have "censor[ed]" plaintiffs' Twitter accounts in

19  violation of their right to free speech under the First Amendment to the United States Constitution.

20  AC ¶¶ 168-87.  Plaintiffs are not starting from a position of strength.  Twitter is a private

21  company, and "the First Amendment applies only to governmental abridgements of speech, and

22  not to alleged abridgements by private companies."  *Williby v. Zuckerberg*, No. 3:18-cv-06295-JD,

23  Dkt. No. 19 at 1 (N.D. Cal. June 18, 2019), *appeal dismissed as frivolous*, No. 19-16306, 2019

24  WL 11662186 (9th Cir. Nov. 25, 2019); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139

25  S. Ct. 1921, 1928 (2019) ("the Free Speech Clause prohibits only *governmental* abridgement of

26  speech.  The Free Speech Clause does not prohibit *private* abridgment of speech.") (emphases in

27  original).

28

United States District Court
Northern District of California

3

1    Plaintiffs' only hope of stating a First Amendment claim is to plausibly allege that Twitter

2    was in effect operating as the government under the "state-action doctrine." This doctrine

3    provides that, in some situations, "governmental authority may dominate an activity to such an

4    extent that its participants must be deemed to act with the authority of the government and, as a

5    result, be subject to constitutional constraints." *Edmonson v. Leesville Concrete Co.*, 500 U.S.

6    614, 620 (1991); *see also Manhattan Cmty. Access*, 139 S. Ct. at 1928. This is not an easy claim

7    to make, for good reasons. Private entities are presumed to act as such, and maintaining the line

8    "between the private sphere and the public sphere, with all its attendant constitutional

9    obligations," is a matter of great importance, as "[o]ne great object of the Constitution is to permit

10   citizens to structure their private relations as they choose subject only to the constraints of

11   statutory or decisional law." *Edmonson*, 500 U.S. at 619. "As a matter of substantive

12   constitutional law the state-action requirement reflects judicial recognition of the fact that 'most

13   rights secured by the Constitution are protected only against infringement by governments.'"

14   *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936 (1982) (citation omitted). "Careful

15   adherence to the 'state action' requirement preserves an area of individual freedom by limiting the

16   reach of federal law and federal judicial power." *Id.*

17   Plaintiffs say that the question of whether they have a First Amendment claim on the basis

18   of the state action doctrine is a factual matter "ill-suited to a Rule 12(b)(6) motion." Dkt. No. 145

19   at 7. Not so. It is certainly true that the ultimate determination of state action is a "necessarily

20   fact-bound inquiry," *Lugar*, 457 U.S. at 939, but that does not relieve plaintiffs of their obligation

21   under Rule 8 and Rule 12(b)(6) to provide in the complaint enough facts to plausibly allege a

22   claim against Twitter on the basis of state action. *See, e.g.*, *Heineke v. Santa Clara Univ.*, 965

23   F.3d 1009, 1015 n.5 (9th Cir. 2020) ("Heineke's contention that it is inappropriate to dismiss his

24   § 1983 constitutional claims at the motion to dismiss stage, is unpersuasive. We have accepted his

25   allegations as true. Because he has failed to plead any allegations sufficient to support his

26   argument that SCU acted under color of state law, however, his § 1983 claims must fail as a

27   matter of law."). To conclude otherwise, as plaintiffs urge, would fly in the face of the pleading

28

United States District Court
Northern District of California

4

requirements squarely stated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).[1]

The salient question under the state action doctrine is whether "the conduct allegedly causing the deprivation of a federal right" is "fairly attributable to the State." *Id*. at 937; *see also Belgau v. Inslee*, 975 F.4th 940, 946 (9th Cir. 2020) ("The state action inquiry boils down to this: is the challenged conduct that caused the alleged constitutional deprivation 'fairly attributable' to the state?"). The answer is determined by a "two-part approach," which requires that "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible"; and that "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar*, 457 U.S. at 937; *see also Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 835 (9th Cir. 1999). These factors "are not the same," and they "diverge when the constitutional claim is directed . . . against a private party." *Lugar*, 457 U.S. at 937.

As the parties noted, different formulations of the factors appear in the case law. *See, e.g.*, *Manhattan Cmty. Access*, 139 S. Ct. at 1928; *Lugar*, 457 U.S. at 939; Dkt. No. 145 at 7-21; Dkt. No. 147 at 1-6. But "[w]hether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry," *Lugar*, 457 U.S. at 939, is a question that the Court need not resolve for present purposes. That is because there is "no specific formula for defining state action." *Sutton*, 192 F.3d at 836 (quotations and citation omitted). What matters is whether plaintiffs have plausibly alleged facts to "show that there is a sufficiently close nexus between the State and the challenged action of" the private defendants, such that "the action of the latter may be fairly treated as that of the State itself." *Id*. (quotations and citations omitted). The specific question the Court must answer here is: have plaintiffs plausibly alleged

---

[1] Plaintiffs make the odd assertion that these pleading standards apply only in antitrust conspiracy actions. Dkt. No. 145 at 6 n.7. *Twombly* and *Iqbal* expressed no such limitation, and their standards have been applied to a myriad of Rule 12(b)(6) motions in non-antitrust actions in every federal district and circuit court. A scant minute of online research makes this abundantly clear. *See, e.g., Mendoza v. Amalgamated Transit Union Int'l*, 30 F.4th 879, 886 n.1 (9th Cir. 2022) (labor and employment case); *Hoffman v. Preston*, 26 F.4th 1059, 1063 (9th Cir. 2022) (*Bivens* claims).

United States District Court
Northern District of California

1    that Twitter was behaving as a state actor pursuant to "a governmental policy" when it closed their

2    accounts? *Id.* at 835.

3        This inquiry "must be determined based on the circumstances of each case," *id*. at 836, and

4    the facts alleged in the amended complaint are not nearly enough for plaintiffs to proceed on a

5    state action theory.  To start, the amended complaint does not plausibly show that plaintiffs'

6    ostensible First Amendment injury was caused by "a rule of conduct imposed by the government."

7    *id*. at 835 (cleaned up); *see also Mathis v. Pacific Gas and Elec. Co.*, 891 F.2d 1429, 1432 (9th

8    Cir. 1989) ("no state, or federal, action unless" a private entity's decision is "made on the basis of

9    some rule of decision for which the State is responsible.") (quotations and citation omitted).  The

10   amended complaint merely offers a grab-bag of allegations to the effect that some Democratic

11   members of Congress wanted Mr. Trump, and "the views he espoused," to be banned from Twitter

12   because such "content and views" were "contrary to those legislators' preferred points of view."

13   *See, e.g.,* AC ¶¶ 53, 55, 60, 61.  But the comments of a handful of elected officials are a far cry

14   from a "rule of decision for which the State is responsible."  Legislators are perfectly free to

15   express opinions without being deemed the official voice of "the State."  Government in our

16   republic of elected representatives would be impossible otherwise.  It is also not plausible to

17   conclude that Twitter or any other listener could discern a clear state rule in such remarks, or even

18   determine what a legislator's "preferred views" might be.

19       The weakness of the state action theory in the amended complaint is further demonstrated

20   by plaintiffs' own explanation of why their accounts were closed.  Twitter is said to have closed

21   Mr. Trump's account because of "the risk of further incitement of violence" and "threats to

22   physical safety."  *Id*. ¶¶ 114-15.  Twitter closed plaintiff Cuadros's account "due to a post about

23   vaccines," *id*. ¶ 124, and Dr. Wolf's account for "vaccine misinformation," *id*. ¶ 162.  Plaintiff

24   Barboza's account was closed "after retweeting President Trump and other conservatives on

25   January 6, 2021," *id*. ¶ 137; plaintiff Latella after he "post[ed] positive messages about Republican

26   candidates and President Trump," *id*. ¶ 142; and plaintiff Root for "messages he posted related to

27   COVID-19 and the 2020 election results," *id*. ¶ 152.

28

United States District Court
Northern District of California

If anything, these explanations indicate that Twitter acted in response to factors specific to each account, and not pursuant to a state rule of decision. These circumstances are not at all comparable to those in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), as plaintiffs urge. In that case, which is discussed *infra* in more detail, a state commission was empowered to compel a private book distributor from selling or supplying certain books. The amended complaint does not allege anything like this type of state dictate to Twitter.

