# EXHIBIT A

IN THE COURT OF COMMON PLEAS, DELAWARE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO ex rel. DAVE YOST, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No.  21-CV-H-06-0274 |
| vs. | : | |
| | : | JUDGE JAMES P. SCHUCK |
| GOOGLE LLC, | : | |
| | : | |
| Defendant. | : | |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

I.  **INTRODUCTION**

At its core, this lawsuit is about how the government views search engines and what duties, if any, should be expected of them.  The State of Ohio's Complaint contends that Google is a common carrier of the world's information, and its algorithms for returning search results should therefore be a neutral, unbiased process that generates data in an objective fashion.  If it is required to return objective search results, the State claims, then Google cannot prefer its own pages and products.

Google, in turn, makes the argument that its process of returning search results necessarily involves the exercise of editorial judgment and discretion because its work requires it to locate and put in order web pages based on a subjective opinion about what the user will find most beneficial.

It is from these two diametrically opposed viewpoints of search-engine theory that the State and Google present their respective legal positions and arguments. The State alleges that Google's editorial discretion should be curtailed in favor of a common law duty to provide unbiased, "truthful" search results. Google counters it is not subject to common law governance and the First Amendment protects it from such regulation.

## II.   FACTS ALLEGED BY THE STATE OF OHIO

The following facts are presumed to be true because they are alleged in the State of Ohio's Complaint. *See State ex rel. Duncan v. American Transmission Systems, Inc.,* _____ Ohio St.3d _____, 2022-Ohio-323, _____ N.E.2d _____, ¶ 10 ("we must presume the truth of the complaint's factual allegations and draw all reasonable inferences in [the non-moving party's] favor").

Google.com is the most visited website in the world and in Ohio. Google owns and/or operates several products and services, including, among others, Google Search, the Android operating system, YouTube, YouTube Music, Google Play, Nest Labs, Google Cloud/Drive, Waze, Google Maps, Google Earth, Google TV, Google Flights, the Gmail electronic mail platform, Google Shopping, the Chrome web browser, Chromebook, and Fitbit. This case concerns Google Search.

Google Search is an internet-based information search service. Google provides its search platform indiscriminately to whomever chooses to use the service. Via the

internet, a user can proceed to http://www.google.com and make a query.  The user does not pay a fee to conduct the search.  Google collects the user's data, which it monetizes—in part by targeting the user with tailored advertisements.

A user's search is followed by a results page.  The first portion of the results page contains organic search results, ranked by Google in the order it believes the user would find the information most helpful.  A second category is specialized search results.  This involves Google retrieving news, flights, shopping, and other specific information onto the results page collected from the internet and other sources.  Examples of specialized search results include Google Shopping and Google Flights.  A third category of search results is AdWords, which returns results directed toward advertisements drawn from Google's auction-based online search advertising platform.

Google Search's search-results page highlights Google's own products and services over third-party sites.  Third-party sites do not have access to the enhanced features on Google Search results pages.

As a result of this "self-preferencing results-page architecture," as the State defines it, a majority of searches on Google Search in 2020 were completed without the user leaving Google-owned platforms.  The Complaint calls these "no-click searches."

Google dominates the internet search industry.  In 2020 and 2021, 88 percent of all internet searches in Ohio were conducted through Google Search.  On mobile devices, that market share was near 90 percent.

3

There is an inherently high barrier to enter the internet search industry. Because users do not pay a fee to conduct a search, users tend to search where they will get the best search results. The algorithms that dictate search results become better and more refined with each search. Therefore, because Google Search is by far the most used search engine, its popularity inherently produces the best results over time. Its dominant market share leads to more users, which leads to better refined search results, which leads to even more users. Because of this, Google Search possesses "substantial market power." [Compl. ¶ 31.]

The State's first cause of action seeks a declaratory judgment that Google Search is a common carrier and/or a public utility, "which subjects Google to the heightened duties that are required of such entities under common law." [Compl. ¶ 43.] The second cause of action seeks an injunction enjoining Google from (1) "prioritizing the placement of Google products, services, and websites over organic search results on Results Pages from Google Searches conducted in Ohio when equal rights to access prioritized placement are not afforded to non-Google entities," and (2) "including features on Results Pages from Google Searches conducted in Ohio that promote captured-click searches, without providing access to similar features to non-Google entities." [Compl. ¶¶ 77-78.]

