JOHN P. COALE (*pro hac vice*)
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY (*pro hac vice*)
MICHAEL J. JONES (*pro hac vice*)
RYAN TOUGIAS (*pro hac vice*)
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

FRANK C. DUDENHEFER , JR. (*pro hac vice*)
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

ANDREI POPOVICI (234820)
MARIE FIALA (79676)
LAW OFFICE OF ANDREI D. POPOVICI,
P.C.
2121 North California Blvd. #290
Walnut Creek, CA 94596
Telephone: (650) 530-9989
Facsimile: (650) 530-9990
Email: andrei@apatent.com
Email: marie@apatent.com

RICHARD POLK LAWSON (*pro hac vice*)
GARDNER BREWER HUDSON, P.A.
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gardnerbrewer.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

|  |  |
|---|---|
| DONALD J. TRUMP, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>META PLATFORMS, INC., *et al.*,<br><br>Defendants. | Case No: 4:21-cv-09044-JSW<br><br>**PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE RE STAY PENDING APPEAL OF *TWITTER* CASE**<br><br>Judge: Hon. Jeffrey S. White |

Plaintiffs hereby respond to the Court's July 12, 2022 Order to Show Cause Re Stay Pending Appeal of *Twitter* Case. Plaintiffs respectfully submit that this Court should not defer to Judge Donato's May 6, 2022 Order re: Motion to Dismiss in *Trump, et al. v. Twitter, Inc., et al.*, 21-cv-8378 (Dkt. #165) ("*Twitter* Order"), or await the outcome of the appeal in that case. The Court is not bound by the *Twitter* order. "It is axiomatic that district court decisions do not create binding precedent on other district courts." *Willis v. City of Fresno*, 2014 WL 4211087, at *2 n.1 (E.D. Cal. Aug. 26, 2014), citing *Starbuck v. City & County of San Francisco*, 556 F.2d 450, 457 n.13 (9th Cir. 1977). Material differences between the record here and in the *Twitter* case, as well as subsequent legal developments, make it unlikely that the *Twitter* appeal will dispositively resolve three of Plaintiffs' four causes of action in this case.

### A.      The Section 230 Unconstitutionality Claim

Count Two of Plaintiffs' First Amended Complaint ("FAC") alleges that Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c), is unconstitutional as applied. Judge Donato dismissed that claim in the *Twitter* case for lack of standing, stating that Plaintiffs' alleged injury was "speculative." *Twitter* Order at 13-14. Critically, the *Twitter* Defendants had not yet asserted Section 230 as a defense to Plaintiffs' claims, although it was inevitable that they would do so. Here, by contrast, Defendants have argued specifically that Section 230 bars Plaintiffs' state law claims. *See* Defendants' Motion to Dismiss (Dkt. 157) at 17-18; Defendants' Reply in Support of Motion to Dismiss (Dkt. 164) at 15. Defendants' express reliance on Section 230 further confirms that Plaintiffs' injury is not speculative. The fact that the Court has not yet ruled on this defense does not preclude challenging it as unconstitutional. The Supreme Court has held that a "preenforcement, as-applied challenge" to a statute can be maintained. *Gonzales v. Carhart*, 550 U.S. 124, 167 (2007). Standing exists because, in this "discrete and well-defined instance[] a particular condition has [occurred] or is likely to occur." *Id.* The "particular condition" here is that Defendants have raised Section 230 immunity as a shield from liability. As applied, Section 230 would deprive Plaintiffs their right to access the courts to pursue their right to hold Defendants responsible under state laws. To the extent that the immunity is

1  unconstitutional in this application, the issue has been joined and should be decided.  Plaintiffs

2  will suffer "a concrete and particularized injury" that is "traceable to the conduct they challenge,"

3  and that "would likely be redressed by a favorable decision."  *Spokeo, Inc. v. Robins*, 578 U.S.

4  330, 338 (2016).  Plaintiffs thus have standing to challenge Section 230's unconstitutionality.

