IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---

DONALD J. TRUMP, et al.,                    Case No.
                                            3:21-CV-9044-WHA
        Plaintiffs,

        vs.                                 San Francisco,
                                            California
META PLATFORMS, INC., et al.,               November 2, 2023
                                            11:04 a.m.
        Defendants.

---

TRANSCRIPT OF CASE MANAGEMENT CONFERENCE PROCEEDINGS

BEFORE THE HONORABLE WILLIAM H. ALSUP
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiffs:     JOHN Q. KELLY
                        Ferguson Cohen, LLP
                        25 Field Point Road
                        Greenwich, Connecticut 06830

For the Defendants:     RONALD K. ANGUAS, JR.
                        Kirkland & Ellis
                        1301 Pennsylvania Ave,  N.W.
                        Washington, DC 20004

                        MARK MCKANE
                        Kirkland & Ellis.
                        555 California Street, Suite 2700
                        San Francisco, California 94104

            MEGAN E. STRAWN, RPR, CRR (via Zoom)
            111 S. Wolcott Street, Casper, WY 82601
            307.232.2626 * strawnreporting@gmail.com

        Proceedings reported with realtime stenography;
    transcript produced with computer-aided transcription.

21-CV-9044                                                                    2

1          (Proceedings commenced at 11:04 a.m., November 2, 2023.)

2               THE COURTROOM DEPUTY:  Calling Civil Action 21-09044,

3     Trump, et al., versus Meta Platforms, Inc., et al.

4               Counsel, please approach the podium and state your

5     appearances for the record, beginning with counsel for

6     Plaintiffs.

7               MR. KELLY:  Good morning.  John, middle initial Q.,

8     Kelly, K-E-L-L-Y, from Ferguson Cohen for the Plaintiffs, Your

9     Honor.

10              THE COURT:  Welcome.  Thank you.  And?

11              MR. ANGUAS:  Good morning, Your Honor.  Ronald Anguas

12    of Kirkland & Ellis on behalf of Meta and Mark Zuckerberg.

13    And with me at counsel table is Mr. Mark McKane.

14              THE COURT:  All right.  Thank you.

15              Okay.  The situation is that, pending an appeal in a

16    related case or a similar case, everyone here agreed some time

17    ago to stay until that appeal was resolved.

18              Am I correct?

19              MR. KELLY:  I don't think there was an agreement.  I

20    think just Judge White on his own issued the stay.

21              THE COURT:  All right.  Is that true?

22              MR. ANGUAS:  Yes, Your Honor.

23              THE COURT:  All right.  Well, then, that's fine.

24              And now you've asked that -- you wanted to have this

25    hearing in order to try to get an exception to allow you to

1    lift the stay for a limited purpose.  So I'm here to listen to

2    what you're -- the reason.

3           Go ahead.

4           MR. KELLY:  First of all, Judge, looking at it from a

5    procedural aspect, we filed our First Amended Complaint in

6    July of 2021.  Our case sat there for 13 months until August

7    of 2022 when Judge White issued a stay pending the outcome of

8    the *Twitter* appeal.  Then in July of this year, Judge White

9    recused himself with no indication or reason why he was

10   recusing himself, whether it was a prior conflict or something

11   new that came up.

12          But in any event, the case was assigned to you in

13   September.  It's now November.  Our clients have sort of

14   languished for two and a half years now, Judge, in the court

15   with absolutely no action taking place.

16          And it's our feeling that from the time of Judge

17   Donato's decision in *Twitter* and Judge White's stay that a

18   plethora of factual information has come out supporting our

19   claims of state action on behalf of Facebook.

20          And at this time, just based on the amount of time

21   we've waited, the fact that, you know, the *Twitter* appeal is

22   not going to resolve the issues in Facebook -- it's different

23   factual issues, different legal issues -- and every day that

24   clients are censored, you know, their First Amendment rights

25   have been put on hold.  And it's basically egregious damages

21-CV-9044                                                              4

1    to not be able to exercise these rights or to have chilling

2    effects on these rights right now.

3              We'd like to be able to at least make a motion for a

4    Second Amended Complaint, put all this down in paper and

5    memorialize it and get the case moving, Your Honor.

6              THE COURT:  All right.  What does Defendant say?

7              MR. ANGUAS:  Thank you, Your Honor.

8              The *Twitter* appeal, as counsel mentioned, is pending

9    and has been submitted on oral argument.  And we submit that

10   it contains similar legal issues.  It does address the core

11   First Amendment state-action questions that are raised by the

12   Plaintiffs' complaint and, likely, any forthcoming complaint

13   so far, as they've indicated in their papers.

14             And it also raises very similar state-law questions

15   under the Florida Unfair Trade Practices Act and the Social

16   Media Censorship Act.  And those issues, which are set to be

17   decided, potentially any day now, are likely to impact the

18   landscape of a Second Amended Complaint.  And we expect that

19   after that decision comes down, Plaintiffs are likely to want

20   to file a further amendment that responds to that decision,

21   whether it comes out one way or the other.

22             And so our position at Meta is that any amendment

23   should wait until after appellate proceedings are concluded.

24             THE COURT:  When will we get the opinion in the --

25   the Donato case?

1          MR. ANGUAS:  I don't know, Your Honor.  It was argued

2     on October the 4th, and the Ninth Circuit's taken the case

3     under advisement and may issue a decision at any time.

4          THE COURT:  Well, do you know what the average length

5     of time is between oral argument and getting the decision out?

6          MR. ANGUAS:  I don't, Your Honor, not in the Ninth

7     Circuit.  And a case involving these types of constitutional

8     questions, I would suspect that it might not be an average

9     case in terms of the duration, perhaps.  It could be shorter;

10    it could be longer.