The amended complaint also does not plausibly allege that Twitter could fairly be deemed to be a state actor. Plaintiffs say they have done so by cataloguing "coercive statements" in paragraph 55 of the amended complaint, and statements made during a March 22, 2021, House Committee on Energy and Commerce hearing on the topic of "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation." *See* Dkt. No. 145 at 3-4 (quoting from AC ¶ 55, and Dkt. No. 145-1 (RJN) ¶¶ 2-4).[2] These statements are said to have compelled Twitter to act as a government entity.

They are again not enough for pleading purposes. Paragraph 55 is said to offer "examples of Democrat legislators threatening new regulations, antitrust breakup, and removal of Section 230 immunity for Defendants and other social media platforms if Twitter did not censor views and content with which these Members of Congress disagreed." AC ¶ 55. The actual quotes do not live up to that billing. The statements attributed to "Bruce Reed, Biden's Top Tech Advisor," and Michelle Obama are of no moment because Reed and Obama were not legislators. *Id*. at 5th and 12th bullet points. Other statements in Paragraph 55 pertain only to Facebook, and not Twitter. *Id*. at 8th, 9th, and 15th bullet points (Senator Markey's question and Mark Zuckerberg's answer regarding Facebook's algorithms and policies; Rep. Adam Schiff's Tweet that "Facebook must ban" Trump). Then-Senator Kamala Harris is quoted three times for calling for "Trump's Twitter account [to be] suspended" and calling on Dorsey to "do something about this Tweet" from Trump, but conspicuously missing is any threatening remark directed to Twitter. *Id*. at 1st, 6th,

---

[2] The proffered statements appear in part only in a request for judicial notice, Dkt. No. 145-1, and not in the amended complaint. Twitter did not object to the judicial notice request, and the Court has taken those materials into account.

United States District Court
Northern District of California

and 7th bullet points.  Five statements are nothing more than general comments about Section 230 (*e.g.*, "We can and should have a conversation about Section 230") untethered to any substance that might have conveyed any threat or punishment tied to any specific action by Twitter.  *Id*. at 2nd, 3rd, 4th, 11th, and 13th bullet points.  The remaining two statements, at the 10th and 14th bullet points, express general concerns and criticisms that Twitter has become a "terrifying tool[] of persuasion and manipulation," and that "[i]ndustry self-regulation has failed."

The statements attributed to the "Disinformation Nation" congressional hearing may have been more heated, but they are still not enough to satisfy plaintiffs' pleading obligation. Committee Chairman Frank Pallone, Jr., is quoted as saying, "it is time for Congress and this Committee to legislate and realign these companies' incentives to effectively deal with disinformation and extremism.  . . . The time for self-regulation is over.  It is time we legislate to hold you accountable." Dkt. No. 145 at 4.  Representative Mike Doyle said, "Your companies need to be held accountable . . . and we will legislate to stop this." *Id*.  Representative Janice D. Schakowsky said, "What our witnesses need to take away from this hearing is that self-regulation has come to the end of its road, and that this democratically elected body is prepared to move forward with legislation and regulation.  Misinformation regarding the election dropped by 73% across social media platforms after Twitter permanently suspended Trump . . . .  The question is, what took so long?" *Id*.

Even giving plaintiffs every benefit of the doubt, these comments fall short of the mark. Plaintiffs' own case citations show why.  *See* Dkt. No. 145 at 7-17.  Strictly speaking, not all of plaintiffs' cases involve the state action doctrine, as the ensuing discussion makes clear. Nevertheless, plaintiffs argued the cases to that end, and the Court will take those arguments on their own terms.

In one of plaintiffs' main citations, *Bantam Books*, 372 U.S. 58, the Rhode Island Legislature established a "Rhode Island Commission to Encourage Morality in Youth" that was composed of members appointed by the state Governor.  *Id*. at 59-60 & n.1.  The Commission was empowered "to educate the public concerning any book . . . manifestly tending to the corruption of the youth," and "to investigate and recommend the prosecution" of all violations of the relevant

laws. *Id*. at 59-60.  Put more simply, it was tasked with formulating and enforcing a blacklist of proscribed books. *Id*. at 68.  The Commission sent letters "on official Commission stationery" to a book distributor listing "certain designated books or magazines distributed by him" that had been declared by the Commission as "objectionable for sale, distribution or display" to minors. *Id*. at 61.  The notice thanked the distributor in advance "for his 'cooperation' with the Commission, usually reminding [him] of the Commission's duty to recommend to the Attorney General prosecution of purveyors of obscenity." *Id*. at 62.  "Copies of the lists of 'objectionable' publications were circulated to the local police departments, and [the distributor] was so informed in the notices." *Id*. at 62-63.  "A local police officer usually visited [the distributor] shortly after [his] receipt of a notice to learn what action he had taken." *Id*. at 63.

In a lawsuit brought by the publishers of books supplied to the distributor, the Supreme Court had no trouble concluding that the acts of the Commission "were performed under color of state law," and that the distributor's "compliance with the Commission's directives was not voluntary." *Id*. at 68.  As the Court stated, "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around, and [the distributor's] reaction . . . was no exception to this general rule." *Id*.  "The Commission's notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications ex proprio vigore." *Id*.  The Court held that the "procedures of the Commission" were constitutionally deficient, and that "the system of informal censorship disclosed by this record violates the Fourteenth Amendment." *Id*. at 71.

In *Lombard v. State of Louisiana*, 373 U.S. 267 (1963), the Supreme Court reversed the state criminal mischief convictions of three black and one white college students who had participated in a "sit-in demonstration" at a restaurant in New Orleans to promote racial desegregation.  Although it was a private restaurant that had refused service and called the police, the Court held that "these convictions, commanded as they were by the voice of the State directing segregated service at the restaurant, cannot stand." *Id*. at 274.  Prior to the demonstration, the Superintendent of Police had stated that "such actions are not in the community interest," and "we

want everyone to fully understand that the police department and its personnel is ready and able to enforce the laws of the city of New Orleans and the state of Louisiana." *Id.* at 270. In addition, "four days before petitioners' arrest, the Mayor of New Orleans issued an unequivocal statement condemning such conduct and demanding its cessation." *Id.* at 271. The Mayor said that "I have today directed the superintendent of police that no additional sit-in demonstrations will be permitted regardless of the avowed purpose or intent of the participants," and "[i]t is my determination that the community interest, the public safety, and the economic welfare of this city require that such demonstrations cease and that henceforth they be prohibited by the police department." *Id.* Both statements were well publicized, and there was evidence in the case "to indicate that the restaurant manager asked petitioners to leave in obedience to the directive of the city officials." *Id.* at 272.

In *Carlin Communications, Inc. v. The Mountain States Telephone and Telegraph Company*, 827 F.2d 1291 (9th Cir. 1987), the defendant, a private regional telephone company, "refuse[d] to carry smut on its dial-a-message network." *Id.* at 1292. This happened after a "deputy attorney of Maricopa County, Arizona, wrote to Mountain Bell threatening to prosecute if the company continued to provide [dial-a-message network service] to Carlin. The letter stated that Carlin's 976 service violated an Arizona statute prohibiting the distribution of sexually explicit material to minors." *Id.* at 1293. "Mountain Bell immediately sent Carlin a notice that its service would be terminated in five days." *Id.* The Ninth Circuit concluded that the termination decision amounted to state action because the "county attorney's threat of prosecution provided the requisite 'nexus' between the state and the challenged action." *Id.* at 1295. In effect, "Arizona 'exercised coercive power' over Mountain Bell and thereby converted its otherwise private conduct into state action." *Id.*