Instead of addressing each claim separately, the parties' briefing has delineated between the State's common-carrier and public-utilities arguments. These are subparts

of the causes of action—that is, separate bases for a declaration and injunction; not separate causes of action. The Court will therefore address the parties' argument in the same fashion.

## III.   APPLICABLE STANDARD

Dismissal of a complaint is warranted under Civ.R. 12(B)(6) when it appears "that the plaintiff can prove no set of facts entitled him to recovery." *Maitland v. Ford Motor Co.*, 103 Ohio St.3d 463, 2014-Ohio-5717, 816 N.E.2d 1061, ¶ 11. The facts alleged in a complaint are taken as true, and all inferences must be drawn in the plaintiff's favor. *Id.* However, unsupported statements of law are not entitled to deference. *State ex rel. Ames v. Portage Cty. Bd. of Revision*, 166 Ohio St.3d 225, 2021-Ohio-4486, 184 N.E.3d 90, ¶ 13 ("legal conclusions, even when cast as factual assertions, are not presumed true for purposes of a motion to dismiss").

This standard must be viewed through the prism of the Declaratory Judgment Act. It is not sufficient, as the State contends, to assert a controversy exists, lay out the parties' respective positions, and claim that a cognizable claim has been stated. This is because a Rule 12(B)(6) motion to dismiss may be granted not only where the facts alleged are insufficient to state a claim, but also where there is no law to support the claim or where there is an insurmountable bar to relief present on the face of the complaint. *Sam Han v. Univ. of Dayton*, 541 Fed. Appx. 622, 625 (6th Cir. 2013); *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 602 (6th Cir. 1978). Google is moving to dismiss

on these latter bases, arguing the facts, if believed, do not make Google Search a common carrier or public utility.

## IV.   LAW AND ANALYSIS

### A.   Is Google Search a Common Carrier?

In the 19th century, American courts began imposing certain obligations on companies in the transportation and communications industries.  These obligations were derived from English common law that imposed legal duties on innkeepers, ferrymen, carriage drivers, and others who served the public.  *See Cellco Partnership v. F.C.C.*, 700 F.3d 534, 545 (D.C. Cir. 2012).  In *Interstate Commerce Comm. v. Baltimore & Ohio R.R. Co.*, 145 U.S. 263, 275, 12 S.Ct. 844, 36 L.Ed.699 (1892), the United States Supreme Court held that common law principles applied to common carriers "demanded little more than that they should carry for all persons who applied, in the order in which the goods were delivered at the particular station, and that their charges for transportation should be reasonable."  Congress subsequently codified these common-law duties in the Interstate Commerce Act of 1887, the Manns–Elkins Act of 1910, and later the Communications Act of 1934.  *Cellco*, 700 F.3d at 545-46.

Although the nature and scope of the duties imposed on common carriers have evolved over the last century, the core of the common law concept of common carriage has remained intact as the holding out of oneself to serve the public indiscriminately to the extent of one's capacity.

Under Ohio law, a common carrier is defined as one who undertakes for hire to transport persons or property, and holds itself out to the public as ready and willing to serve the public indifferently and impartially to the limit of its capacity. *Celina & Mercer Cty. Tel. Co. v. Union Ctr. Mut. Tel. Assn*, 102 Ohio St. 487, 492 (1921); *Kinder Morgan Cochin LLC v. Simonson*, 5th Dist. Ashland No. 15-COA-044, 2016-Ohio-4647, ¶ 33.  "The fundamental test of common carriage is whether there is a public profession or holding out to serve the public." *Kinder Morgan*,  2016-Ohio-4647, ¶ 33, quoting *New England Transrail, LLC Construction, Acquisition, & Operation Exemption*, STB Finance Docket No. 34797, 2007 WL 1989841 (Jun. 29, 2007).

The Fifth District Court of Appeals recently addressed common carriers in *Kinder Morgan, supra*.  That case involved a petroleum pipeline system created to transport ethane and propane from Ohio to Canada.  The court of appeals held that Kinder Morgan's pipeline was a common carrier because Kinder Morgan held it out as such and made the pipeline available to anyone "wanting to transport their petroleum products." *Id.* at ¶ 34.