5         This key factual difference means that the Ninth Circuit's eventual decision in the *Twitter*

6  appeal will not resolve the standing issue in this case or, more generally, the viability of

7  Plaintiffs' Count Two.

8         **B.     The FDUPTA Claim**

9         Plaintiffs' Count Three pleads a claim for unfair and deceptive practices under Florida's

10  Deceptive and Unfair Trade Practices Act.  Fla. Stat. §§ 501.201 *et seq.* ("FDUTPA").  Plaintiffs

11  have alleged that Defendants have failed to act in accordance with their stated content moderation

12  policies in making decisions to remove, demonetize, or otherwise censor content on their

13  platform, and have applied such content standards arbitrarily and subjectively.

14         In dismissing the analogous FDUPTA claim in the *Twitter* case, Judge Donato found that

15  a provision in Twitter's terms of service allowing it to "suspend or terminate an account 'at any

16  time for any or no reason,'" supports the conclusion that Plaintiffs "did not plausibly allege

17  deceptive conduct by Twitter" for purposes of FDUPTA.  *Twitter* Order at 16.  Here, however,

18  Facebook's terms of service contain *no similar provision*.  This factual difference between the

19  Twitter and Facebook contracts suggests that this Court should not simply rely upon the *Twitter*

20  Order to deciding whether Count Three may proceed.  Furthermore, the fact that Count Three

21  arises from a materially different factual record means that the Ninth Circuit's *Twitter* decision

22  likely will not dispositively address the FDUPTA claim pending before this Court.

23         **C.     The SSMCA Claim**

24         Count Four of the FAC alleges that Florida's Stop Social Media Censorship Act, Fla. Stat.

25  § 501.2041 ("SSMCA"), requires subject companies to disclose the standards by which they

26  censor, deplatform, or shadow ban a user, and to apply their standards in a consistent manner.

27  Fla. Stat. § 501.2041(2)(a) & (b) (2021).  Judge Donato dismissed the parallel claim against

28

PLAINTIFFS' RESPONSE TO ORDER TO            Case No. 4:21-cv-09044-JSW
SHOW CAUSE RE STAY PENDING
APPEAL OF *TWITTER* CASE            2

Twitter on the ground that, *inter alia*, "[t]here is a major concern about the enforceability of the SSMCA. Florida government officials were enjoined from enforcing the SSMCA on June 30, 2021, … in a well-reasoned decision issued by the Northern District of Florida. … The Court declines plaintiffs' invitation to disregard this decision…." *Twitter* Order at 17, citing *NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082 (N.D. Fla 2021). However, a few weeks after Judge Donato's decision, the Eleventh Circuit issued an opinion in the appeal from the preliminary injunction entered in that case. *NetChoice LLC v. Attorney Gen., State of Fla.*, 34 F.4th 1196 (11th Cir. 2022). While the court found that certain portions of the SSMCA were likely to be found unconstitutional, the court held that the SSMCA provision requiring social media companies to disclose their content moderation standards (§ 501.2041(2)(a)) likely would survive constitutional scrutiny:

> [I]t is not substantially likely that the disclosure provisions are unconstitutional. The State's interest here is in ensuring that users—consumers who engage in commercial transactions with platforms by providing them with a user and data for advertising in exchange for access to a forum—are fully informed about the terms of that transaction and aren't misled about platforms' content-moderation policies. This interest is likely legitimate. On the ensuing burden question, NetChoice hasn't established a substantial likelihood that the provisions that require platforms to publish their standards (§ 501.2041(2)(a)), inform users about changes to their rules (§ 501.2041(2)(c)), provide users with view counts for their posts, (§ 501.2041(2)(e)), and inform candidates about free advertising (§ 106.072(4)), are unduly burdensome or likely to chill platforms' speech. *So, these provisions aren't substantially likely to be unconstitutional*.

*Id.*, 34 F.4th at 1230 (emphasis added).