11         THE COURT:  And do you know over there, Mr. Kelly,

12    how long it takes from oral argument to decision?

13         MR. KELLY:  I have heard, Judge, that it's an average

14    of five to six months.  However, the other case that might

15    have some bearing on this issue is the children's health

16    decision, the Robert Kennedy action.  And that was argued in

17    the Ninth Circuit over a year ago, and it's still pending.

18         I suspect this case could -- the judges might wait to

19    issue a decision in that case, or it could take a year.  It

20    could take four months.  But we'd really like to get an action

21    going, Judge, and we feel confident that, you know, the

22    *Twitter* decision may not have much of an impact on our

23    separate action.

24         THE COURT:  Well, but -- you say that.  It seems like

25    it will have an impact.  And will you promise me that no

6

1   matter how the *Twitter* appeal comes out, you won't try to move

2   again to amend?  You'll forego that possibility?

3           MR. KELLY:  I would forego that possibility, Your

4   Honor, if we were allowed to file our Second Amended

5   Complaint.

6           THE COURT:  So you're saying -- you're saying if

7   you're allowed to file a Second Amended Complaint now --

8           MR. KELLY:  Yes, Your Honor.

9           THE COURT:  Have you submitted that Second Amended

10  Complaint to me so that I can see what you're getting at?  I

11  mean, this is like a pig in the poke, so to speak.  I have no

12  idea what you have in mind.

13          But whatever it is, you're saying if you're allowed

14  to file that, that will be it.  There will be no more motions

15  to amend?

16          MR. KELLY:  If we can forego the Motion to Amend and

17  we are granted permission here now to file our Second Amended

18  Complaint, we will forego any further amendments based on our

19  confidence in the factual revelations that have come up in the

20  last two years.

21          THE COURT:  What's wrong with that?

22          MR. ANGUAS:  Your Honor, I think, from our

23  perspective, if they want to file an amended complaint now,

24  our ask would be that we hold briefing on a motion to dismiss

25  on it.  Because even if Plaintiffs are willing to give up

1   their right to amend or their opportunity to amend down the

2   line, our defenses in a motion-to-dismiss briefing on both

3   sides is likely to be impacted by the decisions that come out

4   of the *Twitter* case with respect to the First Amendment issues

5   that are going to remain at the core of the Second Amended

6   Complaint along with those state-law issues.

7            And so briefing up a motion to dismiss before

8   *Twitter* -- when a decision may come down from the Ninth

9   Circuit at any point in the intervening period -- before a

10  decision comes down or while briefing is ongoing, we don't

11  believe it's efficient to brief that up now and that any

12  briefing should be held in abeyance until after we hear from

13  *Twitter*, even if the complaint --

14           THE COURT:  All right.  What do you say to that point

15  that if I give you the okay to file a Second Amended Complaint

16  that -- and in addition to you foregoing any other future

17  amendments that we would wait on the briefing and the motion

18  to dismiss until the Ninth Circuit rules on the *Twitter* case?

19           MR. KELLY:  That sort of defeats the purpose of

20  foregoing my further amendments --

21           THE COURT:  It does.  I agree with you.  It would not

22  be so good for you.  How can -- let me ask, how -- yes, there

23  is overlap with the *Twitter* case, but how can we be sure that

24  the *Twitter* case is going to answer everything?  Meta is a big

25  company --

1          MR. KELLY:  Your Honor, I think --

2          THE COURT:  -- and it can afford -- it's got big-time

3    lawyers here.  It can afford to litigate.  I've got Meta in so

4    many cases.  I'm Meta out of my mind.

5          So how come it's so burdensome on you to go ahead and

6    litigate the case and then -- right?

7          MR. ANGUAS:  It's not just a question of burden, Your

8    Honor.  The issues before the *Twitter* court will start with

9    sort of the first core -- the First Amendment claim.  The

10   gravamen of the Second Amended Complaint, as it was described,

11   at least high level in some of the papers here, remains that

12   there's a claim of state action through various theories by

13   private actors.

14         And the scope of the State Action Doctrine in this

15   factual context, in the social media context related to

16   COVID-19 and all of the issues that were teed up in the First

17   Amended Complaint, those issues are squarely before the Court

18   in *Twitter*.  And that's the crux of a forthcoming Second

19   Amended Complaint.

20         So it's not simply a question of the burden of filing

21   a motion to dismiss.  It's whether the issues are going to be

22   decided in a way that will shape the claims and defenses on

23   both sides in a way that's coming down from the Ninth Circuit.

24         And the First Amendment is only one of the issues

25   that's addressed by the *Twitter* court.  There's also state law

```
 1   claims that I mentioned under the Florida Unfair Trade
 2   Practices Act, under the Stop Social Media Censorship Act,
 3   where those legal questions about the retroactive effect of
 4   that law, about the constitutionality of that law are squarely
 5   before the Court as well as mootness issues --
 6           THE COURT:  Do I have those issues about the Florida
 7   law here?
 8           MR. ANGUAS:  Yes, Your Honor.  In the First Amended
 9   Complaint you do, and they're likely to remain through to the
10   Second Amended, as well, unless Plaintiffs are representing
11   that they're going to withdraw the First Amendment, the
12   Florida Trade Unfair Practices claim, the Stop Social Media
13   Act claim as well as the mootness issues that are presented by
14   some of the Plaintiffs whose accounts have been reinstated,
15   admittedly during the pendency of these proceedings.
16           The mootness issues are also --
17           THE COURT:  What is the relief that the Plaintiff
18   wants here against Meta?
19           MR. KELLY:  To file a Second Amended Complaint, Your
20   Honor.
21           THE COURT:  What?  No, no.  But, I mean, if you were
22   to win the whole case, what would -- what relief do you think
23   Plaintiff would be entitled to?
24           MR. KELLY:  Some sort of framework where they would
25   not be fearful, either with the chilling effect or directly,
```

1   to be modified again, their content, and be restored to

2   exercise their First Amendment rights free from secret

3   algorithms and, you know, other ways that Facebook chooses to

4   engage in content moderation, Your Honor.