In *Mathis v. Pacific Gas and Electric Company*, 891 F.2d 1429 (9th Cir. 1989), defendant PG&E had barred plaintiff Mathis from entering the Diablo Canyon Nuclear Power Plant for work because "he was suspected of illegal drug use or sales." *Id.* at 1430. Mathis argued that this was state action because "his denial of access by PG&E was directed or encouraged by the [Nuclear Regulatory Commission (NRC)] pursuant to its Fitness for Duty program." *Id.* at 1433. At the

time, the Fitness for Duty program was only a proposed rule, and the NRC eventually withdrew it "to encourage the initiatives concerning fitness for duty being taken by the nuclear power industry," so long as "the industry programs produce the desired results." *Id.* at 1433. The NRC added that "[i]t is Commission policy that the sale, use, or possession of alcoholic beverages or illegal drugs within protected areas at nuclear plant sites is unacceptable," and that the "decision to use discretion in enforcement to recognize industry initiatives in no way changes the NRC's ability to issue orders, call enforcement meetings, or suspend licenses should a significant safety problem be found." *Id.* The NRC also stated that "[a]n acceptable fitness for duty program should at a minimum include the following essential elements: (1) A provision that the sale, use, or possession of illegal drugs within the protected area will result in immediate revocation of access to vital areas and discharge from nuclear power plant activities . . . ; [and] (2) A provision that any other sale, possession, or use of illegal drugs will result in immediate revocation of access to vital areas, mandatory rehabilitation prior to reinstatement of access, and possible discharge from nuclear power plant activities." *Id.* In these circumstances, the circuit court concluded that Mathis had plausibly made out a state action claim because "[t]he minimum standard [wa]s stated by the NRC, as a minimum acceptable industry plan, backed up by threats of enforcement or of formal rulemaking." *Id.* at 1434.

These cases, which are the centerpieces of plaintiffs' state action argument, are strikingly different from the allegations in the amended complaint. In each of the cases, a concrete and specific government action, or threatened action, was identified. Here, plaintiffs offer only ambiguous and open-ended statements to the effect that "we may legislate" something unfavorable to Twitter or the social media sector. This is a world away from: (1) a state commission sending local police officers for drop-in visits and threatening prosecution by the state attorney general (*Bantam Books*); (2) a city mayor and police superintendent threatening law enforcement action to crack down on sit-in demonstrations (*Lombard*); (3) a deputy county attorney threatening prosecution against a private company under a specific law (*Carlin*); and (4) a federal administrative commission threatening the suspension of licenses or formal rulemaking if its specified elements for an anti-drug program were not followed voluntarily (*Mathis*).

11

The fact that enacting a bill is rarely fast or easy further attenuates the plausibility of the legislative threat plaintiffs speak of.  As the process was described in another context, "[d]issatisfaction . . . is often the cost of legislative compromise.  And negotiations surrounding enactment of this bill tell a typical story of legislative battle among interest groups, Congress, and the President.  Indeed, this legislation failed to ease tensions among many of the interested parties. Its delicate crafting reflected a compromise amidst highly interested parties attempting to pull the provisions in different directions. . . . The deals brokered during a Committee markup, on the floor of the two Houses, during a joint House and Senate Conference, or in negotiations with the President are not for us to judge or second-guess."  *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461 (2002) (internal citations omitted).  There is no way to allege with any degree of plausibility when, if ever, the comments voiced by a handful of members of Congress might become a law, or what changes such a law might impose on social media companies like Twitter.

Plaintiffs also overlook Congress's role as an investigatory body, and the fact that "each House has power 'to secure needed information' in order to legislate." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (citation omitted).  This power "encompasses inquiries into the administration of existing laws, studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.'" *Id.* (quotations and citation omitted).

Much of what plaintiffs challenge fits within the normal boundaries of a congressional investigation, as opposed to threats of punitive state action.  Plaintiffs' own submissions indicate that the House Committee was making inquiries and surveying possible problems "for the purpose of enabling the Congress to remedy them."  In this respect, the allegations in the amended complaint are much more comparable to the cases plaintiffs cited in which no state action was found.  *See Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983) (no state action where Administrator of the Human Resources Administration of New York City wrote letters "urg[ing]" department stores, as a gesture of "public service," not to carry a board game the Administrator found problematic; state action absent where "comments of a government official" cannot "reasonably be interpreted as intimating that some form of punishment or adverse

United States District Court
Northern District of California

1  regulatory action will follow the failure to accede to the official's request"); *see also American*

2  *Family Ass'n, Inc. v. City and County of San Francisco*, 177 F.3d 1114 (9th Cir. 2002) (no First

3  Amendment violation found where City and County of San Francisco passed resolution "urg[ing]

4  'local television stations not to broadcast advertising campaigns aimed at "converting"

5  homosexuals'"; holding that "public officials may criticize practices that they would have no

6  constitutional ability to regulate, so long as there is no actual or threatened imposition of

7  government power or sanction").

8  Overall, the amended complaint does not plausibly allege that Twitter acted as a

9  government entity when it closed plaintiffs' accounts. This resolves the main thrust of plaintiffs'

10  state action theory. Plaintiffs' cursory mention of state "encouragement" (through Section 230(c))

11  and "joint action" are minor variations on the state action theme, and are unavailing for the same

12  reasons. Dkt. No. 145 at 17-21. In addition, "compliance with generally applicable laws" is not

13  "sufficient to convert private conduct into state action." *Heineke*, 965 F.3d at 1013. The

14  government cannot plausibly be said to have compelled Twitter's action through Section 230,

15  which in any event imposed no affirmative obligations on Twitter to act in any particular way.

16  Consequently, the amended complaint does not plausibly allege a First Amendment claim

17  against Twitter. Plaintiffs' first claim is dismissed.

18  **II.      SECTION 230**

19  Plaintiffs' claim for a declaratory judgment that Section 230 is unconstitutional is

20  dismissed for lack of standing. As Article III of the United States Constitution states, federal

21  courts have the "power to decide legal questions only in the presence of an actual 'Cas[e]' or

22  'Controvers[y].'" *Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016). The party invoking a

23  federal court's jurisdiction must demonstrate standing by showing that she has "suffered an 'injury

24  in fact,' that the injury is 'fairly traceable' to the conduct being challenged, and that the injury will

25  likely be 'redressed' by a favorable decision." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504

26  U.S. 555, 560-61 (1992)). Standing is an ongoing inquiry, and "[t]he need to satisfy these three

27  [Article III standing] requirements persists throughout the life of the lawsuit." *Id.* (citation

28  omitted). The Court has an independent duty to be vigilant about standing.

United States District Court
Northern District of California

To establish an injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). These facts are entirely absent from the amended complaint with respect to Section 230. Plaintiffs offer only the vague and speculative allegation that "[u]pon information and belief, defendants would not have de-platformed the plaintiff or similarly situated putative class members but for the immunity purportedly offered by Section 230(c)." AC ¶ 190. Why this might be plausible is left unsaid. The Court declines to accept such speculative and conclusory allegations as grounds for a declaratory judgment claim. *See In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## III. THE FDUTPA CLAIM

Twitter says that plaintiffs' third claim under the Florida Deceptive and Unfair Trade Practices Act should be dismissed because plaintiffs have agreed, pursuant to the Twitter Terms of Service (TOS), that California law will govern all disputes that arise between Twitter and its users. Dkt. No. 138 at 14. Plaintiffs do not dispute that the TOS is a valid contract between the parties, or that it includes an express choice of California law. Dkt. No. 145 at 22-23.

Neither side identified the choice-of-law rules that should apply, but the basic rule is that, "[i]n determining what state law to apply, a federal court applies the choice-of-law rules of the state in which it sits." *Unified Western Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106, 1111 (9th Cir. 2006) (quotations and citation omitted). An exception may arise for federal courts sitting in diversity when a case has been transferred from another jurisdiction, as is the situation here. *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 65 (2013). In that case, the Court will apply the choice-of-law rules of the transferor court, unless the transfer was made on the basis of a valid forum-selection clause. *Id.*; *see also In re Facebook Biometric Information Privacy Litig.*, 185 F. Supp. 3d 1155, 1168 (N.D. Cal. 2016). The TOS specifies venue in this District, and the case was transferred here from the Southern District of Florida for that contractual reason. *See* Dkt. No. 87. Consequently, the Court will apply the choice-of-law rules of its home state, California.