Thus, there must be a "public profession or holding out to serve the public." *Id.* at ¶ 33.  In that regard, the State has alleged that Google's stated mission is to "organize the world's information and make it universally accessible and usable."  [Compl. ¶ 13.] A reasonable factfinder could conclude this unsolicited admission by Google, if true, satisfies such a standard.  Google's response—its citation to "Our Approach to Search"

from its "How Search Works" webpage—goes beyond the four corners of the State's Complaint and cannot be considered at this stage of the proceeding. *See also* Compl. ¶ 28 (alleging Google provides its search engine "generally and indiscriminately" to the people of Ohio).

Google also contends it is not a common carrier because it does not carry anything to another person; it merely retrieves webpages and provides them to the user. According to Google, any subsequent link to outside webpages is carried by the user's internet service provider or mobile carrier. Herein lies the difficulty in applying 18th century common law to 21st century technology and commerce. In the internet age, information is often as valuable as goods. From telegraph, land-line telephones, cable television, and cellular telephones, the law of what is transported and how it is transported has developed over time. The State has alleged that Google carries information. [Compl. ¶¶ 45, 50.] For purposes of the present posture, the State's allegations are sufficient.

Google next contends the State's Complaint lacks allegations that Google is hired or paid by the users of Google Search. The State has alleged that in lieu of charging a fee directly to its users, Google collects each user's data, which is then monetized by selling targeted ad space to its advertisers. An inference may fairly be drawn from the allegation that when a user enters a query on Google Search, it is entering into some sort of understanding or agreement—express or implied—with Google whereby in

8

return for entering a search query, which undoubtedly has some value to Google, the user is providing his location, search, and other data pursuant to a terms-of-service document. The parties discuss at length how Google Search works—what is being carried, who is sending it, how the algorithm works, and other like issues. [Motion to Dismiss at 3-4, 10; Memo in Opp. at 2-3; Reply at 5-6.] How Google Search functions and the structure and operations of its business are evidentiary issues that could have a strong bearing on the question of whether Google Search is a common carrier.

There is also a question as to whether a direct fee from the user is required. Elevators, escalators, hotel and airport shuttles, and air ambulances are examples of common carriers for which the user is not required to pay a direct fee to the operator to use the service. *See McVey v. Cincinnati*, 109 Ohio App.3d 159, 671 N.E.2d 1288 (1st Dist. 1995) (city became a common carrier to the extent it installed escalators in its parking facility); *Moore v. Behringer Harvard 600 Superior L.P.*, 8th Dist. Cuyahoga No. 96926, 2011-Ohio-6652, ¶ 14 (owner of office building a common carrier in use of passenger elevator); *Wyatt v. Otis Elevator Co.*, 921 F.2d 1224, 1227 (11th Cir. 1991) (treating a passenger elevator in an office building as a common carrier); *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 763 (4th Cir. 2018) (an air ambulance is a common carrier); *Suarez v. Trans World Airlines, Inc.*, 498 F.2d 612, 616 (7th Cir. 1974) (treating elevators and escalators as common carriers); *Shamrock Taxi of Fort Collins, Inc. v. North Am.*

*Specialty Ins. Co.*, No. 2006 WL 722188, * 1-2 (D. Colo. Mar. 22, 2006) (common carriers operated shuttle vans and luxury limousines).

To this extent, it appears more recent law has shifted from requiring a direct fee paid to the carrier. A mall does not charge a fee to members of the public who use its escalators. An office complex does not charge a fee to members of the public who use its elevators. An airport does not charge a fee to members of the public who use its terminals. Nonetheless, the availability of these conduits to the general public provides an important ancillary benefit to the owners of the mall, office building, and airport. In return for providing this important service, tenants rent space and perhaps pay more for that space because the landlord is able to provide the tenants' customers with better and quicker access to the tenants' spaces. No direct fee is paid to the landlord by the customers, but cases suggest the landlord is still functioning as a common carrier in those situations.

As a hypothetical, assume the automobile transportation service Uber did not charge its riders a fare based on the distance driven, but rather generated revenue solely by selling advertising space in Uber vehicles. The rider would not be paying any direct fee to use Uber's service, but would be subject to Uber's advertisements. It would be hard to argue Uber was not acting as a common carrier in that instance.