This Court thus will have to decide whether Count Four should move forward in a different legal context than that which determined the outcome in the *Twitter* case. The "major concern about the enforceability of the SSMCA" on which Judge Donato's ruling was grounded in part has been resolved, and the relevant disclosure provisions in the statute have been upheld, at least preliminarily. For that reason, the Ninth Circuit's eventual decision on appeal is unlikely to determine the outcome of motion to dismiss the SSMCA claim here.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.   If the Motion to Dismiss Is Granted, Plaintiffs Will Seek to Amend the Complaint.

If the case proceeds and the Court grants the motion to dismiss, Plaintiffs will seek leave to amend their complaint to (i) supplement the FDUPTA claim with additional facts, and (ii) add a claim that Facebook is a common carrier under common law and thus is prohibited from unfairly discriminating in applying its content moderation standards to users of its platform.

#### 1.   The FDUPTA Claim Amendment

In the fall of 2021, after Plaintiffs filed their FAC, the *Wall Street Journal* issued several reports regarding Facebook's internal operations.  The *Journal* revealed that Facebook maintained an internal program, "cross-check," by which prominent political figures would be subject to an in-depth review of their comments as well as a different standard for compliant content than that applied to average users.  *Wall Street Jounal*, "Facebook Says Its Rules Apply to All.  Company Documents Reveal a Secret Elite That's Exempt."  Sept. 13, 2021.[1]  In light of these revelations, Facebook's Oversight Board issued a report which concluded that "Facebook has not been fully forthcoming with the Board on its cross-check system."

Specifically, the Oversight Board noted that Facebook had deliberately provided deceptive information to the Board in connection with the internal appeal involving closure of President Trump's Facebook account:

> When Facebook referred the case related to former U.S. President Trump to the Board, it did not mention the cross-check system.  Given that the referral included a specific policy question about account-level enforcement for political leaders, many of whom the Board believes were covered by cross-check, this omission is not acceptable.  Facebook only mentioned cross-check to the Board when we asked whether Mr. Trump's page or account had been subject to ordinary content moderation processes.

Oversight Board, "Oversight Board demands more transparency from Facebook" ("Transparency Report"), Oct. 21, 2021.[2]  The Oversight Board further stated that "[T]he Trump decision included guidance at odds with the cross-check program as described by the *Wall Street Journal*,

---

[1] https://www.wsj.com/articles/facebook-files-xcheck-zuckerberg-elite-rules-11631541353?mod=article_inline.
[2] https://www.oversightboard.com/news/215139350722703-oversight-board-demands-more-transparency-from-facebook/.

PLAINTIFFS' RESPONSE TO ORDER TO                    Case No. 4:21-cv-09044-JSW
SHOW CAUSE RE STAY PENDING
APPEAL OF *TWITTER* CASE                    4

1   particularly the idea that "the same rules should apply to all users of the platform ...."  Oversight

2   Board, "Oversight Board transparency reports, Q4 2020, Q1 & Q2 2021," Oct. 21, 2021 at 12.[3]

3        More generally, the Oversight Board criticized Facebook's practices by noting that, "In

4   many of the decisions covered in . . . [the Oversight Board's reports] . . . a clear theme has

5   emerged: *Facebook isn't being clear with the people who use its platforms.*  We've consistently

6   seen users left guessing about why Facebook removed their content. ... Having received over

7   half a million appeals up until the end of June, we know these cases are just the tip of the iceberg.

8   *Right now, it's clear that by not being transparent with users, Facebook is not treating them*

9   *fairly.*"  Transparency Report (emphases added).

10       These findings by Facebook's own Oversight Board strongly support Plaintiff's

11  allegations regarding Defendants' deceptive and discriminatory content moderation practices.

12  These facts are a key point of distinction between the matter before this Court and the *Twitter*

13  decision that will be forthcoming from the Ninth Circuit.

14                    **2.  The New Common Carrier Claim**

15       Since at least the 1670s, the common law has obligated common carriers to treat all

16  comers equally and fairly.  The legal regime governing today's telecommunications industry—

17  including social media platforms—is a direct descendant of these English common law decisions

18  prohibiting unfair discrimination.  *FTC v. AT&T Mobility, LLC*, 883 F.3d 848, 858-861 (9th Cir.