5           And I would just point out with the *Twitter* case,

6   Your Honor, Judge Donato basically only addressed the coercion

7   claim of the Plaintiffs and said that the factual allegations

8   were not sufficient to sustain a state action claim.

9           And that's why we believe that the -- the Twitter

10  decision will not directly and, you know, widely impact our

11  Second Amended Complaint, because we're confident of the

12  factual-bearers that have come out in the last two years.

13          Quite frankly, Judge, our clients, you know, need to

14  see some litigation moving.  It's been two and a half years.

15  It's involved a sitting president and then an ex-president who

16  is censored for two years and other people who had monetized

17  their Facebook pages to make a living.  And there are impacts

18  here.  There have been impacts on elections.  There have been

19  impacts on economic situations.

20          And to have a case sit for two and a half years with

21  absolutely no action is just, you know, unheard of.

22          THE COURT:  What do you say on your side that there's

23  an election coming up next year, and the Plaintiff might be

24  prejudiced by relief being granted but would be too late and

25  that they -- the election might -- it might help him in the

1   election in order -- if he were to win this case?  I'm not

2   saying he's going to win the case.  I haven't -- you two have

3   taken up more of my time in this case than I've put into it at

4   all, because it's been stayed, and I inherited it from another

5   judge.

6        But if I -- once I get into it, I -- I can't say he's

7   going to lose or win.  But let's say he were to win.  It would

8   be too late to do him any good in terms of the election.

9        MR. ANGUAS:  Your Honor, one of the issues that's

10  presented both here, if this case is revived, and the *Twitter*

11  case, as well, is the mootness question, because certain of

12  the Plaintiffs, including the lead Plaintiff, have already had

13  their accounts reinstated on Meta's platforms as they were in

14  the *Twitter* case, as well.

15       And so any injunctive relief, we believe, is not even

16  available at this point because the Plaintiff -- some of the

17  Plaintiffs have been reinstated --

18       THE COURT:  Okay.  That's a good point.  Who are

19  they?  Who are the ones that's been reinstated?

20       MR. ANGUAS:  Mr. Trump and -- I don't have the full

21  set of others, but certainly Mr. Trump.  And given that this

22  is a class action, presumably, there's a number of members of

23  the class that are not named that have potentially been

24  reinstated.  But the lead Plaintiff, Mr. Trump, has been

25  reinstated on this platform and Twitter, which was the source

1    of a whole separate spate of briefing in the Ninth Circuit

2    about whether those claims remained viable, which is -- now

3    the Ninth Circuit has also taken under advisement under

4    similar factual circumstances where the Plaintiffs were

5    reinstated.

6              THE COURT:  Okay.  What's the -- if the -- if Donald

7    Trump has been reinstated, what -- why does he need any more

8    relief?

9              MR. KELLY:  Judge, I think the Ninth Circuit

10   addressed that in the *O'Hanley* matter where they said that

11   even restoration of rights does not rectify the situation

12   because they have the fear of being censored again.  And in

13   fact, individuals that have been restored face greater

14   chilling effect and consequences, possibly, than those that

15   stay off Facebook.

16             Once you're censored, you're censored, and that's it.

17   But when you're restored, you have to watch your step.  You're

18   sort of whistling in the dark every time you use Facebook and

19   even approach matters that Facebook is not endeared to, such

20   as our ex-president.

21             MR. ANGUAS:  May I respond, Your Honor?

22             THE COURT:  I'm trying to think about that.  Who were

23   the other Plaintiffs?

24             MR. KELLY:  I don't have all of them before me.  We

25   reached out last week to check their status, and at least

13

1   Mr. Cabos, we know, who was the first one to respond, is still

2   censored.

3            THE COURT:  Go ahead.

4            MR. ANGUAS:  Your Honor, as it -- what I was going to

5   say was the mention of sort of taking additional action

6   against folks who are already censored, none of that is in the

7   record at this point.  But I can tell you that the mootness

8   issues that address very similar circumstances about voluntary

9   cessation and similar legal issues are, again, briefed up and

10  awaiting decision by the Ninth Circuit there with some of the

11  same Plaintiffs overlapping.

12            THE COURT:  Do you know who the group of Plaintiffs

13  are here?

14            MR. ANGUAS:  The Plaintiffs are here?  Yes, Your

15  Honor.  It's led by Mr. Trump --

16            THE COURT:  I don't have -- I just have Donald J.

17  Trump as the Plaintiff, "et al."  I don't know who the "et

18  al." is.

19            MR. KELLY:  Judge, by the way, I apologize.  I'm sort

20  of third string here.  Local counsel called in sick, and lead

21  counsel bailed on the last minute.  That's why I don't have

22  all the pleadings in front of me.