Under California law, to determine whether a choice-of-law clause is enforceable, courts consider "(1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." *Washington Mutual Bank, FA v. Superior Court*, 24 Cal. 4th 906, 916 (2001). If either test is met, the parties' choice of law "generally will be enforced unless the other side can establish that the chosen law is contrary to a fundamental policy of the state law alternative to the contractual choice, and that the other state has a materially greater interest in the determination of the matter." *In re Facebook*, 185 F. Supp. 3d at 1168 (internal quotations omitted).

There is no reasonable doubt that California has a substantial relationship to this case. Twitter is a leading social media company with hundreds of millions of users, and has its principal place of business in California. Plaintiffs do not dispute this point. They contend only that Florida law should be applied on the basis of a "fundamental policy" conflict with California law. Dkt. No. 145 at 22-23.

This is plaintiffs' burden to establish, *In re Facebook*, 185 F. Supp. 3d at 1168, and they have not succeeded. Plaintiffs contend, in the space of less than half a page, that a fundamental conflict exists because the FDUPTA allows claims for injunctive relief without financial injury, and the UCL supposedly does not. Dkt. No. 145 at 23. The point is not well taken. To start, plaintiffs substantially undercut their position by saying that they have, in effect, already pleaded "a UCL claim for injunctive relief" on the same facts alleged for the FDUPTA claim. Dkt. No. 145 at 23 n.18. That goes a long way to neutralizing the suggestion that the two state statutes are fundamentally at odds. In addition, plaintiffs did not account for the California Supreme Court's conclusions that:

> Section 17203 makes injunctive relief "the primary form of relief available under the UCL," while restitution is merely "ancillary." (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 319, 93 Cal.Rptr.3d 559, 207 P.3d 20.) Nothing in the statute's language conditions a court's authority to order injunctive relief on the need in a given case to also order restitution. Accordingly, the right to seek injunctive relief under section 17203 is not dependent on the right to seek restitution; the two are wholly independent remedies. (*See ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1268, 61 Cal.Rptr.2d 112, 931 P.2d 290 [§ 17203 "contains ... no language of condition linking injunctive

United States District Court
Northern District of California

United States District Court
Northern District of California

1  and restitutionary relief"]; *Prata v. Superior Court* (2001) 91
   Cal.App.4th 1128, 1139, 111 Cal.Rptr.2d 296 [plaintiff could
2  pursue injunctive relief even though restitution was unavailable].)

3  *Clayworth v. Pfizer, Inc.*, 49 C.4th 758, 790 (2010).  Plaintiffs also did not demonstrate that

4  Florida "has a materially greater interest in the determination of the matter."  *In re Facebook*, 185

5  F. Supp. 3d at 1168.  Consequently, plaintiffs have not presented a good reason to disregard the

6  choice of California law in the TOS in favor of the FDUTPA.

7          Although this is enough to dismiss the third claim, some additional observations are useful.

8  A good argument can be made that plaintiffs did not plausibly allege deceptive conduct by Twitter

9  for purposes of either the FDUTPA or the UCL.  The TOS expressly states that Twitter may

10 suspend or terminate an account "at any time for any or no reason." Dkt. No. 138-7 at 8.  It also

11 states that Twitter may remove or refuse to distribute any content.  *Id.* at 5.  There is nothing cagey

12 or misleading about these provisions, and plaintiffs' suggestion that Twitter may have applied

13 them inconsistently, *see* AC ¶¶ 212-16, or at the government's behest, does not change that.  The

14 TOS gave Twitter contractual permission to act as it saw fit with respect to any account or content

15 for any or no reason, which makes its ostensible motives irrelevant for a deceptive practices claim.

16 **IV.    THE SSMCA CLAIM**

17         Plaintiffs' fourth claim under Florida's Stop Social Media Censorship Act is also due for

18 dismissal.  Twitter did not make a choice-of-law argument for this claim, *see* Dkt. No. 138 at 14-

19 19, and so the Court addresses the SSMCA claim on its own terms.

20         An initial problem for plaintiffs is that only one named plaintiff (Dominick Latella) was a

21 Florida resident with any active Twitter account at the time the statute took effect on July 1, 2021,

22 AC ¶¶ 138, 146, and so he is the only plaintiff who might conceivably have a SSMCA claim.  *See*

23 Fla. Stat. § 501.2041(1)(h) ("user" is "a person who resides or is domiciled in [Florida] and who

24 has an account on a social media platform.").  The amended complaint alleges that all of the other

25 plaintiffs were domiciled outside of Florida, or had their Twitter accounts closed prior to July 1,

26 2021.

27         Another problem is that plaintiffs say they are challenging only conduct that occurred after

28 the SSMCA effective date. Dkt. No. 145 at 24.  But the amended complaint focuses on actions

affecting plaintiffs' accounts prior to July 1, 2021. *See* AC ¶¶ 113, 124, 128-29, 137, 143, 150, 158-59, 226. Consequently, it is unclear what plaintiffs allege to be the potential application of the statute to their case.

There is also a major concern about the enforceability of the SSMCA. Florida government officials were enjoined from enforcing the SSMCA on June 30, 2021, the day before the law was to take effect, in a well-reasoned decision issued by the Northern District of Florida. *NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082 (N.D. Fla. 2021), *appeal pending sub nom*, *NetChoice LLC v. Attorney Gen., State of Fla.*, No. 21-12355 (11th Cir.). The court concluded that the statute violated the First Amendment and was preempted by 47 U.S.C. § 230; it also expressed strong concerns that the statute was impermissibly vague. The Court declines plaintiffs' invitation to disregard this decision, particularly while an appeal is pending, and dismisses the SSMCA claim without prejudice.

## CONCLUSION

The amended complaint is dismissed in its entirety. Plaintiffs will have an opportunity to amend their complaint. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000). Plaintiffs may file an amended complaint that is consistent with this order by May 27, 2022. The amended complaint may not add any new claims or defendants without express prior leave of Court. Plaintiffs are advised that further opportunities to amend are not likely to be granted.

**IT IS SO ORDERED.**

Dated: May 6, 2022

JAMES DONATO
United States District Judge

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JUSTIN HART,

        Plaintiff,

    v.

FACEBOOK INC., et al.,

        Defendants.

Case No. 22-cv-00737-CRB

**ORDER GRANTING MOTIONS TO DISMISS**

Plaintiff Justin Hart, a California resident, is suing Defendants Facebook Inc., Twitter Inc., President Joseph Biden, Surgeon General Vivek Murthy, the Department of Health and Human Services (HHS), and the Office of Management and Budget (OMB). See Compl. (dkt. 1). Hart alleges that, between late 2020 and mid-2021, Facebook and Twitter flagged his posts as misinformation about COVID-19 and suspended or locked his accounts. Hart contends that these acts violated the First Amendment of the United States Constitution because President Biden and Surgeon General Murthy (collectively, Federal Defendants) allegedly acted jointly with Facebook and Twitter. Hart also argues that Facebook and Twitter violated the Free Speech Clause of the California Constitution as well as California contract and tort law.[1] Facebook, Twitter, and the Federal Defendants move to dismiss. Facebook and Twitter also move to strike under California's anti-SLAPP statute. Finding oral argument unnecessary, the Court GRANTS the motions to dismiss without leave to amend. The Court declines to reach the motions to strike.

---

[1] Hart also raises a claim against HHS and OMB, but this order does not discuss it, as they did not move to dismiss. Hart alleges that they violated the Freedom of Information Act (FOIA) by failing to timely respond to his document request as to communication between the Federal Defendants, Facebook, and Twitter. See Compl. ¶¶ 66–74.

# I.    BACKGROUND

## A.    Parties

Hart is a resident of San Diego County, California.  Compl. ¶ Intro 12.[2]  He is "the Chief Data Analyst and founder of RationalGround.com, which helps companies, public policy officials, and parents gauge the impact of COVID-19 across the country."  Id.  Hart has used Facebook since 2007 as a networking tool for his consulting business and for his website.  Id. ¶¶ 30–34.  That same year, Hart joined Twitter, which he uses for the same reasons and "as a feeder for his other social media accounts."  Id. ¶¶ 47, 48.