Assume separately that a subway is wholly taxpayer supported and the city operating the subway provides the subway service for free to the traveling public. A

visitor to town uses the subway.  That visitor does not pay city taxes, nor does he pay a

fee to use the subway.  The subway would certainly constitute a common carrier.

The Court finds that the State has stated a cognizable claim in Counts One and

Two that Google Search is a common carrier.  That portion of Google's motion to

dismiss is denied.

**B.     Is Google Search a Public Utility?**

While every public utility is a common carrier, not every common carrier is a

public utility.  For instance, FedEx and United Parcel Service (UPS) are certainly

common carriers, but just as plainly are not public utilities.

The determination of whether an entity is a public utility is a mixed question of

law and fact.  *Marano v. Gibbs*, 45 Ohio St.3d 310, 311, 544 N.E.2d 635 (1989).  "[I]n

determining public utility status" courts must examine "the character of the business in

which the entity is engaged."  *Id.*, citing *Ohio Power Co. v. Attica*, 23 Ohio St.2d 37, 41,

261 N.E.2d 123 (1970).

The Supreme Court of Ohio has developed two factors to consider in

determining whether an entity is a public utility.  *Marano, supra.*

The first factor is public concern.  In considering this factor, courts are to consider

whether the entity occupies a monopolistic position in the marketplace, which gives rise

to a public concern for indiscriminate treatment of that portion of the public which

needs and pays for the vital good or service offered by the entity.  Considerations for

determining whether an enterprise conducts itself so as to become a matter of public concern include the good or service being provided, competition in the local marketplace, and regulation by governmental authority. *A & B Refuse Disposers, Inc. v. Ravenna Twp. Bd. of Trustees*, 64 Ohio St.3d 385, 388, 596 N.E.2d 423 (1992).

The second factor is public service. In considering this factor, courts look at whether there is a devotion of an essential good or service to the general public, which has a legal right to demand or receive that good or service. *Id.* at 388. Further, this attribute requires an obligation by the entity to provide the good or service in a way that it cannot be arbitrarily or unreasonably withdrawn. *Id.* at 388-389.

A simple claim that a business's services are open to the public does not automatically categorize the business as a public utility. *Id.* at 389. Such a holding would incorrectly encompass as public utilities "traditional private business enterprises which are, in various degrees, regulated by diverse public authorities, *e.g.,* dry cleaners, restaurants, and grocery stores." *Id.*

At this stage of the proceeding, it is presumed true that Google Search has substantial market power and provides its service indiscriminately to any member of the public who desires to use it. [Compl., at Introduction and ¶ 31.] These factors weigh in favor of Google Search being a public utility. But the remaining factors point strongly in the opposite direction.

While government regulation of an entity is not necessarily required to find an entity is a public utility, the Supreme Court's decision in *Rumpke* made clear that the lack of statutory or regulatory oversight or requirements was a strong factor against a public-utility finding. *Rumpke Sanitary Landfill, Inc. v. Colerain Twp.*, 134 Ohio St.3d 93, 2012-Ohio-3914, 980 N.E.2d 952, syllabus ("[a] privately owned sanitary landfill cannot be a common-law public utility . . . when there is no public regulation or oversight of its rates and charges, no statutory or regulatory requirement that all solid waste delivered to the landfill be accepted for disposal, and no right of the public to demand and receive its services.").

Ohio does not regulate search engines. Ohio law expressly excludes providers of information services, like Google, from regulation by the Public Utilities Commission of Ohio (PUCO). *See* R.C. 4905.02(A)(5) (excluding providers of "information service" as defined in the Telecommunications Act of 1996 from the definition of "public utility" under Chapter 4905). While an entity may be a public utility outside of PUCO regulation, the State has not cited to any other potential source of law by which Ohio regulates Google.

The fact that Google falls within Section 230 of the Telecommunications Act of 1996, 47 U.S.C. § 230, does not suggest Google is a public utility under Ohio law. That provision merely provides Google with immunity in certain specific instances. It does not concern regulation of public utilities. *A & B Refuse Disposers*, 64 Ohio St.3d at 389

(holding that not just any state regulation is sufficient where environmental regulation is separate and distinct from the public concern involved in the regulation of public utilities).