19  2017).  The common carrier doctrine holds that quasi-public entities may not unfairly

20  discriminate against customers using the service.  *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 58 (2nd

21  Cir. 2006).  Defendants' treatment of the Plaintiffs is in clear violation of this principle.

22       When Facebook solicits and hosts third-party content it does so under the aegis of Section

23  230.  In order to accelerate the development of the Internet, Congress immunized companies like

24  Facebook from exposure to lawsuits for defamation and other torts.  47 U.S.C. § 230(b)(1) &

25  (c)(1).  Without this congressionally-created immunity, hosting third-party content would have

26  carried untenable financial risks.  Courts have previously relied on the existence of similar

27

28  [3] https://oversightboard.com/attachment/987339525145573/.

1 congressional grants as the basis for concluding that a favored industry is a quasi-public common

2 carrier, prohibited from engaging in unfair discrimination.  In the late 1800s, Congress gave

3 massive grants of land to the railroads who sold it off and used the funds to finance the

4 construction of transcontinental rail lines.  In subsequent litigation, the courts struck down some

5 railroads' practices of discriminating against disfavored customers by refusing service or charging

6 lower fares to competitors.  Rejecting arguments from the railroads that they were private entities

7 and were free to carry freight on such terms as they could obtain, courts held that the massive

8 public support received during their construction meant that the railroads were quasi-public

9 entities, prohibited from engaging unfair discrimination.  *See*, *e.g.*, *Johnson v. Pensacola and*

10 *Perdido Railroad Co.*, 16 Fla. 623 (Fla. 1878); *Dinsmore v. the Louisville, Cincinnati &*

11 *Lexington Railway Co.*, 2 F. 465 (Cir. Ct., D. KY, 1880).  For the same reasons, when soliciting

12 and hosting third-party content Facebook acts as a common carrier, is engaged in quasi-public

13 activity, and is prohibited from engaging in unfair discrimination.

14     The pending motions have been fully briefed and awaiting decision since February 28,

15 2022.  The Ninth Circuit *Twitter* appeal will address only one of Plaintiffs' four claims on

16 substantially the same record as presented here.  Plaintiffs respectfully submit that the better and

17 more efficient course is for the Court to decide the pending motions to dismiss and for

18 preliminary injunction so that Plaintiffs can proceed with fully developing the record and theories

19 applicable to their claims against the Defendants.

20     ACCORDINGLY, Plaintiffs respectfully request that the Court should not stay this matter

21 pending final disposition of the appeal in the *Twitter* case.

22

23 Dated: July 26, 2022        Respectfully submitted,

24     ANDREI POPOVICI (234820)
MARIE FIALA (79676)
25     LAW OFFICE OF ANDREI D. POPOVICI, P.C.

26     By:    */s/ Marie L. Fiala*
    Marie L. Fiala

27

28

PLAINTIFFS' RESPONSE TO ORDER TO    Case No. 4:21-cv-09044-JSW
SHOW CAUSE RE STAY PENDING
APPEAL OF *TWITTER* CASE    6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOHN P. COALE (*pro hac vice*)
2901 Fessenden Street NW
Washington, DC 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY (*pro hac vice*)
MICHAEL J. JONES (*pro hac vice*)
RYAN TOUGIAS (*pro hac vice*)
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Email: jqkelly@ibolaw.com
Email: mjones@ibolaw.com

FRANK C. DUDENHEFER, JR. (*pro hac vice*)
THE DUDENHEFER LAW FIRM L.L.C.
2721 Saint Charles Avenue, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226
Email: fcdlaw@aol.com

RICHARD POLK LAWSON (*pro hac vice*)
GARDNER BREWER HUDSON, P.A.
400 North Ashley Drive
Suite 1100
Tampa, FL 33602
Telephone: (813) 221-9600
Facsimile: (813) 221-9611
Email: rlawson@gardnerbrewer.com

*Attorneys for Plaintiffs*

PLAINTIFFS' RESPONSE TO ORDER TO                        Case No. 4:21-cv-09044-JSW
SHOW CAUSE RE STAY PENDING
APPEAL OF *TWITTER* CASE                        7