23            THE COURT:  They what?  And lead counsel did what?

24            MR. KELLY:  Had a family emergency with emergency

25  surgery and couldn't be here, also.  So a lot of my --

```
1              THE COURT:  You got pulled in at the last moment?

2              MR. KELLY:  I'm flying solo at the last minute,

3    Judge.

4              MR. ANGUAS:  Your Honor, I do have the list of

5    Plaintiffs -- named Plaintiffs in the case.

6              THE COURT:  Okay.  Go through them slowly.

7              MR. ANGUAS:  Certainly, Your Honor.  It's on page 5

8    beginning at paragraph 18 of the First Amended Complaint.  The

9    first Plaintiff is Donald J. Trump.  The second Plaintiff is

10   Elizabeth Albert.  The third and fourth Plaintiffs are Kiyan

11   and Bobby Michael.  The next Plaintiff is Jennifer Horton.

12   The next Plaintiff is Andres Cabos.  And the final two

13   Plaintiffs are Magalys Rios and Maria Rodriguez-Fresneda.  And

14   that's in paragraphs 18 through 24 of the First Amended

15   Complaint, Your Honor.

16             THE COURT:  I don't recognize any of those names.

17   Who are they?

18             MR. ANGUAS:  I would defer to Plaintiffs' counsel,

19   but my understanding is that they're private citizens who used

20   the Facebook service.  I don't believe that any of them are

21   public officials or elected officials.

22             MR. KELLY:  That's correct.

23             MR. ANGUAS:  And I would note that Mr. Trump --

24             THE COURT:  What is their grievance?

25             MR. ANGUAS:  Perhaps Plaintiffs' counsel can address
```

1    it in more detail, but my understanding is that some of those

2    Plaintiffs were either censored -- had their content removed

3    by Facebook, is the allegation.

4         THE COURT:  How were those people injured?

5         MR. KELLY:  I don't have the details in front of me,

6    Judge.  I could provide it to the Court within a week, if

7    required, after the hearing.  But my understanding, at least a

8    couple of them were censored and incurred economic damage,

9    Judge, that's still going on.

10        But as I said, it's our position, whether they have

11   been restored or not restored, they still face a substantial

12   chilling effect of prior censorship to make them fearful to

13   exercise their full and free First Amendment speech.

14        THE COURT:  Is this supposed to be a class action?

15        MR. KELLY:  Yes, Judge.

16        THE COURT:  Well, there's a problem that I see there.

17   Well, okay, let's assume for the sake of argument that Former

18   President Trump really wants to get this worked out in a hurry

19   because of the election.

20        On the other hand, he wants to do it as a class

21   action, which will take a lot of time.  There's almost no way

22   this could be resolved as a class action prior to next year's

23   election.

24        So is he even an adequate representative?  Because

25   it -- does he stand in the same position as all these other

1    people that would be in the class?  It's even hard for me to

2    imagine what the class would look like right now.  But I don't

3    see why you have chosen to allege this as a class action.

4              MR. KELLY:  With Mr. Trump as the lead

5    representative?

6              THE COURT:  Well, actually, with anybody as the lead,

7    but especially with him as the lead because of his special

8    circumstances.

9              MR. KELLY:  It certainly has shifting landscape, Your

10   Honor, in terms of the harm done and who would be best

11   representing the class.  I don't think we have to look for the

12   certification of the class right now, and that could change in

13   terms of substitutions.  But the basic principle is the same

14   that, whether restored or still censored, the chilling effect

15   and damage done to these people is substantial and continues

16   every day.

17             Judge, they just want a chance to litigate their

18   case.  A lot of these people -- there are thousands of people

19   that were taken off of Facebook just for mentioning election

20   integrity, mentioning anti-vax positioning, mentioning Wuhan

21   or where the COVID virus came from, and it's just not right.

22             MR. ANGUAS:  May I respond, Your Honor?

23             THE COURT:  Wait a second.

24             MR. ANGUAS:  As Your Honor has pointed out --

25             THE COURT:  Maybe it's not right, but a private

1  company can do whatever it wants.  It doesn't have to do

2  business with anybody.  It's not a public utility.

3          MR. KELLY:  Well, Judge, that's why we're here to

4  allege the state action aspect to the same -- we feel that --

5          THE COURT:  Well, who --

6          MR. KELLY:  -- Facebook is so intertwined with

7  Government actors that it amounts to state action.  In fact,

8  it's been openly admitted at times.  Mr. Musk with his Twitter

9  files, and Mr. Jordan on the House Judiciary Committee not to

10  be outdone with the Facebook files.

11          And Mr. Zuckerberg, who is a named Defendant in this

12  case, in 2022, August, went on the Joe Rogan podcast and

13  admitted right on the air, recorded, that it was the FBI that

14  tipped off the Facebook people about the Hunter Biden laptop

15  contents being Russian misinformation in a hack-and-dump job.

16          That was something that Mr. Biden leaked or used

17  during a debate with Mr. Trump to put down claims that the

18  social media companies were censoring unnecessarily.

19          THE COURT:  Tell me what the Fifth Circuit ruled in

20  that *Missouri* case.

21          MR. KELLY:  Ruled heavily in favor of the state

22  plaintiffs in that there was significant state action because

23  of the involvement with Government officials.  You had, I

24  think, Ian Chan, the FBI agent out of San Francisco who

25  admitted coordinating censorship activities especially

1   designed for Facebook to censor certain points of view.

2           You had -- if I could just have a moment.  There

3   were --

4           THE COURT:  What was --

5           MR. KELLY:  There was the White House

6   representative -- I think it was Flaherty -- and there was a

7   Homeland Security representative who was director of

8   communications.  They all testified.  And based on their

9   deposition testimony, it was disclosed as just inseparable

10  interaction between Facebook and the other social media --

11          THE COURT:  So in the *Missouri* case, Facebook was a

12  party in that case?

13          MR. KELLY:  No.  It was just disclosed -- in that

14  case it was the Government that was the defendants and the

15  states that were the plaintiffs.

16          THE COURT:  But what was the evidence directly about

17  Facebook?

18          MR. KELLY:  That they engaged equally -- sometimes

19  more, sometimes a little less -- with Government actors to,

20  you know, actively censor constitutionally protected --

21          THE COURT:  Was the -- so you're dodging my question.

22  Did the Fifth Circuit use the word "Facebook"?

23          MR. KELLY:  I believe it did many times.

24          THE COURT:  Is that true?

25          MR. ANGUAS:  Your Honor, can I respond to a couple of

1  points?