Facebook Inc. is a corporation with its principal place of business in California that hosts "one of the most popular social media sites," boasting "more than 2.8 billion monthly users worldwide."  Id. ¶ 21.

Twitter Inc. is a corporation with its principal place of business in California that runs a popular social media site used by "more than one in five adult Americans."  Id. ¶ 41.

Vivek Murthy is Surgeon General of the United States and "directs the office of the Surgeon General."  Id. ¶ Intro 15.

Joseph R. Biden, Jr. is President of the United States and directs the federal executive branch, including White House staff.  Id. ¶ Intro 16.

## B.    Facts

### 1.    Terms of Use

Because Hart "refers extensively" to Facebook's Terms of Service and Community Standards and Twitter's Terms of Service, they are incorporated by reference into the complaint.  Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002 (9th Cir. 2018); see Compl. ¶¶ 25–26 & nn. 17–19 (Facebook's Terms of Service and Community Standards); id. ¶¶ 44–46 & nn. 30-31 (Twitter's Terms of Service); see also Twitter RJN (dkt. 71); Facebook Mot. (dkt. 73) at 3 n.2.

---

[2] The complaint numbers paragraphs from 1 to 26 (for sections on Introduction, Parties, and Jurisdiction) and then begins again at 1 and goes to 110.  Unless noted with "Intro," paragraph numbers from the Complaint refer to the paragraph numbers in the body of the complaint (1-110).

United States District Court
Northern District of California

At the relevant times, Facebook's Terms of Service forbade users from sharing "anything . . . [t]hat is unlawful, misleading, discriminatory, or fraudulent." See https://web.archive.org/web/20210718231018/https://www.facebook.com/legal/terms/plain _text_terms (Facebook Terms of Service). The Terms of Service also forbade users from sharing anything that violated its "Community Standards." See id. One category of speech that could violate Facebook's Community Standards was "Integrity and Authenticity," Compl. ¶ 27, of which a subcategory was "False News." See https://web.archive.org/web/20210713153441/https://www.facebook.com/communitystand ards/integrity_authenticity (Facebook Community Standards). The Terms of Service also stated that Facebook "can remove or restrict access to content that is in violation of these provisions." See Facebook Terms of Service.

Twitter similarly conditions the use of its platform on compliance with its Terms of Service and various rules and policies, which are posted on Twitter's website. See Compl. ¶¶ 44-46. By accepting Twitter's User Agreement, a Twitter user agrees to be bound by the current version of the Terms of Service. See Patchen Decl. Ex. 1 (dkt. 70-2) § 6 (Twitter Terms of Service). In its Terms of Service, Twitter "reserve[s] the right to remove Content that violates the User Agreement" and directs people to its website for information "regarding specific policies and the process for reporting or appealing violations." Id. § 3. One of Twitter's policies prohibits using "Twitter's services to share false or misleading information about COVID-19 which may lead to harm." Patchen Decl. Ex. 3 (dkt. 70-4) (Twitter Covid-19 Misleading Information Policy). The policy further states that Twitter "will label or remove false or misleading information" about personal protective equipment "such as claims about the efficacy and safety of face masks to reduce viral spread" and that penalties may include account locks. Id.

### 2. Allegations as to Facebook

Beginning in September 2020, Hart's Facebook posts triggered warnings from Facebook that they "violated its Community Standard[s]." Id. ¶¶ 35–37. First, on or around September 15, 2020, Facebook issued a warning regarding a July 2020 post in

which Hart described a video as depicting "cops defending" a statue of Christopher Columbus in Chicago from "hundreds of 'peaceful' protestors throw[ing] bottles, cans, canes, and rocks" as part of a "BLM/SJW rally." Id. ¶ 35. Hart alleges that Facebook's warning claimed that "[f]alse information about COVID-19 [was] found in your post." Id. On September 25, Facebook banned Hart for 30 days from advertising on Facebook and from "live" communication with his followers after he posted "'Spotify seems like a great place to work!' – Joseph Goebbels." Id. ¶ 36.

On April 23, 2021, Facebook restricted Hart from posting or commenting for 24 hours because it stated that three of Hart's posts from earlier in April violated its Community Standards:

> If you ever want to know where your BLM donation is going – the co-founder 'trained Marxist' Patrisee Cullars – just bought this amazing home in LA. (Id. ¶ 37(a))

> This is the truth: Covid is almost gone in America. Hospitals are literally empty. Every willing senior has already been vaccinated. In a few weeks every willing adult can be… (Id. ¶ 37(c))

(Hart alleges that the third post "was removed from Facebook" but does not allege anything about its content. Id. ¶ 37(b).)

Finally, on July 13, 2021, Hart posted an infographic on his personal Facebook page entitled "Masking Children is Impractical and Not Backed by Research or Real World Data." Id. ¶ 1. The post argued, among other things, that masking "can often cause headaches and fatigue," that "[s]ome masks contain toxic chemicals," "[d]eaf & disabled children struggle to learn with masks," and masking could "cause a wide variety of . . . health issues." Id. ¶ 2. Hart alleges that the graphic is "science-based" and contained footnotes to scientific evidence supporting the claims. Id. ¶ 3. Facebook flagged the post with the following notice:

> You can't post or comment for 3 days.

> This is because you previously posted something that didn't follow our Community Standards.

> This post goes against our standards on misinformation that

could cause physical harm, so only you can see it.

Learn more about updates to our standards.

Id. ¶ 4.

Hart has a "valid employment contract" with Donorbureau, LLC, a Virginia-based limited liability company, as Administrator of its Facebook account. Id. ¶¶ 91-92. He alleges that he was unable to fulfill his contractual duties because Facebook suspended his account. Id. ¶¶ 92, 96-97.

### 3. Allegations as to Twitter

On or around July 18, 2021, Hart published the following Tweet on his Twitter account @justin_hart:

> So the CDC just reported that 70% of those who came down with #COvId19 symptoms had been wearing a mask. We know that masks don't protect you . . . but at some point you have to wonder if they are PART of the problem.

Id. ¶ 5. That same day, Twitter locked Hart's account and provided him with notice that he violated the Covid-19 Misleading Information Policy:

> Hi Justin Hart,
>
> Your Account, @justin_hart has been locked for violating the Twitter Rules.
>
> Specifically for: Violating the policy on spreading misleading and potentially harmful information related to COVID-19.

Id. ¶ 6.

### 4. Statements by Federal Officials

On July 15, 2021—two days after Facebook's final disciplinary action against Hart and three days before Twitter locked his account—the Biden Administration announced a focus on COVID-19-related misinformation on social media. See id. ¶¶ 7–8. At a White House press conference, Surgeon General Murthy stated: "We're asking [our technology companies] to consistently take action against misinformation super-spreaders on their platforms." Id. ¶ 8. Hart alleges that "a team of government employees are actively researching and tracking social media posts with which it disagrees and relaying those posts to social media companies with instructions to take them down." Id. ¶ 9. White

5

House Press Secretary Jen Psaki stated that: "We've increased disinformation research and tracking within the Surgeon General's office.  We're flagging problematic posts for Facebook that spread disinformation."  Id. ¶ 10.  Psaki also said that "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team."  Id. ¶ 12.

Hart alleges that Biden and Murthy "directed" social media platforms to make four changes: (1) to "measure and publicly share the impact of misinformation on their platform"; (2) to "create a robust enforcement strategy that bridges their properties and provides transparency about the rules"; (3) to "take faster action against harmful posts" because "information travels quite quickly on social media platforms"; and (4) to "promote quality information in their feed algorithm."  Id. ¶¶ 14-17.  Hart also alleges that Biden directed Murthy to create a 22-page advisory with "instructions on how social media companies should remove posts with which Murthy and Biden disagree."  Id. ¶ 18.  Finally, Hart alleges that Biden "threatened" social media companies who do not comply by "publicly shaming and humiliating them, stating, 'They're killing people.'"  Id. ¶ 19.