The case of *Washington Twp. Trustees v. Davis*, 95 Ohio St.3d 274, 2002-Ohio-2123, 767 N.E.2d 261, is instructive. There, the owner of an AM radio station sought status as a common-law public utility. While the Supreme Court noted that the radio station had a license issued by the Federal Communications Commission ("FCC") and was charged with serving the "public interest, convenience, and necessity," the Court found even this limited regulation insufficient to confer public-utility status. *Id.* at ¶ 20.

The lack of regulation by the State of Ohio is consistent with the notion that the public has no legal right to demand Google's search engine. While it is no doubt a popular service, the public has no legal right to demand a device to search the internet. The lack of regulation means that Google is free to stop providing its search platform whenever it chooses. It could choose to focus on other parts of its company, or—as unlikely as it may seem—go out of business entirely. Google needn't give notice or reason before doing so. *Rumpke*, 134 Ohio St.3d at ¶ 34 ("Rumpke could lawfully close its doors to the public").

The public has a legal right to demand or receive electric, gas, water, and solid waste removal. *See St. Mary's v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561 (solid waste district was a public utility because it provided

an essential service to the general public, that had a right to demand that service). If the provider of these services were to cease operating, the public would be severely harmed by not having these essential public services. The public would rightly ask what the government would do to fill that void. This is the definition of an essential public service. *Washington Twp. Trustees*, 95 Ohio St.3d 274, at ¶ 22 (noting that radio broadcasting stands in contrast to traditional public utilities like electricity, gas, and local telephone service).

While Google Search is inarguably convenient and often used, it does not provide a fundamental life-essential service that the public has a right to demand and receive. Google Search barely existed two decades ago.

And even though Google Search has a 90 percent market share according to the State's Complaint, were Google Search to cease operating, Google's competitors, like Bing, Ask, and Duck Go, would undoubtedly fill the void left by Google's departure. The minimal inconvenience of leaving users to type the web address of a different search engine into their search bars is not equivalent to the significant harm faced by the public if the local water company shuts down its pipes or the local electric company powers down the grid.

For these reasons, Google Search does not fall within the definition of a common-law public utility under Ohio law. Accordingly, Google's motion to dismiss those portions of the State's Complaint asserting Google Search is a public utility is granted.

C.      **Does the Right to Free Speech and Association Bar the State's Claim?**

Google's final argument is that the State's claims must be dismissed because the

requested relief would violate Google's First Amendment free-speech rights

(incorporated through the Fourteenth Amendment).  Though the initial inquiry is

whether the challenged conduct by Google even constitutes speech by Google, the

State's memorandum in opposition to Google's motion to dismiss seems to

acknowledge it does.

As for the State's request for declaratory relief, merely declaring or designating

Google Search to be a common carrier does not, of itself, violate the First Amendment or

infringe on Google's constitutional speech rights.  After all, that mere designation does

not inhibit speech.  It is the burdens and obligations accompanying that designation

that implicate the First Amendment.

What's more, even the State's second cause of action—seeking a positive

injunction directed toward Google Search's duties—may not violate the First

Amendment.   Any restriction of this type must satisfy intermediate scrutiny.  Under

that standard, a content-neutral restriction on speech will be upheld if it "furthers an

important or substantial government interest" and "the means chosen" to achieve that

interest "do not burden substantially more speech than is necessary" to achieve that

interest.  *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642, 114 S.Ct. 2445, 129

L.Ed.2d 497 (1994) (a law that compels speakers to utter or distribute speech bearing a

particular message is subject to strict scrutiny, while a law that is unrelated to the content of speech is subject to intermediate scrutiny).

In *Turner*, the United States Supreme Court addressed whether the "must carry" provisions of the Cable Television Consumer Protection and Competition Act of 1992 violated the First Amendment. That federal law required cable television systems to carry local broadcast television stations and prohibited cable companies from charging local stations for carrying their signals. The Court held that these "must carry" requirements served the important governmental interest of promoting fair competition in the television programming market. *Id.* at 664 ("the government's interest in eliminating restraints on fair competition is always substantial, even when the individuals or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment").

It is presently unknown what exactly the attendant duties on Google Search might be if it is declared to be a common carrier. The United States Supreme Court has repeatedly held that fostering competition in the marketplace is an important interest of the state. It is possible that discovery will show that the burdens accompanying common-carrier status, while inhibiting free speech, further that important governmental interest.