2           THE COURT:  Well, answer my question first and then

3  you can respond.

4           MR. ANGUAS:  Yes.

5           THE COURT:  Okay.  So go ahead.  Respond.

6           MR. ANGUAS:  A couple points that Your Honor has

7  raised.  Facebook -- excuse me -- Meta and none of the other

8  social media defendants that were third parties in that case

9  were actually defendants in the case.  The Court actually

10 assessed litigation against Government actors.  And that case

11 also has been stayed, and cert has been granted to review the

12 decision.  So there are a couple of issues there.

13          And we -- the law on state action in the Fifth

14 Circuit is different in terms of what the scope of activity is

15 required to find state action by a private party, which the

16 Fifth Circuit addressed in that opinion.  But the key issue in

17 *Missouri v. Biden* was that those defendants were all

18 Government officials, not private entities like we have here.

19          There was no finding of liability with respect to any

20 social media --

21          THE COURT:  Well, what -- did the Fifth Circuit say

22 something along the lines that Facebook became an arm of the

23 First Amendment -- violating the First Amendment because the

24 Government leaned on Facebook to do certain things?  Did that

25 come up?

20

1           MR. ANGUAS:  I don't have the opinion in front of me,

2     Your Honor, but, yes, the Court did evaluate the relationship

3     between the Government and various social media companies,

4     including Meta, in that decision that's now stayed --

5           THE COURT:  All right.  Did it go so far as to say,

6     "And when Meta did these things under pressure from the

7     Government that that constituted -- that Meta was part of a

8     First Amendment violation"?

9           MR. ANGUAS:  I don't have the opinion in front of me,

10    but I -- I don't think there was a finding that Meta violated

11    the First Amendment itself.  Meta wasn't a party.  So just

12    thinking about it, there wouldn't have been an opportunity to

13    pass on that question.  The question was whether the

14    Government violated the First Amendment, but I'd have to check

15    the opinion, Your Honor --

16          THE COURT:  All right.  What else did you want to

17    say?

18          MR. ANGUAS:  I wanted to address a couple of other

19    issues that have just come up in the colloquy.

20          THE COURT:  All right.  Go ahead.

21          MR. ANGUAS:  First being that Plaintiffs' counsel has

22    mentioned the Twitter files and has mentioned the *Twitter* case

23    as sort of another example of the type of conduct here.  And

24    that's exactly our point, that those very similar questions

25    about the scope of the State Action Doctrine, which were also

1    teed up to some degree in the *Missouri v. Biden* case in the

2    context of a Government defendant, those very legal questions

3    are before the Ninth Circuit now.  They're before the Supreme

4    Court in the *Missouri v. Biden* case, which granted cert in the

5    matter, and --

6              THE COURT:  Cert was granted?

7              MR. ANGUAS:  Cert was granted.  The decision of the

8    Fifth Circuit was stayed, I believe, on October 20th -- so

9    just a couple of weeks ago -- and cert was granted.  And so

10   the issues are being addressed there.

11             But really it's the Ninth Circuit decision that's on

12   all fours factually with this case because it is private

13   defendants.  It is addressing Government conduct with the same

14   types of Government agencies and officials, and that -- the

15   timing of this motion is just such that the case is under

16   advisement.  And we can be uncertain about exactly how long

17   it's going to take the Ninth Circuit to render a decision, but

18   it's not as if briefing is just opening.  Briefing was

19   complete.  The case was argued, now, a month ago.

20             To begin motion-to-dismiss briefing now where a

21   motion to dismiss would be due sometime down the line would

22   only further make it likely that any day now the Ninth Circuit

23   could issue a decision which would upend the ongoing

24   proceedings here that we would have.

25             And finally, Your Honor raised some points about the

1    class-action issues.  We completely agree that in this current

2    context, there are commonality, predominance, adequacy issues

3    under Rule 23 with the current slate of named Plaintiffs that

4    would need to be addressed at a class-cert motion,

5    potentially, before we get to the merits determination here.

6    And that further would delay these proceedings based on how

7    Plaintiffs have chosen to proceed.

8         And so after -- 15 months after filing -- excuse

9    me -- two years after filing three parallel cases, having one

10   of them go into appellate proceedings, the case against

11   YouTube, which is affiliated with Google, remains stayed

12   before this Court, and Plaintiffs have not filed a motion to

13   lift the stay to file an amended complaint in that action.

14        That action remains stayed.  This is the only case

15   where Plaintiffs have attempted to lift the stay to file a

16   Second Amended Complaint.  And given the timing, Your Honor,

17   we believe it's simply more prudent to wait for a decision

18   from the Ninth Circuit in any further appellate proceedings in

19   Twitter --

20        THE COURT:  Are these same ten or so Plaintiffs a

21   Plaintiff in the case that Judge Donato had on appeal?

22        MR. ANGUAS:  My understanding is that Mr. Trump is a

23   common Plaintiff across all three of the cases, and I don't

24   know whether the other secondary Defendants -- excuse me --

25   secondary Plaintiffs are shared across the three cases.  But I

1   do know Mr. Trump is the lead Plaintiff and designated class

2   representative or putative class representative across all

3   three of the cases.

4           THE COURT:  What do you say to that?

5           MR. KELLY:  Judge, first of all, if you were so

6   inclined, we might ask the Court to entertain lifting the stay

7   on the YouTube litigation, also, since it's been brought up

8   by --

9           THE COURT:  I don't have YouTube, do I?

10          MR. ANGUAS:  No, Your Honor.  It's before a different

11  judge in this court.