### C.    Procedural History

On July 22, 2021, one week after White House press conference, Hart submitted a FOIA request to HHS and OMB.  Compl. ¶ 67; see Ex. A to Ex. 1 (dkt. 78-1) at 2 (FOIA request for "[a]ll records of communications . . . between the White House or HHS and any social media company related to Justin Hart or his social media posts").  Neither agency responded within the 20-day statutory deadline.  Id. ¶ 69; see 5 U.S.C. § 552(a)(6)(A)(i).

On August 31, 2021, Hart filed this lawsuit in the Southern District of California against President Biden, Surgeon General Murthy, Facebook, Twitter, HHS, and OMB. See Compl.  On February 2, 2022, a district judge granted Facebook and Twitter's motions to transfer, holding that the forum-selection clauses in both companies' Terms of Service were valid and enforceable and applicable to all claims in this suit.  See Order Granting Transfer (dkt. 45).

Facebook and Twitter moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  See Twitter Mot. (dkt. 70); Facebook Mot. (dkt. 73). Twitter and Facebook also moved to strike under California's anti-SLAPP statute.  Twitter anti-SLAPP (dkt. 72); Facebook Mot. at 17-19.  The Federal Defendants moved to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction.  Gov't Mot. (dkt. 69).

## II.    LEGAL STANDARD

### A.    12(b)(6) Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim for which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) applies when a complaint lacks either a "cognizable legal theory" or "sufficient facts alleged" under such a theory.  Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019).  Whether a complaint contains sufficient factual allegations depends on whether it pleads enough facts to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678.  When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  The Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A court has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed,

7

1   undue prejudice to the opposing party by virtue of allowance of the amendment, [and]

2   futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir.

3   2008).

4       **B.    12(b)(1) Motion to Dismiss**

5       "The doctrine of standing limits federal judicial power." Or. Advocacy Ctr. v.

6   Mink, 322 F.3d 1101, 1108 (9th Cir. 2003). The question of whether plaintiffs have

7   standing "precedes, and does not require, analysis of the merits." Equity Lifestyle Props.,

8   Inc. v. Cnty. of San Luis Obispo, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008). To have

9   standing, plaintiffs must establish (1) that they have suffered an injury in fact, (2) that their

10   injury is fairly traceable to a defendant's conduct, and (3) that their injury would likely be

11   redressed by a favorable decision. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61

12   (1992). Each of these elements must be supported "with the manner and degree of

13   evidence required at the successive stages of the litigation." Id. at 561. And plaintiffs

14   "must have standing to seek each form of relief requested in the complaint." Town of

15   Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1651 (2017).

16       Under Rule 12(b)(1), a defendant may move to dismiss for lack of standing and thus

17   lack of subject matter jurisdiction. See White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).

18   Rule 12(b)(1) attacks on standing can be either facial, confining the court's inquiry to

19   allegations in the complaint, or factual, permitting the court to look beyond the complaint.

20   Id.; Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). For facial

21   attacks, courts accept the jurisdictional allegations in the complaint as true. See, e.g.,

22   Whisnant v. U.S., 400 F.3d 1177, 1179 (9th Cir. 2005). When addressing a factual attack,

23   however, courts may consider evidence like declarations submitted by the parties, and the

24   party opposing the motion to dismiss has the burden of establishing subject matter

25   jurisdiction by a preponderance of the evidence. See, e.g., Leite v. Crane Co., 749 F.3d

26   1117, 1121 (9th Cir. 2014).

27   **III.    DISCUSSION**

28       For the reasons set out below, the Court grants the motions to dismiss by Facebook,

United States District Court
Northern District of California

8

1    Twitter, and the Federal Defendants.

2            **A.    Facebook and Twitter**

3            Hart's sole federal claim against Facebook and Twitter is a First Amendment claim

4    that requires alleging that they engaged in state action.  The Court dismisses this claim

5    because Hart fails to do so plausibly.  The Court declines to exercise jurisdiction over the

6    state-law claims and does not reach the motions to strike.

7                    **1.    State Action**

8            The Ninth Circuit recently reaffirmed that "a private entity hosting speech on the

9    Internet is not a state actor" subject to the Constitution.  See Prager Univ. v. Google LLC,

10   951 F.3d 991, 995 (9th Cir. 2020) ("Despite YouTube's ubiquity and its role as a public-

11   facing platform, it remains a private forum, not a public forum subject to judicial scrutiny

12   under the First Amendment.").  The Supreme Court also recently explained that "merely

13   hosting speech by others is not a traditional, exclusive public function and does not alone

14   transform private entities into state actors subject to First Amendment constraints."

15   Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1930 (2019).

16           However, in rare cases, action by a private party can constitute state action.  See

17   Pasadena Republican Club v. W. Justice Ctr., 985 F.3d 1161, 1167 (9th Cir. 2021) (noting

18   the four different tests that the Supreme Court has employed to determine if a private party

19   engaged in state action).  Hart argues that Facebook and Twitter engaged in state action

20   under either of two theories: a "joint action" theory and a "governmental compulsion or

21   coercion" theory.  See Opp. at 3; see Pasadena, 985 F.3d at 1167.  Hart does not come

22   close to pleading state action under either theory.

23                   **a.    Joint Action**

24           Under the joint action test, state action occurs where "the state has 'so far insinuated

25   itself into a position of interdependence with [the private entity] that it must be recognized

26   as a joint participant in the challenged activity." Gorenc v. Salt River Project Agr. Imp. &

27   Power Dist., 869 F.2d 503, 507 (9th Cir. 1989) (quoting Burton v. Wilmington Parking

28   Auth., 365 U.S. 715, 725 (1961)).  But "a bare allegation of such joint action will not

overcome a motion to dismiss." <u>DeGrassi v. City of Glendora</u>, 207 F.3d 636, 647 (9th Cir. 2000).  The Supreme Court has explained:

> [A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.  Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives.

<u>Blum v. Yaretsky</u>, 457 U.S. 991, 1004–05 (1982).  This circuit has required "substantial cooperation" or that the private entity and government's actions be "inextricably intertwined."  <u>Brunette v. Humane Society of Ventura Cnty.</u>, 294 F.3d 1205, 1211 (9th Cir. 2002).  "A conspiracy between the State and a private party to violate constitutional rights may also satisfy the joint action test."  <u>Id.</u>  However, the private and governmental actors must have had a "meeting of the minds" to "violate constitutional rights."  <u>Fonda v. Gray</u>, 707 F.2d 435, 438 (9th Cir. 1983).

First, the Court emphasizes that Facebook and Twitter made contemporaneous statements that they took action because they concluded that Hart had violated company policy.  <u>See, e.g.</u>, <u>id.</u> ¶ 4.  (Facebook: "This post goes against our standards on misinformation that could cause physical harm, so only you can see it. . . Learn more about updates to our standards."); <u>id.</u> ¶ 6. (Twitter: "Your Account, @justin_hart has been locked for violating the Twitter Rules.  Specifically for: Violating the policy on spreading misleading and potentially harmful information related to COVID-19.").  Both companies' Terms of Service establish that (1) they have misinformation policies; and (2) they enforce them.  <u>See</u> Facebook Community Standards (stating that the platform disallows "False News"); Facebook Terms of Service (users may not share anything "[t]hat is . . . misleading"); <u>id.</u> (Facebook "can remove or restrict access to content that is in violation of these provisions"); Twitter Terms of Service (Twitter "reserve[s] the right to remove Content that violates the User Agreement"); <u>id.</u> (directing Twitter users to the website for more details); Twitter Covid-19 Misleading Information Policy (Twitter "will label or

United States District Court
Northern District of California

remove false or misleading information" about personal protective equipment "such as claims about the efficacy and safety of face masks to reduce viral spread" and that penalties may include account locks). On their own, Facebook and Twitter's contemporaneous statements plausibly explain Hart's injury. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557 (2007) (allegations of secret illegal conduct are insufficient where they are consistent with plausible legal explanations).