Courts have held that infringing on a private actor's speech by requiring that actor to host another person's speech does not always violate the First Amendment. *See*

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980)

(noting that the views expressed by speakers who are granted a right of access to a

shopping center would "not likely be identified with those of the owner"); *Rumsfeld v.*

*Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 126 S.Ct. 1297, 164 L.Ed.2d

156 (2006) (unanimous Court held the government may require law schools to host

speech from military recruiters); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct.

1794, 23 L.Ed.2d 371 (1969) (upholding restrictions on editorial authority); *see also*

*Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, ____ U.S. ____, 140 S.Ct. 2082,

2083, 207 L.Ed.2d 654 (2020)  (Breyer, J., dissenting) ("requiring someone to host another

person's speech is often a perfectly legitimate thing for the Government to do.").

There are several examples in which private companies involved in mass

communications were prohibited from censorship.  The best known are the now-

repealed fairness doctrine imposed by the FCC, Florida's right-of-reply statute at issue

in *Miami Herald*, regulation of telephone carriers, and the aforementioned must-carry

laws targeting cable television operators.

Without dispute, there is a line of cases striking down laws where the

government has forced a speaker to host another speaker's message.  *See e.g. Hurley v.*

*Irish–American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 566, 115 S.Ct. 2338,

132 L.Ed.2d 487 (1995) (state law cannot require a parade to include a group whose

message the parade's organizer does not wish to send); *Pacific Gas & Elec. Co. v. Public*

18

*Util. Comm'n of Cal.*, 475 U.S. 1, 20–21, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality

opinion) (state agency cannot require a utility company to include a third-party

newsletter in its billing envelope); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241,

258, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (right-of-reply statute violates editors' right to

determine the content of their newspapers).

But the compelled speech in these cases was struck down not because of

compelled hosting but instead because the host's message was impacted by the speech

it was forced to accommodate, which compelled an association that caused public

confusion between the speaker's message and the host's message.  *Agency for Int'l Dev.*,

140 S.Ct. at 2083 (noting *Hurley* and cases like it are based on a concern of

"misattribution between formally distinct speakers" premised on "government

compulsion to associate with another entity").  *But see Bd. of Education of Westside*

*Community Schools v. Mergens*, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) ("To

the extent a school makes clear that its recognition of respondents' proposed [religion]

is not an endorsement of the views of the club's participants, students will reasonably

understand that the school's official recognition of the club evinces neutrality toward,

rather than endorsement of, religious speech.").

There is minimal concern that Google Search's users will believe that Google

Search's results constitute Google's own speech.  When a user searches a speech by

former President Donald Trump on Google Search and that speech is retrieved by

Google with a link to the speech on YouTube, no rational person would conclude that Google is associating with President Trump or endorsing what is seen in the video. If the State obtains the relief it seeks in this case—an order that Google not self-preference—then any such concern of forced association would be all the more attenuated because the public would know that Google was being forced to host that video.

Based on the allegations made by the State, the Court is unable to conclude at this juncture that it would be impossible for the State to demonstrate that the mere requirement that Google Search fairly return search results that are not slanted to its own products would unconstitutionally compel its association or speech. That issue must be left for another day, after the parties have an opportunity to develop an evidentiary record. *Turner Broadcasting System*, 512 U.S. at 667-668 (remanding to the district court to "permit the parties to develop a more thorough factual record and allow the district court to resolve any factual disputes remaining before passing upon the constitutional validity of the challenged provisions").

## V.    Conclusion

One final note about what this decision is and what this decision is not. Google calls this case unprecedented. All parties seem to agree with that. None of the cases cited by the parties or that the Court could find dealt squarely with whether a search

engine with an admittedly overwhelming share of the market may constitute a common carrier.

That lack of case authority does not bring this case to a halt though.  Technology has certainly evolved over the last three decades of internet development, and the law must adjust and develop along with the technology.  The question remains then whether Google's search function, as a private business, affects the public concern to such an extent that it should be declared a common carrier.  The Court believes, at this stage of the proceeding, that the State should have the ability to take discovery, develop its case, and present evidence to support its claim.

For the foregoing reasons, Google's motion to dismiss is granted in part and denied in part.  The motion is denied as to those portions of the Complaint asserting Google Search is a common carrier.  The motion is granted as to those portions of the Complaint asserting Google Search is a public utility.

IT IS SO ORDERED.

JUDGE JAMES P. SCHUCK