12          MR. KELLY:  And one other thing, I'd just point out

13  that although the Government was the defendants in the

14  *Missouri* and *Louisiana* cases, the solicitor general in August,

15  when arguing for a stay, stated that social media platforms

16  can be held liable for violating the First Amendment simply by

17  modifying content at the Government's request.

18          THE COURT:  Say that again.

19          MR. KELLY:  The solicitor general was arguing for a

20  stay on the Fifth Circuit ruling by stating that not only was

21  the Government being handcuffed by the state but that with the

22  findings in the Fifth Circuit that private social media

23  platforms could be held liable also just by acting on the

24  recommendation of Government actors, in effect conceding that

25  social media platforms are in the same posture as the

1   Government in terms of Government action.  It takes two to

2   dance, two sides of the same coin.

3           THE COURT:  I'll give you an example.  Let's say

4   that -- I'll ask you for a hypothetical.  Let's say that the

5   police go to Meta and -- or any of these, Twitter, and they

6   say, "Look, you've got somebody on your website who is a drug

7   dealer and is using your platform to gin up drug dealers and

8   is selling fentanyl, is selling terrible drugs to children."

9           So your view would be that if Meta, on its own, after

10  getting that information, cancels that account, that violates

11  the First Amendment?  How could that be?

12          MR. KELLY:  Well, first of all, I don't think the

13  police would be considered Government actors under that

14  situation.

15          THE COURT:  They are Government actors.  Aren't the

16  police -- if you don't go with the police, take the FBI, then.

17  Let's say the FBI did it.  Of course all of them are

18  Government actors.

19          MR. KELLY:  I think Facebook has procedures in place

20  for subpoenas being issued and turning over the information.

21  So the police can act on it, but --

22          THE COURT:  If the Government coerces somebody and

23  says, "We're going to sue you," or, "You better do this or

24  else," okay, that's one thing.  But if the Government simply

25  puts out its own information and Meta then acts based on that,

1   makes its own decision, how can that be a violation of the

2   First Amendment?

3          MR. KELLY:  Well, if there's no indication that

4   Facebook did anything other than make its own decision, then

5   that's it if it doesn't involve First Amendment rights.  I

6   don't think drug dealing is a protected speech under our

7   Constitution, Judge.  But I would point out that Facebook and

8   the social media platforms were empowered to sort of

9   self-police by Section 230.  And, you know, they can act on

10  their own, but First Amendment rights and censorship is a

11  different issue.

12         I actually lost my train of thought a little bit,

13  Judge.

14         THE COURT:  Well, let's say the President of the

15  United States calls up Meta and says, you know, "Be careful

16  about this account.  They've got -- we don't think their

17  information is correct."  And then Meta says, "Well, okay."

18  They do their own inquiry and decide that the President is

19  right.  And so they -- is that a First Amendment violation if

20  they take down the account?

21         MR. KELLY:  It very well could be, Judge.

22         THE COURT:  How come?  How could that be?  It's a

23  voluntary action by Meta.  And the Government, let's say, is

24  doing a good thing and --

25         MR. KELLY:  Whether Meta thinks they're doing a good

1    thing is not up to --

2          THE COURT:  It's not up to a court to tell somebody

3    what's good or bad; it's that Meta makes its own decisions.

4    Now, if there's coercion on the Government saying, "Take down

5    that account or else we're going to put you in jail," okay, I

6    could see that being a First Amendment violation.

7          But if the Government is simply putting out

8    information that leads a private actor to take action, I

9    question whether that can be, ever, a First Amendment

10   violation even with 230 or not with 230.

11         MR. KELLY:  I don't think so, Judge.  And coercion

12   can take many forms.  And with major social media platforms,

13   especially Facebook, the -- more than coercion, it's been sort

14   of cooperation and economic fear that they're going to face

15   repercussions if they don't act on the Government

16   recommendations.

17         Nobody's being, you know, arrested.  No one has a gun

18   to their head.  But maybe they'll make 6 billion less the next

19   year defending libel suits or something because they let

20   certain things be posted or participated in it.

21         MR. ANGUAS:  May I respond, Your Honor?

22         MR. KELLY:  Judge, I don't know if -- I'm obviously

23   not nailing the answer to the question you're looking for.

24         THE COURT:  You're not really answering my question,

25   because the -- if somebody brings a libel suit, that's a

1    private -- again, private action.  And a private actor in

2    Meta's position can make its own decisions about the best --

3    you know, how the risk -- to manage the risks.  But that

4    doesn't transform it into a First Amendment.

5            All right.  Go ahead.  What's your point?

6            MR. ANGUAS:  I think Your Honor's hit it right on the

7    head that there is no state action here.  And we -- in our

8    first Motion to Dismiss the First Amended Complaint, we

9    explained why, under the facts as alleged in that First

10   Amended Complaint, there is no state action.

11           The *Twitter* case, again, addresses the very questions

12   that we're talking about:  the metes and bounds of private

13   action and when it can and cannot be converted into state

14   action through compulsion or otherwise.

15           And so, again, sort of on the narrow question before

16   us now of whether to proceed with a Second Amended Complaint,

17   I think the colloquy that the parties and the Court have been

18   having underscore why those issues are precisely teed up in

19   that case.

20           THE COURT:  To what extent is the *Missouri* case

21   possibly going to impact the *Twitter* case?

22           MR. ANGUAS:  The *Missouri* case has been -- cert's

23   been granted, and so there may be an opportunity there for the

24   U.S. Supreme Court to weigh in on the issues there.  But

25   again, I think the fact that that case is against private --

1    excuse me -- public officials as defendants makes it not

2    squarely on all fours with what we have here.