Next, the Court rejects Hart's joint action argument as to most of Facebook's conduct because it occurred long before the administration made any statements at all. Mysteriously, Hart believes that the Federal Defendants and Facebook took joint action against his posts months before he alleges that the Federal Defendants even began communicating with Facebook about misinformation. See, e.g., Compl. ¶ 37 (Facebook disciplined Hart in April 2021). Even more mysteriously, Hart apparently believes that the Federal Defendants and Facebook committed joint state action against him in September 2020. See Compl. ¶¶ 35, 36. Yet neither Biden nor Murthy was in government until January 2021. Hart fails to explain how Facebook took joint action with governmental actors from the future. Instead, he argues that Press Secretary Psaki's use of a present tense verb on July 15, 2021 indicates that state actors had already been acting jointly with Facebook and Twitter for months. See Opp. at 8-9 (quoting Compl. ¶ 13). The Court disagrees. See Fed. Agency of News LLC v. Facebook, Inc., 432 F. Supp. 3d 1107, 1125 (N.D. Cal. 2020) (allegations "do little to demonstrate joint action in the instant case, as most of [them] post-date the relevant conduct that allegedly injured Plaintiffs"); Children's Health Def. v. Facebook Inc., 546 F. Supp. 3d 909, 930 (N.D. Cal. 2021) (similar); see also Fonda, 707 F.2d at 438 (joint action requires a "meeting of the minds").[3]

---

[3] Hart also alleges that Facebook "tak[es] its directives" from President Biden in promulgating its "constantly shifting" policies on misinformation. See Compl. ¶¶ 39, 40. Even if true, this allegation would not imply that Facebook's conduct towards Hart was state action, for the reasons discussed in the next paragraph of the order. In any case, the claim is conclusory and implausible, unless it is reinterpreted as an anodyne allegation that Facebook considers currently-known information and the statements of governmental and public health authorities in designing its policies. And (as noted below) neither the government's communication of information nor a

United States District Court
Northern District of California

1    Despite occurring relatively close in time to two alleged instances of joint action,

2    the Federal Defendants' statements are far too vague and precatory to suggest joint action.

3    The four "key changes" the administration suggested to social media platforms are vague

4    and unenforceable.  See, e.g., Compl. ¶¶ 14-15 (recommending that they "measure and

5    publicly share the impact of misinformation on their platform" and "create a robust

6    enforcement strategy").  And Surgeon General Murthy's "22-page advisory" document is,

7    well, advisory.  Id. ¶ 18.  Hart cites no authority for the proposition that vague government

8    advisory documents transform private action into state action.  These documents are issued

9    annually by the thousands and do not secretly transform large swathes of the private sector

10    into state actors.

11    Furthermore, the administration's statements have no particularized connection to

12    Facebook or Twitter's actions toward Hart.  See DeGrassi, 207 F.3d at 647 (noting that a

13    "bare allegation of [] joint action" is insufficient).  The two alleged actions that are close in

14    time are: (1) Facebook's flagging of Hart's July 13, 2021 post about the purported dangers

15    of masking (Compl. ¶¶ 1, 4); and (2) Twitter's temporary locking of his account because of

16    his July 18, 2021 tweet (Compl. ¶ 5).  Yet Hart makes no allegation that the Federal

17    Defendants ever knew about his July 13 Facebook post, his July 18 tweet, or even his

18    existence.  Because the Federal Defendants did not know about Hart's post or tweet, they

19    could not have had a "meeting of the minds" as to the disciplinary action those companies

20    took.  See Children's Health Def., 546 F. Supp. 3d at 930 (no joint action as to plaintiff on

21    the basis of vague allegations that the government and Facebook were "working together"

22    to fight misinformation); Fed. Agency of News, 432 F. Supp. 3d at 1126 (no joint action

23    where the allegations as to government policy were "unconnected" to the harm to the

24    plaintiff).  In his opposition, Hart insists that the government policy "called on the private

25    _____

26    private party's use of that information transforms private action into state action.  Finally, Hart's
     allegation that Facebook applies its misinformation policy oddly, see id. ¶ 35 (alleging that
27    Facebook flagged a post about police clashes with protestors as involving COVID-19
     misinformation), suggests only that Facebook applies its misinformation policy oddly and has
28    nothing to do with state action.

United States District Court
Northern District of California

1    party to take the precise action at issue." Opp. at 7. This is flatly belied by the complaint.

2    The fact that the White House communicated with Facebook and Twitter about the general

3    topic does not transform into state action their decisions about one post or tweet.

4         Finally, even if the White House had specifically communicated with these

5    companies about Hart's post or tweet, their enforcement of its policy as to that post or

6    tweet would still not be joint action. One party supplying information to another party

7    does not amount to joint action. See Lockhead v. Weinstein, 24 Fed. App'x 805, 806

8    (9th Cir. 2001) ("[M]ere furnishing of information to police officers does not constitute

9    joint action"); Fed. Agency of News, 432 F. Supp. 3d at 1124 ("supplying information to

10   the state alone [does not amount] to conspiracy or joint action") (alteration added). The

11   one-way communication alleged here falls far short of "substantial cooperation." See

12   Brunette, 294 F.3d at 1212. After all, the Federal Defendants did not "exert[] control

13   over how [Facebook or Twitter] used the information [it] obtained." See Deeths v. Lucile

14   Slater Packard Children's Hospital at Stanford, 2013 WL 6185175, at *10 (E.D. Cal.

15   Nov. 26, 2013). Indeed, even if the Federal Defendants communicated with Facebook or

16   Twitter about Hart's post and later agreed with those companies' decisions, approval or

17   acquiescence does not make the State responsible for their actions. See Blum, 457 U.S at

18   1004–05.

19        The Court easily concludes that the Federal Defendants did not "so far insinuate[]

20   [themselves] into a position of interdependence" with Facebook and Twitter that they

21   "must be recognized as joint participant[s]" in their decisions to enforce their policies

22   against Hart. See Gorenc, 869 F.2d at 507.

23                     **b.    Government Coercion**

24        Hart also fails to plead state action on the theory that the Federal Defendants

25   coerced Facebook or Twitter into taking action as to his accounts. As noted above, state

26   action may be found where a State "exercised coercive power or has provided such

27   significant encouragement, either overt or covert, that the choice must in law be deemed to

28   be that of the State." Blum, 457 U.S. at 1004–05. Hart vaguely alleges that the Federal

                                          13

Defendants "directed [] Facebook and Twitter to remove Hart's social media posts." Compl. ¶ 20.  He also alleges that President Biden "threatened social media companies who do not comply with his directives by publicly shaming and humiliating them, stating, 'They're killing people.'" Id. ¶ 19.  Hart argues that, in light of "public battles over the future of Section 230 [of the Communications Decency Act] legislation and ongoing antitrust investigations, including by executive agencies" such a statement amounts to a "threat."  Opp. at 4.

None of these conclusory allegations come remotely close to coercion.  Indeed, Hart admits that this theory is even weaker than the joint action theory, see Opp. at 4, and he does not try to argue that any case finding government coercion is factually analogous, see Opp. at 3-4.  For obvious reasons, the government's vague recommendations and advisory opinions are not coercion.  Nor can coercion be inferred from President Biden's comment that social media companies are "killing people."  Compl. ¶ 19.  A President's one-time statement about an industry does not convert into state action all later decisions by actors in that industry that are vaguely in line with the President's preferences.  And Hart has not alleged any connection between any (threat of) agency investigation and Facebook and Twitter's decisions.[4]  See Zhou v. Breed, No. 21-15554, 2022 WL 135815, at *1 (9th Cir. Jan. 14, 2022) ("The mere fact that Breed or other public officials criticized a billboard or called for its removal, without coercion or threat of government sanction, does not make that billboard's subsequent removal by a private party state action.").  Finally, even if Hart had plausibly pleaded that the Federal Defendants exercised coercive power over the companies' misinformation policies, he still fails to specifically allege that they coerced action as to him.  See Children's Health Def., 546 F. Supp. 3d at 933 (rejecting a government coercion argument because there was no allegation that a state actor ordered Facebook to "take any specific action with regard to [plaintiff] or its Facebook page").

---

[4] It is still more difficult to understand how general legislative debates, such as those surrounding Section 230, could provide a President with coercive power over a private company sufficient to confer state action.

1

As Hart fails to plead state action under either a joint action or government coercion

2

theory, his First Amendment claim against Facebook and Twitter fails as a matter of law.