3          Now, the Court may address the State Action Doctrine

4    there, but the Ninth Circuit has not indicated, formally or

5    otherwise that I'm aware of, that they're planning to hold the

6    decision pending the *Missouri* proceedings in the U.S. Supreme

7    Court, if that's --

8          THE COURT:  That's what I'm getting at.  I -- but

9    does the -- does the circuit court put out a statement that

10   they're holding it pending what goes on in the Supreme Court,

11   or do they just -- they just sit back and decide internally,

12   We're going to hold it and see what the Supreme Court says?

13         MR. ANGUAS:  I couldn't answer that, Your Honor, as

14   to what the -- whether there would be a formal notice or not.

15         THE COURT:  But do you know --

16         MR. KELLY:  I don't know for sure, but just based on

17   the little common sense and experience, I don't remember any

18   circuit court saying they're going to hold off on a decision

19   until the Supreme Court rules that will give them guidance.

20         MR. ANGUAS:  Your Honor, that's all the more reason.

21   If -- if the Supreme Court, in *Missouri v. Biden,* is going to

22   offer clarification, refinement, whatever word we want to use,

23   on the scope of the State Action Doctrine, that's all the more

24   reason why a Motion to Dismiss briefing now is not an

25   efficient course if we're going to see additional decisions

21-CV-9044                                                                29

1    that bear on these issues.

2            MR. KELLY:  Judge, that could go on forever, you

3    know, waiting for decisions that might have some bearing on

4    some of the issues in these cases.

5            MR. ANGUAS:  And that's not our ask, Your Honor.  Our

6    ask is to hold for the Ninth Circuit decision, which is now

7    submitted and has been briefed --

8            THE COURT:  Well, my concern is that the judges on

9    the Ninth Circuit are going to be saying, "Okay, the *Missouri*

10   case is now in the Supreme Court.  And the way we've written

11   our draft order, we might get sideswiped by the Supreme Court.

12   So we better wait and hold it and see how the Supreme Court

13   rules on the *Missouri* case."

14           So then they -- without telling anyone that they were

15   going to wait, they just wait.  Now, if that were to happen,

16   then the delay -- there would be even more delay in moving

17   this case forward.

18           I, though, question what you can say in an amended

19   complaint that would -- so you're not only asking -- you're

20   asking me to gin up, get all my chambers -- you know, you

21   probably have a bigger law firm than I have.  My law firm is

22   one person sitting right over there, and she's got 200 other

23   cases.

24           So you're asking her to work night and day on a case

25   that could be completely moot just so -- that really is -- and

1    it's in a cock-eyed situation with a class action that sounds

2    like it can't really ever be a class action.

3          So it's more than just one individual seeking justice

4    from Meta.  It's a nationwide class with a -- with a group of

5    people that may not be qualified to be class representatives

6    because of their unique situations.  I don't know.  Why are

7    we -- the application's been around for two years.  I agree.

8    That's your best point.

9          MR. KELLY:  Two and a half, probably.

10         THE COURT:  Two and a half, okay.  Although, you

11   haven't -- you haven't come in here before and asked me.  This

12   is your first attempt to ask me to do anything.

13         So, okay, here's what I'm going to do.  Are you

14   ready?  I'm not going to say yes.  I'm going to require you to

15   do more.  Here's what you can do:  You can file a motion.

16   This is not -- this is -- you can file a motion to be allowed

17   to file a -- what is it?  Second Amended Complaint? -- Second

18   Amended Complaint.  And you lay out the entire Second Amended

19   Complaint -- 42 pages, 89 pages, whatever it is -- and you

20   address all the points that you think we've raised here today

21   that could be of concern.

22         And then in addition to what your pleading would

23   be -- so you would actually have the pleading -- tell us who

24   the Plaintiffs are now --

25         MR. KELLY:  As in Exhibit 2D?

1          THE COURT:  Yeah, as an exhibit.  It won't accepted

2   yet for filing; it would just be what you propose to file.

3   And then you explain in the motion, "Here's how we address all

4   these concerns about mootness, about *Missouri*, about delay,

5   about class action," and -- and especially address why you

6   want us to spend so much time and effort with motions to

7   dismiss when we know for sure the Ninth Circuit is going to

8   have a decision eventually that will address at least some of

9   the issues -- some of the important issues in the case.

10          So -- and why -- why it wouldn't -- in other words,

11   you've got to convince me that -- but so far you haven't even

12   drafted the complaint.  It would be a gamble for me to say,

13   "Okay, just go ahead and file it."  No.  That would be crazy

14   for me to do that.

15          I would like to see what you propose to file in a

16   formal motion and address those jurisprudential points about

17   why we shouldn't wait.  That would be filed on a normal 35-day

18   track, and then the Defendant -- is there one Defendant or two

19   Defendants?

20          MR. ANGUAS:  Two Defendants, Your Honor:  Meta

21   Platforms and Mark Zuckerberg.

22          THE COURT:  You get to file a response, and then you

23   get to file a reply.  And then we'll come back here 35 days

24   after you file the motion to have another argument over it.

25   And I'm not saying I would grant it.  I might -- in fact,

21-CV-9044                                                                        32

1   right now, I'm probably leaning to not let you file it and

2   wait.  But maybe, maybe you have some reasons for going ahead

3   that are better than I see right now.

4          His account has been restored, so is it really

5   plausible that President Trump, who is as vigorous a person as

6   could possibly exist, is afraid of his shadow and will be

7   chilled in his -- what he says on the platform?  I rather

8   doubt it.

9          But there could be other considerations that would be

10  more persuasive than he would be chilled.  That's not too

11  persuasive, is it?  Do you really think?

12         MR. KELLY:  My apologies to your law clerk.

13         THE COURT:  Well, it's a lot of work.  These young

14  people, do you know how long they work?  They work until

15  2:00 a.m., not on this -- to this instance but on other cases.