3

### 2.      California Claims

4

Hart also alleges four California claims against Facebook and Twitter.  The first two

5

(against both defendants) involve the Free Speech Clause of the California Constitution

6

and a promissory estoppel theory.  Compl. at 17-19.  The next two (against Facebook only)

7

allege intentional interference with contract and negligent interference with prospective

8

economic advantage (as to the disruption of Hart's business relationship with

9

Donorbureau).  See id. at 19-21.  Having dismissed the sole federal claim against these

10

defendants, the Court declines to exercise supplemental jurisdiction over these claims.

11

A district court may decline to exercise supplemental jurisdiction where it has

12

dismissed all claims over which it has original jurisdiction.  See 28 U.S.C. § 1367(c)(3);

13

Oliver v. Ralphs Grocery Co., 654 F.3d 903, 911 (9th Cir. 2011) (not error to decline

14

supplemental jurisdiction where "balance of the factors of 'judicial economy, convenience,

15

fairness, and comity' did not 'tip in favor of retaining the state-law claims' after dismissal

16

of the [federal] claim"); Acri v. Varian Assocs., Inc., 114 F.3d 999, 1000 (9th Cir. 1997)

17

("[S]tate law claims 'should' be dismissed if federal claims are dismissed before trial")

18

(emphasis in original).  The claims under the California Constitution and various contract

19

or tort law theories involve novel issues that are best addressed, in the first instance, by a

20

state court.

21

Accordingly, the Court grants Facebook and Twitter's motions to dismiss.

22

### 3.      Motions to Strike

23

Both Twitter and Facebook bring motions to strike under California's anti-SLAPP

24

statute.  See Twitter Anti-SLAPP; Facebook Mot. at 17-19.  That statute facilitates "the

25

early dismissal of unmeritorious claims filed to interfere with the valid exercise of the

26

constitutional rights of freedom of speech and petition."  Club Members for an Honest

27

Election v. Sierra Club, 45 Cal. 4th 309 (2008); see Cal. Code Civ. Proc. § 425.16(b)(1).

28

Analysis of a motion to strike pursuant to the anti-SLAPP statute consists of two

United States District Court
Northern District of California

15

steps.  The defendant must first show that the statute applies because the defendant was "engaged in conduct (1) in furtherance of the right of free speech; and (2) in connection with an issue of public interest."  See Doe, 730 F.3d at 953.  If the defendant makes this showing, the court then considers whether the plaintiff has demonstrated "a reasonable probability" of prevailing on the merits of his claims.  In re NCAA Student-Athlete Name & Likeness Licensing Litig., 724 F.3d 1268, 1273 (9th Cir. 2013) (quoting Batzel v. Smith, 333 F.3d 1018, 1024 (9th Cir. 2003)).

Because the Court does not exercise supplemental jurisdiction over the California claims, the Court cannot determine whether Hart has demonstrated a reasonable probability of prevailing on the merits.  Accordingly, the Court does not reach either anti-SLAPP motion.

### B.    Federal Defendants

As explained above, Hart has not plausibly pleaded that any action by President Biden or Surgeon General Murthy was causally related to Facebook and Twitter's decisions to enforce their misinformation policies against Hart.  Thus, even if Hart has pleaded injury cognizable for the requested relief—which is doubtful[5]—the Court lacks Article III standing over Hart's claims against the Federal Defendants for two independent reasons: (1) the injury is not "fairly traceable" to their conduct, and (2) even if it were, that injury could not be redressed by a favorable decision.  See Lujan, 504 U.S. at 560–61.

Another district court reached similar conclusions on both causation and redressability grounds in a case brought by an activist and a nonprofit organization skeptical of vaccines against Congressman Adam Schiff.  See Ass'n of Am. Physicians & Surgeons v. Schiff, 518 F. Supp. 3d 505 (D.D.C. 2021), aff'd, 23 F.4th 1028 (D.C. Cir. 2022).  The plaintiffs there alleged injury from censorship by technology companies and

---

[5] A claim for injunctive relief (all that is available under the First Amendment) requires plausibly pleading that he faces "real and immediate threat of repeated injury" from the Federal Defendants.  Fortyune v. Am. Multi-Cinema, Inc., 364 F.3d 1075, 1081 (9th Cir. 2004).  The intimations of future injury in Hart's complaint are vague and based entirely in innuendo.

United States District Court
Northern District of California

claimed that Congressman Schiff caused that censorship in violation of the First Amendment. First, the court explained why this causation theory was insufficient for Article III standing:

> Plaintiffs cannot satisfy the causation element of standing because all the alleged harms stem from the actions of [social media companies], not from Congressman Schiff. . . . The open letters and public statements made by Congressman Schiff do not mention AAPS, do not advocate for any specific actions, and do not contain any threatening language. Despite this, Plaintiffs allege that, through the open letters and public comments, Congressman Schiff coerced several companies to take specific actions against AAPS. . . . These allegations are not plausible and ignore the innumerable other potential causes for the actions taken by the technology companies.

Id. at 515–16 (citations omitted).

Next, on redressability, the district court concluded that "[i]t [was] pure speculation that any order directed at Congressman Schiff . . . would result in the [technology] companies changing their behavior" towards the plaintiffs. Ass'n of Am. Physicians, 518 F. Supp. 3d at 516. That is, even if there were a causal link between Congressman Schiff's actions and the plaintiffs' injury, it was highly implausible that enjoining Congressman Schiff would have any effect whatsoever on the policies of the technology companies, much less how those policies are enforced against the plaintiffs. See id.

On appeal, the D.C. Circuit affirmed the district court's causation analysis and did not reach the redressability issue. The court explained that the vague allegations failed to plausibly allege a causal relationship: "[I]t is far less plausible that the companies' actions were a response to [Congressman Schiff's] inquiry than that they were a response to widespread societal concerns about online misinformation." 23 F.4th at 1034-35. Along the way, it noted that "several of the [] adverse actions by the technology companies occurred before" Congressman Schiff took any action at all. Id. at 1034.

The above analysis is apt here. Hart makes only vague and implausible allegations connecting the Federal Defendants' conduct to his injury. That injury has no causal relationship with the Federal Defendants' actions, and no court order as to the Federal

United States District Court
Northern District of California

1    Defendants could redress it.  See Lujan, 504 U.S. at 560–61.  Accordingly, the Court

2    grants the Federal Defendants' motion to dismiss for lack of jurisdiction.

3         **C.    Leave to Amend**

4         A court should "freely give leave" to amend "when justice so requires."  Fed. R.

5    Civ. P. 15(a)(2).  However, a court has discretion to deny leave to amend where

6    amendment would be futile.  See Leadsinger, 512 F.3d at 532.

7         The Court finds that leave to amend would be futile.  Hart fails to come close to

8    alleging that Facebook and Twitter's enforcement of their misinformation policies against

9    him were state action.  Thus, the only federal claim against Facebook and Twitter fails, and

10   this Court lacks subject-matter jurisdiction over the claim against the Federal Defendants.

11   Nor can the complaint be amended to advance some other theory of federal jurisdiction.[6]

12        However, Hart still has a FOIA claim against HHS and OMB as to his request for

13   information about the Federal Defendants' supposed communications with Facebook and

14   Twitter about his accounts.  See Compl. ¶¶ 66–74; Ex. A to Ex. 1 (dkt. 78-1).  If Hart

15   prevails and learns facts that plausibly suggest that "the state has so far insinuated itself

16   into a position of interdependence with [Facebook and Twitter] that it must be recognized

17   as a joint participant" in enforcing their company policies, see Gorenc, 869 F.2d at 507, the

18   Court will permit amendment.

19   **IV.   CONCLUSION**

20        For the foregoing reasons, the Court GRANTS the motions to dismiss without leave

21   to amend, but without prejudice to Hart bringing his state claims in state court.  The Court

22   does not reach the motions to strike.

23        **IT IS SO ORDERED.**

24        Dated: May 5, 2022



CHARLES R. BREYER
United States District Judge

---

[6] Hart, Facebook, and Twitter are all residents of California, so Hart cannot amend his
complaint to establish diversity jurisdiction over the state claims.

18