16  They work, work, work, work.  And I do, too, but not until

17  2:00 a.m. anymore.  But it's a -- we've got limited resources.

18         MR. KELLY:  I understand.

19         THE COURT:  And we have 200 cases to work on.  Some

20  of them are criminal cases where people are going to go to

21  prison, maybe.  And it's important that we do justice in those

22  cases.  So it's not -- it's a big ask, whatever you -- in a

23  complicated case, class action, that's going to require a lot

24  of briefing.  We have to get into it.  It's not a small thing.

25         So on the other hand, you did file the lawsuit.  And

1    I -- it's not -- you know, I've got to do my job, and my job

2    is I can't shrink away from doing work just because it's work.

3    No.  That wouldn't be right either, would it?

4              So -- all right.

5              MR. KELLY:  I'm feeling guilty right now, Judge.

6              THE COURT:  Yes.  You should.

7         (Simultaneous cross-talking.)

8              THE COURT:  Don't feel too guilty but feel some

9    guilt.

10             MR. KELLY:  And I apologize to your law clerk again.

11   I appreciate the quality of work they do, too.

12             THE COURT:  Now, if I was in your position and I was

13   writing this up, I would have that complaint lay out every

14   fact that you could possibly allege in good faith, if you got

15   it from the *Missouri* case or whatever, that would point the

16   finger at Meta and say that Meta has done something wrong

17   here, and not use generalities.  Because if it's just a bunch

18   of platitudes and blather, that's not going to be very

19   persuasive.  It won't advance things.

20             You're going to have to have some zingers in there

21   that really show that Meta has done something wrong and -- so

22   be -- put some work into it.  See, now I'm putting the work

23   back on you.  I could just see you now.  You're going to go

24   back --

25        (Simultaneous cross-talking.)

1        THE COURT:  You're going to say to your -- the guy

2   who had the family emergency, "So now you've got to do some

3   real work.  It's going to take you many hours, and maybe the

4   Judge is not going to allow it anyway.  Do you really want to

5   go forward with this?"

6        Also, I want you to say in your motion whether you

7   will forego future -- I'm not holding you to anything you said

8   today.  I'm just -- but you've got to say something in your

9   brief.  "Judge, if you'll allow to us do this now, in the

10  future, we will never ask for another amendment no matter what

11  the Supreme Court says.  No matter what."  See?  Now, to me,

12  that would be a gamble.  I'm not sure I would want to take

13  that gamble, but you said it earlier.

14       MR. KELLY:  I know.

15       THE COURT:  You think about it.  Talk to Mr. Big and

16  find out if they want to take that gamble.  But I would like

17  to know, because here's the thing:  If I'm going to have to go

18  through all this and then the Ninth Circuit comes out again

19  and then you come back and say, "Oh, Judge, here's this

20  paragraph in the Ninth Circuit decision.  We can meet that --

21  just let us amend to meet that," then I will say no.  You told

22  me -- I'm not going to go -- I don't want to go through it

23  twice.

24       MR. KELLY:  I understand.

25       THE COURT:  So you need to address that problem.

1   That's the best point Meta has made all day is that we will

2   wind up having to do it twice and maybe, with the Supreme

3   Court, three times.  And I don't want to do that.  Let's just

4   do it once.

5           MR. ANGUAS:  Your Honor, may I -- one question on the

6   scope of the briefing?

7           THE COURT:  Sure.

8           MR. ANGUAS:  If Plaintiffs are going to be filing a

9   Motion for Leave to Amend, I just wanted to make clear that in

10  our opposition, we wouldn't be addressing sort of the

11  substantive motion-to-dismiss arguments under a futility

12  standard.  We'd be reserving the right to file a motion to

13  dismiss if the complaint --

14          THE COURT:  You have that choice.  You don't have to

15  address the merits.  That will be for Rule 12.  But if you

16  felt it would be a good point to make, then, sure, you can

17  address it.  But I'm more interested in the jurisprudential

18  points.  But I do want to see the substance of the allegations

19  and how it would -- how it would -- all right.

20          MR. ANGUAS:  Understood.

21          THE COURT:  That's the most damage I can do in one

22  day.

23          MR. KELLY:  I feel like I'm walking out of here with

24  my pockets turned inside out having to give up all these

25  things, Judge.

1           THE COURT:  You haven't given up anything yet.  You

2    haven't given up anything yet, but you do feel guilty.  That

3    law clerk over there, she's got so much to do and --

4           (Simultaneous cross-talking.)

5           THE COURT:  Just remember that.  All of you in the

6    courtroom remember that.

7           Meta, too, because you're the ones that -- you're the

8    biggest litigator in this whole courthouse, I think, is you

9    and Google.

10           So . . .

11           MR. KELLY:  Thank you, Judge.

12           THE COURT:  All right.  Good luck.  Thank you.

13           MR. ANGUAS:  Thank you, Your Honor.

14      (Proceedings concluded at 12:52 p.m., November 2, 2023.)

15                  *       *       *       *       *

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3            I, MEGAN E. STRAWN, Federal Official Court Reporter

4    for the United States District Court for the District of

5    Wyoming, a Registered Professional Reporter and Certified

6    Realtime Reporter, do hereby certify that I reported by

7    machine shorthand the proceedings contained herein on the

8    aforementioned subject on the date herein set forth, and that

9    the foregoing 36 pages constitute a full, true, and correct

10   transcript.

11           Dated this 20th day of November 2023.

12

13

14

15                 _____/s/ Megan E. Strawn_____

16                      MEGAN E. STRAWN
                   Registered Professional Reporter
17                   Certified Realtime Reporter

18

19

20

21

22

23

24

25